**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KATRINA BERGER** individually and on behalf of herself and all others similarly situated, | Case No. 1:22-cv-7374 |
| | **CLASS ACTION** |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | |
| **JETBLUE AIRWAYS CORPORATION** and **AMERICAN AIRLINES GROUP INC.**, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Katrina Berger (the "Plaintiff"), on behalf of herself and all others similarly situated, allege the following Class Action Complaint (the "Action") for actual damages, treble damages, declaratory and injunctive relief, costs of suit, pre- and post- judgment interest, and other relief upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel as follows:

## I.   NATURE OF THE ACTION

1.   This is an action under the Sherman Antitrust Act to restrain the anticompetitive conduct of Defendants, JetBlue Airways Corporation ("JetBlue") and American Airlines Group Inc. ("American Airlines") (collectively, "Defendants") to remedy the effects of Defendants' unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to consumers who purchased airline tickets from Defendants.

2.   In 2019, Defendants JetBlue and American Airlines began to discuss what the United States Department of Justice ("DOJ") and several states attorneys' general would, in their own lawsuit against the Defendants, call "a modern-day version of a nineteenth-century business trust" that harms consumers to the tune of $700 million annually. The agreement, which eliminates head-to-head competition between JetBlue and American Airlines at four of the largest airports in the United States (Boston Logan, New York-LaGuardia, New York-Kennedy, and Newark-Liberty Airports), leads to supracompetitive prices for consumers, like Plaintiff Berger, and the members of the Class, who bought airline tickets from JetBlue and American Airlines after the agreement was formally entered into on July 15, 2020.

3.   According to the DOJ, the agreement coined the Northeastern Alliance (the "Alliance") "commit[s] to pool revenues and coordinate 'on all aspects' of network planning at

Boston Logan, JFK, LaGuardia, and Newark Liberty airports, including deciding together which routes to fly, when to fly them, who will fly them, and what size planes to use… In addition… Defendants [commit] to pool and apportion revenues earned on flights to and from the four airports such that each partner earns the same revenues regardless of whether a passenger flies on an American or JetBlue plane." Additionally, a series of other agreements went along with these restraints, including, according to the DOJ, "a [codesharing agreement], through which American and JetBlue have agreed to market each other's flights to and from the four airports, as well as potentially other flights that have yet to be determined. American and JetBlue have also agreed to pool their "slots" at JFK and LaGuardia, which are takeoff and landing authorizations issued by the Federal Aviation Administration."

4.      The DOJ and the plaintiff states continue, "[t]hese kinds of restraints of trade – agreements between competitors to coordinate on output or to share revenues – are often condemned as *per se* illegal because they have the same tendencies to increase prices and reduce output as explicit horizontal agreements on price… Moreover, Defendants can raise fares simply by one of them exiting a market where it competed against the other, and then share in their-now ally's increased profits." The DOJ concludes, as this Action does, that the "Alliance is anticompetitive and unlawful as a whole, and the output coordination and revenue-sharing restraints present particular competitive concerns due to their inherently anticompetitive nature."

5.      As such, Plaintiff Berger and the members of the Class bring this Action for damages, trebled damages, injunctive relief, and reasonable attorneys' fees against Defendants JetBlue and American Airlines due to their *per se* violation of the Sherman Antitrust Act.

**II.      JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26), because Plaintiff alleges violations of federal law.

7.      This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, **are** be found in and transact business this District. Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of airline tickets to consumers, like Plaintiff Berger, and the members of the Class.

8.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain their principal place of business, business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III.    PARTIES

### *Plaintiff Katrina Berger*

9.      Plaintiff Katrina Berger is a natural person and a resident of the state of New York.

10.     Plaintiff Katrina Berger is a direct purchaser of flights from JetBlue – and has used their services at least once during the proposed Class Period, including on flights originating out of and returning to New York's airports. Plaintiff Katrina Berger has paid JetBlue directly either through JetBlue's mobile application or through the JetBlue website for her tickets purchased in order to travel on these respective flights.

### Defendant JetBlue Airways Corporation

11.     Defendant JetBlue is a Delaware corporation with its headquarters located in Long Island City, New York. In 2019, the last full year before the establishment of the Alliance, JetBlue made roughly $8 billion in revenues.

### Defendant American Airlines Group, Inc.

12.     Defendant American Airlines is a Delaware corporation with its headquarters located in Fort Worth, Texas. In 2019, the last full year before the establishment of the Alliance, American Airlines made roughly $45 billion in revenues.

## IV.    FACTUAL ALLEGATIONS

### A.  Defendants' Businesses

#### JetBlue Airways Corporation

13.     JetBlue is a New York-based corporation and markets itself as a low-cost airline carrier providing flights to consumers both domestically and internationally.

14.     JetBlue's operations in New York are robust for a relatively new airline (as compared to Delta, United, and American Airlines). According to JetBlue's 2021 Annual Report, JetBlue calls itself "New York's Hometown Airline" as "approximately one-half of [JetBlue's] flights originate or are destined for the New York metropolitan area." According to JetBlue in the same report, through the Alliance, "[JetBlue] expects to offer nearly 300 daily departures at JFK, with JetBlue operating approximately 200 flights [and American operating the other 100]."

15.     JetBlue is also "the largest carrier at Boston's Logan" and that "[t]ogether with American, the [Alliance] will offer more than 200 daily departures at Boston, serving 46 of the top 50 U.S. mainland markets from Boston."

#### American Airlines Group, Inc.

16.     American Airlines is a Texas-based corporation and is the largest airline both domestically and internationally; additionally, American Airlines provides flights to consumers both domestically and internationally.

**B.  Relevant Market**

17.     Insofar as Plaintiff is required to plead the relevant product and geographic market to establish the antitrust violations alleged here, Plaintiff allege the relevant markets at issue and have pled how Defendants' conduct has harmed competitive processes in these markets.

18.     The relevant market in this Action is the market for airline flights out of airports in the United States.

19.     Millions of consumers originating out of Boston Logan, JFK, LaGuardia, and Newark airports depend on the airline industry to be able to travel both domestically and internationally. These consumers depend on competition among the airlines who fly out of these respective airports to drive innovation, cost competition/affordability, consumer choice, and quality of service.

20.     Even the Defendants know this.

21.     Indeed, prior to the Alliance, JetBlue was known in the airline industry for continually lowering fares in order to attract consumers shopping for affordable flights out of the aforementioned airports. For example, initially when JetBlue began service from JFK and Boston Logan in the early 2000's, JetBlue's persistent lowering of fares caused competitors to also lower theirs as well – leading to something that travel industry gurus called the "JetBlue effect."

22.     Prior to the Alliance, and as a result of JetBlue's price competition, JetBlue gained significant market share; for example, JetBlue became the number one airline originating out of Boston Logan airport – and this was due in part to low fares for consumers; according to the DOJ,

in 2019, JetBlue calculated that it had saved consumers flying in and out of Boston more than $3 billion since it began serving the airport in 2004.

23.      However, overtime, JetBlue's attitude toward lowering fares changed – marked, in part, by the establishment of the Alliance in 2020. As JetBlue began to realize that it was gaining market share, JetBlue became more willing to raise prices on consumers – who had reduced choice of flights due to JetBlue's increasing size. And, with the establishment of the Alliance and with American Airlines being the largest airline in the world, JetBlue gained access to even more slots (take-off-and-landing authorizations) at each of the four aforementioned airports, giving JetBlue an even larger share of control over the consumers who fly out of the four aforementioned airports, reducing competition, and giving the Defendants the ability to raise prices to supracompetitive levels.

24.      The Relevant Market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

25.      Here, the SSNIP test is satisfied and the market is properly defined. As described above and below, pursuant to the Defendants' agreement, consumers overpay hundreds of millions of dollars annually due to the Alliance's propensity to raise prices, throttle competition and reduce consumer choice, and yet those increases have not driven enough consumers out of the market such that the SSNIP has become unprofitable to Defendants.

### C.  Geographic Market

26.     In this Action, the Geographic Market is the entirety of the United States – as the anticompetitive effects of the Alliance can be felt throughout the country.

27.     While this Action is focused on Plaintiff and Class Members, who are airline customers of JetBlue and/or American Airlines who flew out of Boston Logan, JFK, LaGuardia, and Newark from the creation of the Alliance through the present, the Alliance impacts a much broader swath of the economy and interstate commerce than just the immediately visible higher prices for consumers originating from those four airports.

### D.  Defendant's Alliance

28.     Prior to the Alliance, in 2019, JetBlue had the fourth largest market share for flights to and from the northeastern United States (16% of capacity) and American Airlines had the largest market share for flights in the same region (21% of capacity).

29.     On July 16, 2020, the Defendants' announced, in relevant part, the Alliance via Press Release:

> **NEW YORK & FORT WORTH, Texas--(BUSINESS WIRE)--JetBlue Airways Corp. (NASDAQ: JBLU) and American Airlines Group Inc. (NASDAQ: AAL) today announced a strategic partnership that will create seamless connectivity for travelers in the Northeast and more choice for customers across their complementary domestic and international networks. In addition, the relationship will accelerate each airline's recovery as the travel industry adapts to new trends as a result of the pandemic.**
>
> **The partnership includes an alliance agreement that proposes codeshare and loyalty benefits that will enhance each carrier's offerings in New York and Boston, providing strategic growth and driving value for customers and crewmembers of both airlines.**

30.     The Defendants touted the new partnership and released infographics to show the full details of what was foreseen by the Defendants in terms of the Alliance's benefit for consumers of the two airlines:



31.     However, these infographics failed to discuss the reductions in competition – specifically for consumers for the affected routes as well as the price of airfares by the two Defendants – and how those reductions in competition between the Defendants would harm consumers. While the infographics touted the Alliance's alleged proclivity to "create[] more competitive options and choice for consumers in the northeast[ern United States]" it failed to discuss the harms caused by the Defendants' new combined market share in the northeastern United States and how those harms would actually lead to fewer options and higher prices for consumers.

32.     Combined, the two entities now represent and/or represented at least a 37% market share for flights to and from the northeastern United States.

### *The Department of Transportation's Review of the Alliance*

33.     Upon information and belief, the Alliance between the Defendants was first formed or discussed between the Defendants in 2019.

34.     On or about July 22, 2020, American Airlines and JetBlue submitted to the Department of Transportation "cooperative agreements, including code-sharing and alliance agreements" for review under 49 U.S.C. 41720**,** which requires each of the major air carriers who entered into the agreement to submit a copy of the agreement and related materials to the Secretary of Transportation at least 30 days before the agreement takes effect. Under 49 U.S.C. 41712, "[t]he Department [of Transportation] retains independent statutory authority under 49 U.S.C. 41712 to prohibit unfair methods of competition in air transportation to further its statutory objectives to prevent predatory or anticompetitive practices and to avoid unreasonable industry concentration."

35.     On August 5, 2020, the Department of Transportation extended the waiting period for the code-sharing agreement to take effect from 30 days from July 22, 2020 (August 22, 2020) to November 19, 2020. Ultimately, the Department did not render a decision based on the legality of the Alliance, allowing the Alliance's code-sharing agreement to take effect.

36.     The reasons for this, according to the Department of Transportation, are two-fold: first, because the Department of Transportation stated that "the Department intends to defer to DOJ, as the primary enforcer of Federal antitrust laws" to resolve the antitrust concerns that the DOJ has identified with respect to [the Alliance] and, second, because Section 41720 "does not provide the Department authority to approve or disapprove agreements submitted for review under that section; rather, the section gives the Department a limited period of time to review the

agreements before such agreements may take effect. DOJ, which is responsible for enforcing Federal antitrust laws and has also been conducting its own review of the [Alliance], had not concluded its investigation at the time DOT's review period ended… In this context, DOT's review of the [Alliance] under Section 41720 was not designed to approve or disapprove the alliance."

37.    The Department of Transportation, during the limited window it had to be able to review the Alliance, was able to reach an agreement for minor concessions by American Airlines and JetBlue but stated that the agreement "did not address all of the Department's concerns resulting from the [Alliance]'s impacts on competition, but instead sought concessions from the carriers that were intended to mitigate some of the anticompetitive harm while providing a means for monitoring the [Alliance's] implementation."

38.    Critically, "[t]he parties to the [Department of Transportation Agreement] recognized that the [A]lliance was still subject to the antitrust laws, that DOJ was continuing its review, and that DOT retained its authority to remedy any anticompetitive harm." Historically, under 49 U.S.C. 41712, the Department of Transportation "prohibits anticompetitive conduct that (1) violates the antitrust laws, (2) is not yet serious enough to violate the antitrust laws but may well do so if left unchecked, or (3) although not a violation of the letter of antitrust laws, is close to a violation or is contrary to their spirit." *See, e.g. ASTA v. United et al.*, DOT Order 2002-9-2 (Sept. 4, 2002); citing *E.I. DuPont de Nemours and Co. v. Federal Trade Commission*, 729 F.2d 128, 136-137 (2d Cir. 1984).

### E. *Spirit Airlines and Others Complain About the Alliance to the Department of Transportation*

39.    On January 7, 2021, Spirit Airlines filed a formal complaint with the Department of Transportation regarding the Alliance. *Complaint of Spirit Airlines, Inc.*, Docket No. DOT-

OST-2021-0001. Additionally, Spirit claimed that the information disclosed about the Alliance to the public was insufficient during the Department of Transportation's review and that "the remedies agreed to in the Department of Transportation Agreement [between the DOT, JetBlue and American Airlines] were insufficient to address anticompetitive concerns." The Spirit Airlines complaint led to other groups filing public comments about the Alliance being anticompetitive, including other airlines, an airline association, a non-profit focused on competition, and a consumer advocacy organization. However, these comments were filed after the public release of the agreement made between the DOT, JetBlue and American Airlines.

40.     The DOT stayed the proceedings in *Complaint of Spirit Airlines, Inc.* while the DOJ's action proceeded.

### F.  *Department of Justice and Several States Attorneys General Sue to Stop the Alliance*

41.     On September 21, 2021, the Department of Justice, along with the State of Arizona, the State of California, the District of Columbia, the State of Florida, the Commonwealth of Massachusetts, the Commonwealth of Pennsylvania, and the Commonwealth of Virginia sued American Airlines and JetBlue under Section 1 of the Sherman Act, stating "[t]he United States and Plaintiff States bring this action to prevent harm to consumers that will occur once the [Alliance] is fully implemented[.]" *United States of America, et al. v. American Airlines Group Inc. and JetBlue Airways Corporation*, Case No. 1:21-cv-11558 (D. Ma., filed Sept. 21, 2021), ECF No. 1 (the "DOJ Complaint").

42.     The DOJ Complaint states that "[b]y consolidating [Defendants'] businesses in this way, American and JetBlue will effectively merge their operations on flights to and from the four airports… In so doing, the Northeast Alliance will eliminate significant competition between American and JetBlue that has led to lower fares and higher quality service for consumers traveling

to and from those airports. It will also tie JetBlue's fate to that of American, diminishing JetBlue's incentives to compete with American in markets across the country. The United States and Plaintiff States bring this action to prevent the hundreds of millions in harm to consumers that will occur if these two rivals are permitted to maintain this [Alliance.]"

43.     As the DOJ complaint states, American Airlines, which is the largest airline domestically and internationally, is led by management which has "long been a 'proponent of consolidation in the industry'" and that "'domestic consolidation' remains one of American's 'long term projects.'" Indeed, internally, the DOJ reports that American Airlines' former CEO and current Chairman Doug Parker has been referred to as "the Godfather of consolidation," having led numerous mergers previously – as CEO of America West, Parker led a merger with US Airways; as CEO of US Airways, Parker led a merger with American Airlines; and now, at American Airlines, Parker has engaged in the Alliance as described herein, what the DOJ calls a "modern-day version of a nineteenth-century business trust."

44.     JetBlue, being a smaller airline with a slimmer market share than American Airlines, has opposed consolidation before the alliance. JetBlue's CEO stated two years before the alliance that consolidation "has come at a cost to consumers. Just look at the fares in some of the fortress hubs and in some of the legacy-dominated markets without low-fare competition. Chances are, you'll see fares that are higher than they should be and in that construct there's very little incentive to provide great service or to innovate."

45.     The DOJ Complaint survived a Motion to Dismiss by the Defendants, with the Court stating in relevant part: "the [Alliance] at issue between American and JetBlue is likely to harm competition in the relevant markets, and that American and JetBlue control a significant share in an already concentrated market." ECF No. 106, (Sorokin, J.).

46.     In September 2022, one year after the DOJ and Plaintiff states initiated their challenge to the alliance, the trial began in Judge Sorokin's courtroom in September of 2022. At the trial, the DOJ and the Plaintiff States' attested to government economists' estimates that consumers would be harmed to the tune of $700 million annually and that, because of JetBlue's removal as a low-cost carrier, that other airlines would be less incentivized to participate in price competition after JetBlue's Alliance with American Airlines.

47.     The trial in this matter concluded on November 18, 2022, after an 18-day bench trial in front of Judge Sorokin. ECF No. 327.

### G.  The Alliance is Anticompetitive and Causes Antitrust Injury

48.     The Alliance will combine JetBlue and American Airlines' respective market share at the four airports that are highlighted by this Action – JFK, LGA, EWR and BOS. At JFK and LGA. Prior to the Alliance, JetBlue already had the largest market share at BOS, which only grew with the agreement between Defendants to enter the Alliance.

49.     Specifically, the DOJ testified at trial that for routes between Boston and 12 major airports, that the Defendants have a combined revenue share of over 49.8% for each of those routes as listed below:

(a)     Boston – Charlotte: 96.1% (combined revenue share)

(b)     Boston – Chicago: 48.5%

(c)     Boston – Dallas: 83.6%

(d)     Boston – Los Angeles: 62.6%

(e)     Boston – Miami: 76.5%

(f)     Boston – New York City (JFK or LGA): 49.8%

(g)     Boston – Philadelphia: 86.8%

      (h)      Boston – Phoenix: 85.2%

      (i)      Boston – Rochester: 86.2%

      (j)      Boston – Syracuse: 82.1%

      (k)      Boston – Washington D.C. (DCA): 88%

50.      Each of these revenue shares is anticompetitive under the conventional HHI test, which measures market concentration and potential for anticompetitive conduct.

51.      Additionally, the DOJ testified at trial that for routes between JFK/LGA or EWR and 18 major airports, that the Defendants have a combined revenue share of over 31% for each of those routes as listed below:

      (a)      New York (JFK/LGA) – Austin: 44.6%

      (b)      New York – Charleston: 43.6%

      (c)      New York – Chicago: 36.2%

      (d)      New York – Las Vegas: 46.5%

      (e)      New York – Los Angeles: 57%

      (f)      New York – Martha's Vineyard: 92.5%

      (g)      New York – Miami: 55.9%

      (h)      Newark – Miami: 31%

      (i)      New York – Nantucket: 96.8%

      (j)      New York – Orlando: 55.3%

      (k)      New York – Phoenix: 61.5%

      (l)      New York – Portland: 37.4%

      (m)      New York – Raleigh-Durham: 47.8%

      (n)      New York – San Diego: 44.7%

      (o)     New York – San Francisco: 45.7%

      (p)     New York – Savannah: 46.5%

      (q)     New York – West Palm Beach: 60%

52.    Each of these revenue shares is anticompetitive under the conventional HHI test, which measures market concentration and potential for anticompetitive conduct.

53.    In 2019, prior to the Alliance, the general, non-route specific market share of each of the two airlines in the New York City and Boston metro areas were as follows:

      (a)     New York City:

           (i)     JetBlue: 24%

           (ii)    American Airlines: 16%

      (b)     Boston:

           (i)     JetBlue: 35%

           (ii)    American Airlines: 16%

54.    Thus, the combined market share in 2019 of the two previously independent entities is as follows:

      (a)     New York City:

           (i)     JetBlue and American Airlines: 40%

      (b)     Boston:

           (i)     JetBlue and American Airlines: 51%

55.    These dominant market shares that are highlighted by this Action allow the Defendants to dictate flight availability, fare pricing, and other variables at these respective airports.

56.     Competition and consumers alike are harmed as a result of the Alliance – including but not limited to the following effects: the Alliance eliminates head-to-head competition between the Defendants, reducing consumer choice as well as price competition in the market generally, and increases the likelihood of anticompetitive coordination.

57.     Ironically, this is articulated by the Defendants themselves when examining the threat of other airlines doing the same as what the Defendants did in the Action as alleged herein with respect to the Alliance: American Airlines, in their 2021 Annual Report, discusses how "additional mergers and other forms of industry consolidation" could harm American Airlines' bottom line and market share: "[d]epending on which carriers combine and which assets… our competitive position relative to the post-combination carriers or other carriers that acquire such assets could be harmed. In addition, as carriers combine through traditional mergers or antitrust immunity grants, their route networks will grow, and that growth will result in greater overlap with our network, which in turn could decrease our overall market share and revenues."

58.     This was also articulated by Defendants in deposition testimony and while at trial in the DOJ and Plaintiff States' case before Judge Sorokin:

(a)     Paul Swartz, American Airlines Regional Sales Manager, when asked "[s]o you no longer compete with JetBlue": "… yes."

(b)     Brian Znotins, American Airlines Vice President, Network & Regional Schedule Planning, when asked "[s]o you are no longer competitors [with JetBlue] on those [Alliance] routes from a network perspective": "Yes."

(c)     Robin Hayes, JetBlue CEO, when asked "[a]nd you would agree that, within the [Alliance], where the two airlines are coordinating capacity, JetBlue and American no longer compete with each other, correct?": "… we don't compete with each other directly."

(d)     Scott Laurence, American Airlines SVP of Partnership Strategy, when asked "[w]ith the [Alliance] in place, do you agree that the revenue sharing component means that it makes more sense to cooperate with American than compete?": "For [Alliance] routes, yes."

59.     The harm to consumers and to competition is well articulated by the Defendants' direct competitors in the Relevant Market. Some of the concerns articulated by competitors include harm to consumers (in the form of higher prices, reduced choice, and, subsequently, being priced out of the Relevant Market), the inability for new entrants into the market (because the Defendants control the available slots at airports which would be needed in order to viably compete with the Defendants), and other types of harm.

60.     For example, Spirit Airlines' antitrust complaint with the Department of Transportation was bolstered by economic analysis of how consumers would be impacted by the alliance. Generally, the analysis found that consumers would be harmed:

# The Strategic Partnership Is Likely to Harm Consumers

**A 5% fare benefit from the AAdvantage program is likely and would result in $383 million in higher costs for Air Travelers and the increase fares would price 2.7 million O&D passengers out of the air travel market.**

|       | Passengers Subject to Fare Increase | | Average Fare Increase | | Revenue Impact of Higher Average Fares | Passengers Lost Due to Higher Average Fares |
|-------|------------------------------------:|---|----------------------:|---|---------------------------------------:|--------------------------------------------:|
| Total | 37,476,531 | $ | 10.24 | $ | 383,767,385 | 2,712,778 |
| BOS   | 12,188,847 | $ | 9.54  | $ | 116,272,321 | 882,303   |
| JFK   | 24,404,280 | $ | 10.66 | $ | 260,202,725 | 1,766,530 |
| EWR   | 478,667    | $ | 8.79  | $ | 4,208,268   | 34,649    |
| LGA   | 404,737    | $ | 7.62  | $ | 3,084,071   | 29,297    |

61.     Specifically, Spirit Airlines did an analysis of how the Alliance would impact consumer pricing, and found that even marginal increases in airfares as a result of the Alliance would result in hundreds of millions of dollars of revenue for the Defendants on an annual basis:

# Impact of Higher Fares on Consumer Prices
(Increased revenue in millions, annually)

Given JetBlue's recent fare trends it is likely that the Strategic Partnership will increase fares in the range of 5% or more.  Each 1% increase will raise the cost to consumers by roughly $80 million annually

| Market | 1% Increase | 3% Increase | 5% Increase |
|--------|-------------|-------------|-------------|
| **Total** | **$ 81.2** | **$ 236.9** | **$ 383.8** |
| BOS | $ 24.6 | $ 71.8 | $ 116.3 |
| JFK | $ 55.1 | $ 160.6 | $ 260.2 |
| EWR | $ 0.9 | $ 2.6 | $ 4.2 |
| LGA | $ 0.7 | $ 1.9 | $ 3.1 |

- Given the scope of the Strategic Partnership and the leverage and market power of the AAdvantage program, an increase of 5% is likely if not conservative

62.     And, as a result of these increases in price, more consumers would be "priced out of the market" for airfare. Spirit Airlines also did an analysis of the effect of higher prices on consumer demand:

# Impact of Higher Fares on Consumer Demand
(Lost passengers in thousands, annually)

---

As price increases, more passengers will be priced out of the market.  For each 1% increase in price, slightly more than half a million travelers will be lost; the impact of the Strategic Partnership will negatively impact over 2.5 million.

| Market | 1% Increase | 3% Increase | 5% Increase |
|---|---|---|---|
| **Total** | **542.6** | **1,627.7** | **2,712.8** |
| BOS | 176.5 | 529.4 | 882.3 |
| JFK | 353.3 | 1,059.9 | 1,766.5 |
| EWR | 6.9 | 20.8 | 34.6 |
| LGA | 5.9 | 17.6 | 29.3 |

• The displaced demand of higher fares would normally present an opportunity for more efficient competitors to enter the market and satisfy that demand, but congestion at these airports limit effective new entry.

63.    Both of analyses by Spirit Airlines show the real impacts of the Alliance on consumers: higher prices leading to a decline in demand due to "more passengers being priced out of the market."

64.    Additionally, this has been the conclusion of the states' attorneys general and the Department of Justice who sued JetBlue and American Airlines over the Alliance. The DOJ and

the Plaintiff States testified at trial that the Alliance would cause up to $700 million in higher fares for consumers annually.

65.     Airline prices over the Class Period have far outpaced the rate of inflation, which, in part, may be due to unlawful agreements like the Alliance – this is direct evidence of consumer harm as a result of the Alliance. Additionally, during the Class Period, both Defendants JetBlue and American Airlines have cut routes and reduced the amount of planes in the air "in an effort to stabilize operations" – this is direct evidence that consumers are experiencing reduced output and diminished service quality.

66.     Specific to these consumers, however, the prices of airfares out of Boston Logan, LaGuardia, JFK and Newark Liberty have increased substantially from prior to the class period through the present day:



67.     Given that the quality of flights have not substantially improved, the Defendant's dominant market shares in the respective four airports (originating and arrivals via JFK, LaGuardia, Boston Logan and Newark-Liberty) at issue in this Action, and that the Alliance was supposed to foster competition and drive prices down (according to Defendants), there is no excuse beyond the implementation of the illegal agreement for why prices have made such a substantial leap in such a short time-span.

68.     These are the types of harms that the antitrust laws were intended to combat and prevent. Additionally, there are threats to consumers beyond just price and output. As stated by FTC Commissioner Lina Khan in her paper, *The Amazon Paradox*: "long-term interests of consumers include product quality, variety and innovation – factors best promoted through both a robust competitive process and open markets. By contrast, allowing a highly concentrated market structure to persist endangers these long-term interests, since firms in uncompetitive markets need not compete to improve old products or tinker to create [new] ones."

69.     Indeed, the antitrust laws were intended to prevent all of these types of harms caused by a lack of competition. Commissioner Khan's paper reveals discusses how the legislative history for the Sherman Act called "for diversity and access to markets [and in opposition to] high concentration and abuses of power." United States Senator John Sherman himself, the Senator from Ohio who was the architect of the Sherman Antitrust Act, stated: "[i]f we will not endure a king as a political power, we should not endure a king over the production, transportation, and sale of any of the necessities of life. If we would not submit to an emperor, we should not submit to an autocrat of trade, with power to prevent competition and to fix the price of any commodity."

70.     As such, Plaintiff Berger and the members of the Class bring this Action to rectify the harms as alleged herein.

### H. Defendants Profit from the Alliance

71.     The Defendants have profited substantially as a result of the Alliance.

72.     For example, in JetBlue's 2021 Annual Report, JetBlue states that they reached $100 million in gross codeshare revenue generated by the Alliance. In that same Annual Report, JetBlue states that they "continue to seek additional strategic opportunities through new commercial partners as well as assess ways to deepen existing airline partnerships, including the [Alliance.] We plan to do this by expanding codeshare relationships and other areas of cooperation such as frequent flier programs. We believe these commercial partnerships allow us to better leverage our strong network and drive incremental traffic and revenue[.]" If the goal of the Alliance was to provide lower fares to consumers, "driv[ing] revenue" directly clashes with that goal.

## V.     CLASS ALLEGATIONS

73.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> **Nationwide Class.** All direct purchasers of airline tickets going to or from BOS, LGA, JFK, and EWR from Defendants JetBlue and American Airlines from when the Alliance was officially established on July 16, 2020 through the present day (the "Class Period'').

74.     Numerosity. The Class is so numerous that joinder of all members in this action is impracticable. There are millions of members in the proposed Class who, like Plaintiff Berger, bought tickets from JetBlue and/or American Airlines directly during the proposed Class Period for flights which either originated from or landed at Boston Logan, JFK, LaGuardia, or Newark Liberty airport(s).

75.     Typicality. Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for flights than they otherwise would have in a normal, competitive market.

76.     Predominance. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

77.     Questions of law and fact common to the Class include:

(a)     Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of flights originating or landing in the aforementioned airports;

(b)     If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

(c)     If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply in the Relevant Market;

(d)     The proper measure of damages; and

(e)     The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

78.     Adequacy. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff is not antagonistic to the Class.

79.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VI.     CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF THE SHERMAN ANTITRUST ACT

### 15 U.S.C. 1

80.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

81.     Beginning at a time currently unknown to Plaintiff and members of the Class, Defendants colluded to artificially inflate the price of flights to and from BOS, LGA, EWR, and JFK airports.

82.     Defendants' agreement has caused Plaintiff and members of the Class to suffer overcharge damages.

83.     There are no procompetitive justifications for the Defendants' agreement, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

84.     The Defendants' cartel is unlawful under a *per se* mode of analysis.

85.     In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

86.     Defendants' conduct caused the Plaintiff and the members of the Class to pay supracompetitive prices for airline tickets to and from BOS, LGA, JFK, and EWR airports in the Relevant Market.

## VII.     PRAYER FOR RELIEF

87.     WHEREFORE, Plaintiff, on behalf of herself and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.  The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.  The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C.  Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.  Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act; on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct,

conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**E.** Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**F.** Plaintiff and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**G.** Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**H.** Plaintiff and the members of the Class have such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMAND

88.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**DATED:**        Dec. 5, 2022                    Respectfully submitted,

*/s/ Blake Hunter Yagman*
Israel David
*israel.david@davidllc.com*
Blake Hunter Yagman
*blake.yagman@davidllc.com*

Hayley Lowe*
*hayley.lowe@davidllc.com*
Madeline Sheffield*
*madeline.sheffield@davidllc.com*
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Tel.:    (212) 739-0622

*Pro Hac Vice Forthcoming

*Attorneys for Plaintiff and the Proposed Class*