UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____ x

In re AMERICAN AIRLINES/JETBLUE
ANTITRUST LITIGATION
_____

This Document Relates To:

    ALL ACTIONS.
_____ x

:
:
:
:
:
:
:
:
:
:
:

Lead Case No. 1:22-cv-07374-AMD-TAM

(Consolidated with Case No. 1:22-cv-07423-AMD-TAM)

CLASS ACTION

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT FOR VIOLATIONS
OF THE SHERMAN ANTITRUST ACT

DEMAND FOR JURY TRIAL

Plaintiffs Katrina Berger and Toni Guerin (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Consolidated Amended Class Action Complaint for Violations of the Sherman Antitrust Act (the "Action") under §1 of the Sherman Antitrust Act, 15 U.S.C. §1, for actual damages, treble damages, punitive damages, declaratory and injunctive relief, costs of suit, pre-and post-judgment interest, and other relief, and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action under the Sherman Antitrust Act, 15 U.S.C. §1, to restrain the anticompetitive conduct of Defendants JetBlue Airways Corporation ("JetBlue") and American Airlines Group Inc. ("American Airlines") (collectively, "Defendants") to remedy the effects of Defendants' unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to consumers who purchased airline tickets from Defendants.

2.      In 2019, Defendants began to discuss what the U.S. Department of Justice ("DOJ") and a bipartisan group of Attorneys General from various states would, in their own lawsuit against Defendants, call "*a modern-day version of a nineteenth-century business trust*" that harms consumers to the tune of nearly $700 million annually.  The agreement, which eliminates head-to-head competition between Defendants at four of the largest airports in the United States (Boston Logan International Airport ("Boston Logan"), LaGuardia Airport ("LaGuardia"), John F. Kennedy International Airport ("JFK"), and Newark Liberty International Airport ("Newark Liberty")), leads to supracompetitive prices for consumers, like Plaintiffs and the members of the Class (defined below), who bought airline tickets from Defendants after the agreement was formally entered into on July 15, 2020.

3.      According to the DOJ, the agreement, coined the Northeast Alliance (the "Alliance"):

[C]ommit[s] . . . Defendants to pool revenues and coordinate "on all aspects" of network planning at Boston Logan, JFK, LaGuardia, and Newark Liberty [airports],

including deciding together which routes to fly, when to fly them, who will fly them, and what size planes to use.  In addition . . . Defendants [commit] to pool and apportion revenues earned on flights to and from the four airports such that each partner earns the same revenues regardless of whether a passenger flies on an American or JetBlue plane.

4.      Additionally, a series of other agreements went along with these restraints, including, according to the DOJ:

[A] [codesharing agreement], through which American and JetBlue have agreed to market each other's flights to and from the four airports, as well as potentially other flights that have yet to be determined.  American and JetBlue have also agreed to pool their "slots" at JFK and LaGuardia, which are takeoff and landing authorizations issued by the Federal Aviation Administration.

5.      The DOJ and the Plaintiff States continue:

These kinds of restraints of trade – agreements between competitors to coordinate on output or to share revenues – are often condemned as *per se* illegal because they have the same tendencies to increase prices and reduce output as explicit horizontal agreements on price. . . .  Moreover, [d]efendants can raise fares simply by one of them exiting a market where it competed against the other, and then share in their-now ally's increased profits.

6.      The DOJ concludes, as this Action does, that the "Alliance is anticompetitive and unlawful as a whole, and the output coordination and revenue-sharing restraints present particular competitive concerns due to their inherently anticompetitive nature."

7.      This Alliance, despite being challenged by the DOJ and a bipartisan group of Attorneys General from various states (as well as this Action), continues to be expanded to this day. Indeed, JetBlue's Chief Executive Officer ("CEO") Robin Hayes stated on January 27, 2023, that JetBlue was looking forward to continuing the "momentum" that the Alliance created, momentum which netted JetBlue over $100 million in 2021 alone while consumers paid higher prices on average at the airports where the Alliance has taken effect.

8.      As such, Plaintiffs and the members of the Class bring this Action for damages, trebled damages, and reasonable attorneys' fees against Defendants due to their *per se* violation of

- 2 -

4875-6712-4302.v1

the Sherman Antitrust Act, 15 U.S.C. §1.  Additionally, Plaintiffs seek injunctive relief on behalf of themselves and the members of the Class, including, but not limited to, the disbanding of the Alliance.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, as this Action arises out of §1 of the Sherman Antitrust Act (15 U.S.C. §1), and §§4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§15 and 26), because Plaintiffs allege violations of federal law.

10.     This Court has personal jurisdiction over Defendants under §12 of the Clayton Act (15 U.S.C. §22).  Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, are found in and transact business in this District.  Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of airline tickets to consumers, like Plaintiffs and the members of the Class.

11.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and the federal venue statute (28 U.S.C. §1391), because one or more Defendants maintain their principal place of business, have business facilities, have agents, transact business, and are otherwise found within this District, and certain unlawful acts alleged herein were performed and had effects within this District.

## PARTIES

**Plaintiff Katrina Berger**

12.     Plaintiff Katrina Berger, a natural person and a resident of the state of New York, is a direct purchaser of flights from JetBlue, and has purchased its services at least once during the proposed Class Period, including on September 30, 2021, on flights originating out of and returning to New York's airports.  Plaintiff Katrina Berger has paid JetBlue directly either through JetBlue's

mobile application or through the JetBlue website for her tickets purchased in order to travel on these respective flights.

**Plaintiff Toni Guerin**

13.     Plaintiff Toni Guerin, a natural person and a resident of the state of New York, is a direct purchaser of flights from JetBlue, and has purchased its services at least once during the proposed Class Period, including on September 30, 2021, on flights originating out of and returning to New York's airports.  Plaintiff Toni Guerin has paid JetBlue directly either through JetBlue's mobile application or through the JetBlue website, for her tickets purchased in order to travel on these respective flights.

**Defendant JetBlue Airways Corporation**

14.     Defendant JetBlue Airways Corporation is a Delaware corporation with its headquarters located in Long Island City, New York.  In 2019, the last full year before the establishment of the Alliance and the last full year before the onset of COVID-19, JetBlue made roughly $8 billion in revenues.  Despite the 2020 onset of the COVID-19 pandemic and its effects on the airline industry, JetBlue's 2022 revenue was approximately $8.57 billion.

**Defendant American Airlines Group Inc.**

15.     Defendant American Airlines Group Inc. is a Delaware corporation with its headquarters located in Fort Worth, Texas.  In 2019, the last full year before the establishment of the Alliance and the last full year before the onset of COVID-19, American Airlines made roughly $45 billion in revenues.  Despite the 2020 onset of the COVID-19 pandemic and its effects on the airline industry, American Airlines's 2022 revenue was approximately $48.97 billion.

## FACTUAL ALLEGATIONS

**A.     Defendants' Businesses**

**1.     JetBlue Airways Corporation**

16.     JetBlue is a New York-based corporation which markets itself as a low-cost airline carrier providing flights to consumers both domestically and internationally.

17.     JetBlue's operations in New York are robust for a relatively new airline (as compared to Delta, United, and American Airlines).  According to JetBlue's 2021 Annual Report, JetBlue calls itself "New York's Hometown Airline" as "[a]pproximately one-half of [JetBlue's] flights originate from or are destined for the New York metropolitan area."  According to JetBlue in the same report, through the Alliance, "[JetBlue] expect[s] to offer nearly 300 daily departures at JFK, with JetBlue operating approximately 200 flights [and American operating the other 100]."

18.     JetBlue is also "the largest carrier at Boston's Logan" and that "[t]ogether with American, the [Alliance] will offer more than 200 daily departures at Boston, serving 46 of the top 50 U.S. mainland markets from Boston."

**2.     American Airlines Group Inc.**

19.     American Airlines is a Texas-based corporation and is the largest airline both domestically and internationally; additionally, American Airlines provides flights to consumers both domestically and internationally.  American Airlines operates 74 routes to and from JFK.

**B.     Relevant Market**

20.     Insofar as Plaintiffs are required to plead the relevant product and geographic market to establish the antitrust violations alleged herein, Plaintiffs allege the relevant market at issue and have pled how Defendants' conduct has harmed competitive processes in this market.

21.     The relevant market in this Action is the market for airline flights out of airports in the United States (the "Relevant Market").

- 5 -

22.     Millions of consumers originating out of Boston Logan, JFK, LaGuardia, and Newark Liberty airports depend on the airline industry to be able to travel both domestically and internationally.  These consumers depend on competition among the airlines who fly out of these respective airports to drive innovation, cost competition/affordability, consumer choice, and quality of service.  Even Defendants know this.

23.     Indeed, prior to the Alliance, JetBlue was known in the airline industry for continually lowering fares in order to attract consumers shopping for affordable flights out of the aforementioned airports.  For example, when JetBlue initially began service from JFK and Boston Logan in the early 2000s, JetBlue's persistent lowering of fares caused competitors to also lower theirs as well – leading to something that travel industry gurus called the "JetBlue effect."  For consumers, this meant that when JetBlue would enter a respective route or start to offer service at a different airport, fares on that route offered by competitors would eventually drop due to the price competition that JetBlue's quality combined with JetBlue's low fares created.

24.     Prior to the Alliance, and as a result of JetBlue's price competition, JetBlue quickly gained significant market share.  For example, JetBlue became the number one airline originating out of Boston Logan airport – and this was due in part to low fares for consumers.  According to the DOJ, in 2019, JetBlue calculated that it had saved consumers flying in and out of Boston Logan more than $3 billion since it began serving the airport in 2004.

25.     However, over time, JetBlue's attitude toward lowering fares changed – marked, in part, by the establishment of the Alliance in 2020.  As JetBlue began to realize that it was gaining market share, JetBlue became more willing to raise prices to consumers – who had reduced choice of flights due to JetBlue's increasing size.  And, with the establishment of the Alliance and with American Airlines being the largest airline in the world, JetBlue gained access to even more slots

- 6 -

(take-off-and-landing authorizations) at each of the four aforementioned airports, giving JetBlue an even larger share of control over the consumers who fly out of the four aforementioned airports, reducing competition, and giving Defendants the ability to raise prices to supracompetitive levels. Essentially, JetBlue parlayed initially-low prices into higher market share. Then, once that market share was firmly entrenched, JetBlue would begin to raise prices on consumers in an effort to recapture whatever profits JetBlue could have made initially.

26.     The Relevant Market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

27.     Here, the SSNIP test is satisfied and the market is properly defined. As described above and below, pursuant to Defendants' agreement, consumers overpay hundreds of millions of dollars annually due to the Alliance's propensity to raise prices, throttle competition, and reduce consumer choice, and yet those increases have not driven enough consumers out of the market such that the SSNIP has become unprofitable to Defendants.

**C.     Geographic Market**

28.     In this Action, the Geographic Market is the entirety of the United States – as the anticompetitive effects of the Alliance can be felt throughout the country.

29.     While this Action is focused on Plaintiffs and Class members, who are airline customers of JetBlue and/or American Airlines who flew out of Boston Logan, JFK, LaGuardia, and

Newark Liberty airports from the creation of the Alliance through the present, the Alliance impacts a much broader swath of the economy and interstate commerce than just the immediately visible higher prices for consumers originating from those four airports.

**D.    Defendants' Alliance**

30.    Prior to the Alliance, in 2019, JetBlue had the fourth-largest market share for flights to and from the northeastern United States (16% of capacity) and American Airlines had the largest market share for flights in the same region (21% of capacity).  Both airlines were in fierce competition with each other, which had resulted in lower prices and increased consumer choice, such as greater flight frequencies.

31.    Before the Alliance, price competition between Defendants was intense, with JetBlue moving aggressively to win market share on routes out of Boston and other major airports in the northeast.  In November 2018, JetBlue launched a regional fare sale on routes in several of its focus cities, including Boston, which American Airlines matched.  According to testimony from American Airlines's Regional Sales Director, Paul Swartz, at trial, JetBlue's $99 fully-refundable fare for corporate travelers flying Boston Logan-Ronald Reagan Washington National Airport ("DCA") and increased frequencies on that route created a "problem" for American Airlines in 2019, and JetBlue's regional fares triggered a fare war between Defendants, with each matching the other's pricing decreases.

32.    In May 2019, in the face of JetBlue's competitive pressure, American Airlines attempted two system-wide price increases on its fares.  However, those attempted price increases failed in markets where JetBlue competed against American Airlines non-stop and did not increase its prices. American Airlines was forced to lower its prices.

4875-6712-4302.v1

33.     In December 2019, JetBlue added "shuttle flights" from Boston Logan to LaGuardia, DCA, and Philadelphia International Airport ("PHL") in an effort to compete with American Airlines and Delta.  Responding to this increased competition, American Airlines approved higher shuttle discounts for corporate customers on Boston Logan-LaGuardia routes in order to "keep [JetBlue] out of the shuttle routes."  American Airlines's published fares on these routes decreased. Under the Alliance, on January 4, 2022, American Airlines exited the Boston Logan-LaGuardia route, transferring that route entirely to JetBlue.

34.     JetBlue's competitive measures also helped lower fares on other heavily trafficked routes.  In 2014, JetBlue launched its revolutionary new product, Mint.  Mint, originally offered on flights between New York and Los Angeles and New York and San Francisco, featured lie-flat seats and suites, a small plates menu, free Wi-Fi, extra seat and leg space, and enhanced entertainment options.

35.     When JetBlue entered the JFK to Los Angeles ("LAX") route with Mint service in June 2014, American Airlines and Delta lowered their fares to match JetBlue.  As a result, business class fares on the JFK-LAX route decreased.  Refundable walk-up fares decreased 65%, non-refundable walk-up fares decreased 49%, and non-refundable 30-day advance purchase fares decreased 79% following JetBlue's Mint entry on JFK-LAX.

36.     In 2015 and 2016, JetBlue announced expansions of its Mint service, adding substantially more routes, including routes from Boston to Los Angeles and San Francisco.  Prices on these routes fell following JetBlue's introduction of its Mint service, with American Airlines's lowest fares dropping 50%.  At trial, JetBlue's Vice President of Network Planning, Andrea Lusso, testified that Mint was revolutionary in the transcontinental markets, resulting in lower premium fares.

4875-6712-4302.v1

37.    On the JFK to LAX route, in particular, American Airlines and Delta fares dropped significantly after JetBlue introduced Mint.  Before Mint, the lowest premium fare offered was $3,000; after JetBlue entered the market, American Airlines and Delta both offered $599 fares in 2016, and $659 fares in 2018.  In March 2020, American Airlines lowered fares on JFK to LAX, and JetBlue matched those lower fares.  Similar price reductions were seen on the JFK to SFO route, where American Airlines and Delta lowered their premium fares from about $2,000 to $506.  The introduction of Mint also resulted in competing airlines also increasing the number of fare options, the number of business class seats, a decrease in ancillary fees, such as change fees, and upgraded aircraft equipment.

38.    All of this changed when, on July 16, 2020, Defendants announced the Alliance via a press release, which stated, in relevant part:

> JetBlue Airways Corp. and American Airlines Group Inc. today announced a strategic partnership that will create seamless connectivity for travelers in the Northeast and more choice for customers across their complementary domestic and international networks.  In addition, the relationship will accelerate each airline's recovery as the travel industry adapts to new trends as a result of the pandemic.
>
> The partnership includes an alliance agreement that proposes codeshare and loyalty benefits that will enhance each carrier's offerings in New York and Boston, providing strategic growth and driving value for customers and crewmembers of both airlines.

39.    As discussed below, as a result of the Alliance, due to the agreement, Defendants have stopped competing with one another on routes subject to the Alliance.  Defendants have reduced capacity on overlapping routes, depriving consumers of increased choice and higher quality service and causing consumers to pay more for fares.  Indeed, JetBlue's capacity in the 1Q 2022 was lower than in 2019, but revenue was at record high levels.  Additionally, this Alliance has allowed Defendants to "recapture" each other's prospective and actual consumers; meaning, because of the size of their collective market share, consumers, if they felt a price at one of the two airlines was too

- 10 -

high, would likely end up migrating their business to the other airline because that airline also had a significant market share.  Taken together, their dominant collective market shares over the routes that the Alliance implemented complimented each other's businesses; and, because the two sides share revenue made from the Alliance, business lost to the other airline is recouped to a significant extent through the revenue sharing agreement.

40.     Defendants touted the new partnership and released infographics to show the full details of what was foreseen by Defendants in terms of the Alliance's benefit for consumers of the two airlines:



41.     However, the infographics failed to discuss the reductions in competition – specifically for customers of the affected routes, as well as the price of airfares by Defendants – and

how those reductions in competition between Defendants would harm consumers.  While the infographics touted the Alliance's alleged proclivity to "create[] more competitive options and choice for customers in the northeast[ern United States]," the infographics failed to discuss the harms caused by Defendants' new combined market share in the northeastern United States and how those harms would actually lead to fewer options and higher prices for consumers.

42.     Combined, the two entities now represent and/or represented at least a 37% market share for flights to and from the northeastern United States.

### 1.    The Department of Transportation's Review of the Alliance

43.     Upon information and belief, Defendants first formed or discussed the Alliance in 2019.

44.     On or about July 22, 2020, Defendants submitted to the U.S. Department of Transportation ("DOT") "cooperative agreements, including code-sharing and alliance agreements" for review under 49 U.S.C. §41720, which requires each of the major air carriers who entered into the agreement to submit a copy of the agreement and related materials to the Secretary of Transportation at least 30 days before the agreement takes effect.  Under 49 U.S.C. [§]41712, "[t]he Department [of Transportation] retains independent statutory authority under 49 U.S.C. §41712 to prohibit unfair methods of competition in air transportation to further its statutory objectives to prevent predatory or anticompetitive practices and to avoid unreasonable industry concentration."

45.     On August 20, 2020, the DOT extended the waiting period for the code-sharing agreement to take effect 90 days from August 21, 2020 to November 19, 2020.  Ultimately, the DOT did not render a decision based on the legality of the Alliance, allowing the Alliance's code-sharing agreement to take effect.

- 12 -

4875-6712-4302.v1

46.     The reasons for this, according to the DOT, was two-fold: first, because the DOT

stated that "the Department intends to defer to DOJ, as the primary enforcer of Federal antitrust laws

to resolve the antitrust concerns that the DOJ has identified with respect to [the Alliance]" and,

second, because §41720

> does not provide the Department authority to approve or disapprove agreements
> submitted for review under that section; rather, the section gives the Department a
> limited period of time to review the agreements before such agreements may take
> effect.  DOJ, which is responsible for enforcing Federal antitrust laws and has also
> been conducting its own review of the [Alliance], had not concluded its investigation
> at the time DOT's review period ended . . . .
>
>     In this context, DOT's review of the [Alliance] under [S]ection 41720 was
> not designed to approve or disapprove the alliance.

47.     The DOT, during the limited window it had to be able to review the Alliance, was

able to reach an agreement for minor concessions by Defendants but stated that the agreement "did

not address all of the Department's concerns resulting from the [Alliance]'s impacts on competition,

but instead sought concessions from the carriers that were intended to mitigate some of the

anticompetitive harm while providing a means for monitoring the [Alliance's] implementation."

48.     Critically, "[t]he parties to the [Department of Transportation Agreement] recognized

that the [A]lliance was still subject to the antitrust laws, that DOJ was continuing its review, and that

DOT retained its authority to remedy any anticompetitive harm."  Historically, under 49 U.S.C.

§41712, the DOT "prohibits anticompetitive conduct that (1) violates the antitrust laws, (2) is not yet

serious enough to violate the antitrust laws but may well do so if left unchecked, or (3) although not

a violation of the letter of antitrust laws, is close to a violation or is contrary to their spirit."  *See,*

*e.g.*, *ASTA v. United Airlines, Inc., et al.*, Docket No. OST-99-6410, Order 2002-9-2 (Dep't of

Transp. Sept. 4, 2002) (citing *E.I. DuPont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-37 (2d Cir.

1984)).

- 13 -

4875-6712-4302.v1

2.   **Spirit Airlines, Inc. and Others Complain About the Alliance to the Department of Transportation**

49.     On January 7, 2021, Spirit Airlines, Inc. ("Spirit Airlines") filed a formal complaint with the DOT regarding the Alliance.  Complaint of *Spirit Airlines, Inc.*, Docket No. OST-2021-0001 (Dep't of Transp. Jan. 7, 2021).  Additionally, Spirit Airlines claimed that the information disclosed about the Alliance to the public was insufficient during the DOT's review and that "the remedies agreed to in the DOT Agreement [between the DOT, JetBlue, and American Airlines] were insufficient to address anticompetitive concerns."  The Spirit Airlines complaint led to other groups filing public comments about the Alliance being anticompetitive, including other airlines, an airline association, a non-profit focused on competition, and a consumer advocacy organization.  However, these comments were filed after the public release of the agreement made between the DOT, JetBlue, and American Airlines.

50.     The DOT stayed the proceedings in Complaint of *Spirit Airlines, Inc.* while the DOJ's action proceeded.

E.   **The Department of Justice and Several States' Attorneys General Sue to Stop the Alliance**

51.     On September 21, 2021, the DOJ, along with the State of Arizona, the State of California, the District of Columbia, the State of Florida, the Commonwealth of Massachusetts, the Commonwealth of Pennsylvania, and the Commonwealth of Virginia, sued Defendants under §1 of the Sherman Antitrust Act, 15 U.S.C. §1, stating: "[T]he United States and Plaintiff States bring this action to prevent the harm to consumers that will occur once the [Alliance] is fully implemented . . . ."  *United States v. American Airlines Group Inc.*, No. 1:21-cv-11558 (D. Mass., filed Sept. 21, 2021) (the "DOJ Action"), ECF 1 (the "DOJ Complaint").

52.     The DOJ Complaint states:

By consolidating [defendants'] businesses in this way, American and JetBlue will effectively merge their operations on flights to and from the four airports . . . .  In so doing, the Northeast Alliance will eliminate significant competition between American and JetBlue that has led to lower fares and higher quality service for consumers traveling to and from those airports.  It will also tie JetBlue's fate to that of American, diminishing JetBlue's incentives to compete with American in markets across the country.  The United States and Plaintiff States bring this action to prevent the hundreds of millions in harm to consumers that will occur if these two rivals are permitted to maintain this [Alliance].

53.     As the DOJ Complaint states, American Airlines, which is the largest airline domestically and internationally, is led by management which has "long been a 'proponent of consolidation in the industry'" and that "'[d]omestic consolidation' remains one of American's 'long term projects.'"  Indeed, internally, the DOJ reports that American Airlines's former CEO and current Chairman Doug Parker has been referred to as "'the Godfather of consolidation,'" having led numerous mergers previously: as CEO of America West, Parker led a merger with US Airways; as CEO of US Airways, Parker led a merger with American Airlines; and now, at American Airlines, Parker has engaged in the Alliance as described herein, what the DOJ calls a "***modern-day version of a nineteenth-century business trust***."

54.     JetBlue, being a smaller airline with a slimmer market share than American Airlines, had opposed consolidation before the Alliance.  JetBlue's CEO stated two years before the Alliance that consolidation "'has come at a cost to consumers.  Just look at the fares in some of the fortress hubs and in some of the legacy-dominated markets without low-fare competition.  Chances are, you'll see fares that are higher than they should be and in that construct there's very little incentive to provide great service or to innovate.'"

55.     The federal court overseeing the DOJ Action refused to dismiss the case, stating in relevant part: "[T]he [Alliance] at issue between American and JetBlue is likely to harm competition

- 15 -

in the relevant markets, and that American and JetBlue control a significant share in an already concentrated market," and the DOJ Action proceeded to trial.  DOJ Action, ECF 103.

56.     In September 2022, one year after the DOJ and Plaintiff States initiated their challenge to the Alliance, trial began in Judge Sorokin's courtroom.  At the trial, the DOJ and the Plaintiff States attested to government economists' estimates that consumers would be harmed to the tune of $700 million annually and that, because of JetBlue's removal as a low-cost carrier, that other airlines would be less incentivized to participate in price competition after JetBlue's Alliance with American Airlines.

57.     The trial in the DOJ Action concluded on November 18, 2022, after an 18-day bench trial in front of Judge Sorokin.  DOJ Action, ECF 327.

**F.     The Alliance Is Anticompetitive and Causes Antitrust Injury**

58.     The Alliance combines Defendants respective market share at the four airports that are highlighted by this Action – Boston Logan, LaGuardia, JFK, and Newark Liberty.  Prior to the Alliance, JetBlue already had the largest market share at Boston Logan, which only grew with the agreement between Defendants to enter the Alliance.

59.     Specifically, the DOJ testified at trial that for routes between Boston Logan and 12 major airports, Defendants have a combined revenue share of over 49.8% for each of those routes, as listed below:

      (a)     Boston – Charlotte: 96.1% (combined revenue share);

      (b)     Boston – Chicago: 48.5%;

      (c)     Boston – Dallas: 83.6%;

      (d)     Boston – Los Angeles: 62.6%;

      (e)     Boston – Miami: 76.5%;

(f)     Boston – New York City (JFK or LaGuardia): 49.8%;

(g)     Boston – PHL: 86.8%;

(h)     Boston – Phoenix: 85.2%;

(i)     Boston – Rochester: 86.2%;

(j)     Boston – Syracuse: 82.1%; and

(k)     Boston – Washington D.C. (DCA): 88%.

60.     Each of these revenue shares is considered to be anticompetitive under the conventional Herfindahl-Hirschman Index ("HHI") test, which measures market concentration and potential for anticompetitive conduct.  Market concentration harms consumers because it eliminates consumer choice, throttles price competition, reduces incentives to increase supply and to innovate, and tends to negatively influence downward pricing pressure.

61.     Additionally, the DOJ testified at trial that for routes between JFK/LaGuardia or Newark Liberty and 18 major airports, Defendants have a combined revenue share of over 31% for each of those routes, as listed below:

(a)     New York (JFK/LaGuardia) – Austin: 44.6%;

(b)     New York – Charleston: 43.6%;

(c)     New York – Chicago: 36.2%;

(d)     New York – Las Vegas: 46.5%;

(e)     New York – Los Angeles: 57%;

(f)     New York – Martha's Vineyard: 92.5%;

(g)     New York – Miami: 55.9%;

(h)     Newark Liberty – Miami: 31%;

(i)     New York – Nantucket: 96.8%;

- 17 -

  (j)  New York – Orlando: 55.3%;

  (k)  New York – Phoenix: 61.5%;

  (l)  New York – Portland: 37.4%;

  (m)  New York – Raleigh-Durham: 47.8%;

  (n)  New York – San Diego: 44.7%;

  (o)  New York – San Francisco: 45.7%;

  (p)  New York – Savannah: 46.5%; and

  (q)  New York – West Palm Beach: 60%.

62. Each of these revenue shares is considered to be anticompetitive under the conventional HHI test, which measures market concentration and potential for anticompetitive conduct.

63. In 2019, prior to the Alliance, the general, non-route specific market share of each of the two airlines in the New York City and Boston metro areas were as follows:

  (a)  New York City:

    (i)  JetBlue: 24%

    (ii)  American Airlines: 16%

  (b)  Boston:

    (i)  JetBlue: 35%

    (ii)  American Airlines: 16%

64. Thus, the combined market share in 2019 of the two previously independent entities is as follows:

  (a)  New York City:  JetBlue and American Airlines: 40%

  (b)  Boston:  JetBlue and American Airlines: 51%

- 18 -

65.     These dominant market shares that are highlighted by this Action allow Defendants to dictate flight availability, fare pricing, and other variables at these respective airports.   These dominant market shares also drive up prices for flights on other airlines, which respond to higher prices and a decreased ability to usher out flights from the airports at-issue.

66.     Competition and consumers alike are harmed as a result of the Alliance, including, but not limited to, the following effects: the Alliance eliminates head-to-head competition between Defendants, reducing consumer choice as well as price competition in the market generally, and increases the likelihood of anticompetitive coordination.

67.     Ironically, Defendants themselves have recognized this very harm when examining the threat of other airlines entering into similar alliances: American Airlines, in its 2021 Annual Report, discusses how "additional mergers and other forms of industry consolidation" could harm American Airlines's bottom line and market share:

> Depending on which carriers combine and which assets . . . [American Airlines's] competitive position relative to the post-combination carriers or other carriers that acquire such assets could be harmed.  In addition, as carriers combine through traditional mergers or antitrust immunity grants, their route networks will grow, and that growth will result in greater overlap with our network, which in turn could decrease [American Airlines's] overall market share and revenues.

68.     This was also articulated by Defendants in deposition testimony and while at trial in the DOJ and Plaintiff States' case before Judge Sorokin:

(a)     Paul Swartz, American Airlines's Regional Sales Manager, when asked "[s]o you no longer compete with JetBlue," answered "[Y]es";

(b)     Brian Znotins, American Airlines's Vice President, Network & Regional Schedule Planning, when asked "[s]o you are no longer competitors [with JetBlue] on those [Alliance] routes from a network perspective," answered "Yes";

(c)     Robin Hayes, JetBlue's CEO, when asked "[a]nd you would agree that, within the [Alliance], where the two airlines are coordinating capacity, JetBlue and American no longer compete with each other, correct?," answered "[W]e don't compete with each other directly"; and

- 19 -

(d)     Scott Laurence, American Airlines's SVP of Partnership Strategy, when asked "[w]ith the [Alliance] in place, do you agree that the revenue sharing component means that it makes more sense to cooperate with American than compete?," answered "For [Alliance] routes, yes."

69.     Defendants' direct competitors in the Relevant Market have likewise recognized the harm to consumers and competition.  Some of the concerns articulated by competitors include harm to consumers (in the form of higher prices, reduced choice, and, subsequently, being priced out of the Relevant Market), the inability for new entrants into the market (because Defendants control the available slots at airports which would be needed in order to viably compete with Defendants), and other types of harm.

70.     To be sure, the Alliance has already caused harm to the competitive process, which, in turn, has resulted in consumers such as Plaintiffs paying higher prices.  For example, as a result of the Alliance, American Airlines exited the Boston Logan to LaGuardia route.  On the Boston Logan to DCA route, Defendants fly fewer frequencies today than before the Alliance.  Further, JetBlue has agreed to take over from American Airlines the JFK to San Francisco ("SFO") route, with American Airlines planning to exit that route.

71.     This reduction in capacity has predictably resulted in higher prices, poorer-quality service and fewer passengers.  For example, when JetBlue left the JFK to Richmond route, fares rose by 65% and passenger counts fell by 49%.  According to testimony and documents presented at the DOJ trial, when American Airlines stopped flying JFK to San Diego ("SAN") due to the 737 MAX grounding, JetBlue "'ignor[ed] AA pricing, until it becomes clear they will re-enter the market,'" and JetBlue "'down-bucketed its entire fare structure in JFK to San Diego,'" which "'effectively increased fares by $20-$40 throughout the structure.'"  As a result, JFK-SAN was "'one of the highest-fare trans-con markets in the system.'"  Additionally, on at least eight routes out of New York City, JetBlue increased its prices, on average, by 7.8%.

72.     This is consistent with the conclusion reached by Spirit Airlines in its antitrust complaint with the DOT, which was bolstered by economic analysis of how consumers would be impacted by the Alliance.  Generally, the analysis found that consumers would be harmed:

# The Strategic Partnership Is Likely to Harm Consumers

A 5% fare benefit from the AAdvantage program is likely and would result in $383 million in higher costs for Air Travelers and the increase fares would price 2.7 million O&D passengers out of the air travel market.

| | Passengers Subject to Fare Increase | | Average Fare Increase | | Revenue Impact of Higher Average Fares | Passengers Lost Due to Higher Average Fares |
|---|---|---|---|---|---|---|
| Total | 37,476,531 | $ | 10.24 | $ | 383,767,385 | 2,712,778 |
| BOS | 12,188,847 | $ | 9.54 | $ | 116,272,321 | 882,303 |
| JFK | 24,404,280 | $ | 10.66 | $ | 260,202,725 | 1,766,530 |
| EWR | 478,667 | $ | 8.79 | $ | 4,208,268 | 34,649 |
| LGA | 404,737 | $ | 7.62 | $ | 3,084,071 | 29,297 |

73.     Specifically, Spirit Airlines did an analysis of how the Alliance would impact consumer pricing, and found that even marginal increases in airfares as a result of the Alliance would result in hundreds of millions of dollars of revenue for Defendants on an annual basis:

- 21 -

## Impact of Higher Fares on Consumer Prices
(Increased revenue in millions, annually)

Given JetBlue's recent fare trends it is likely that the Strategic Partnership will increase fares in the range of 5% or more.  Each 1% increase will raise the cost to consumers by roughly $80 million annually

| Market | 1% Increase | 3% Increase | 5% Increase |
|--------|-------------|-------------|-------------|
| **Total** | $  81.2 | $  236.9 | $  383.8 |
| BOS | $  24.6 | $  71.8 | $  116.3 |
| JFK | $  55.1 | $  160.6 | $  260.2 |
| EWR | $  0.9 | $  2.6 | $  4.2 |
| LGA | $  0.7 | $  1.9 | $  3.1 |

- Given the scope of the Strategic Partnership and the leverage and market power of the AAdvantage program, an increase of 5% is likely if not conservative

74.     And, as a result of these increases in price, more consumers would be "priced out of the market" for airfare.  Spirit Airlines also did an analysis of the effect of higher prices on consumer demand:

## Impact of Higher Fares on Consumer Demand
(Lost passengers in thousands, annually)

As price increases, more passengers will be priced out of the market.  For each 1% increase in price, slightly more than half a million travelers will be lost; the impact of the Strategic Partnership will negatively impact over 2.5 million.

| Market | 1% Increase | 3% Increase | 5% Increase |
|--------|-------------|-------------|-------------|
| **Total** | 542.6 | 1,627.7 | 2,712.8 |
| BOS | 176.5 | 529.4 | 882.3 |
| JFK | 353.3 | 1,059.9 | 1,766.5 |
| EWR | 6.9 | 20.8 | 34.6 |
| LGA | 5.9 | 17.6 | 29.3 |

- The displaced demand of higher fares would normally present an opportunity for more efficient competitors to enter the market and satisfy that demand, but congestion at these airports limit effective new entry.

- 22 -

75.     These analyses by Spirit Airlines show the real impacts of the Alliance on consumers: higher prices leading to a decline in demand due to "more passengers [being] priced out of the market."

76.     Additionally, this has been the conclusion of the States' Attorneys General and the DOJ who sued Defendants over the Alliance.  The DOJ and the Plaintiff States testified at trial that the Alliance would cause up to $700 million in higher fares for consumers annually.

77.     During the Class Period, both Defendants have cut routes and reduced the amount of planes in the air "in an effort to stabilize operations."  This is direct evidence that consumers are experiencing reduced output and diminished service quality.  Indeed, American Airlines's own internal assessment of whether the Alliance was resulting in higher quality of service ("QSI") at Alliance airports shows that, first, other airlines's QSI improved more than either American Airlines or JetBlue during the Alliance implementation, and second, that JetBlue actually lost QSI share.

78.     These are the types of harms that the antitrust laws were intended to combat and prevent.  Additionally, there are threats to consumers beyond just price and output.  As stated by FTC Commissioner Lina Khan in her paper, *Amazon's Antitrust Paradox*:

> [L]ong-term interests of consumers include product quality, variety and innovation – factors best promoted through both a robust competitive process and open markets. By contrast, allowing a highly concentrated market structure to persist endangers these long-term interests, since firms in uncompetitive markets need not compete to improve old products or tinker to create [new] ones.

79.     Indeed, the antitrust laws were intended to prevent all of these types of harms caused by a lack of competition.  Khan's paper discusses how the legislative history for the Sherman Antitrust Act called "for diversity and access to markets [and in opposition to] high concentration and abuses of power."  United States Senator John Sherman himself, the Senator from Ohio who was the architect of the Sherman Antitrust Act, stated:

- 23 -

> If we will not endure a king as a political power, we should not endure a king over the production, transportation, and sale of any of the necessities of life. If we would not submit to an emperor, we should not submit to an autocrat of trade, with power to prevent competition and to fix the price of any commodity.

80.     As such, Plaintiffs and the members of the Class bring this Action to rectify the harms as alleged herein.

### G.      Defendants Profit from the Alliance

81.     Ultimately, the Alliance was formed because, as other airline mergers and quasi-mergers have shown, controlling a dominant market share over (and stamping out competition) some of the most travelled routes in the Relevant Market is highly profitable. Defendants have profited substantially as a result of the Alliance. For example, in JetBlue's 2021 Annual Report, JetBlue states that it reached $100 million in gross code-share revenue generated by the Alliance. In that same Annual Report, JetBlue states it

> continue[s] to seek additional strategic opportunities through new commercial partners as well as assess ways to deepen existing airline partnerships, including the [Alliance]. [JetBlue] plan[s] to do this by expanding codeshare relationships and other areas of cooperation such as frequent flier programs. [JetBlue] believe[s] these commercial partnerships allow [it] to better leverage [its] strong network and drive incremental traffic and revenue.

82.     If the goal of the Alliance was to provide lower fares to consumers, "driv[ing] revenue" directly clashes with that goal. Indeed, at the core of the Alliance is an agreement between Defendants to share revenue stemming from the Alliance.

83.     The Defendants, since the filing of the initial complaint in this Action, have opted to continue to expand the reach of the Alliance, despite the anticompetitive nature of the Alliance. American Airlines will be "launching" six new Alliance routes out of LaGuardia, JetBlue will offer four new routes from LaGuardia, and JetBlue will offer a new route from Boston Logan and from JFK.

## CLASS ALLEGATIONS

84.     Plaintiffs bring this Action on behalf of themselves and all others similarly situated

pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) as representatives of the Class, which is

defined as follows:

> **Nationwide Class**.  All direct purchasers of airline tickets going to or from Boston
> Logan International Airport, LaGuardia Airport, John F. Kennedy International
> Airport, and Newark Liberty International Airport from Defendants JetBlue Airways
> Corporation and American Airlines Group Inc. from when the Northeast Alliance
> was officially established on July 15, 2020 through the present day (the "Class
> Period").

85.     **Numerosity**.  The Class is so numerous that joinder of all members in this Action is

impracticable.  There are millions of members in the proposed Class who, like Plaintiffs, bought

tickets from JetBlue and/or American Airlines directly during the proposed Class Period for flights

which either originated from or landed at Boston Logan, JFK, LaGuardia, or Newark Liberty

airports.

86.     **Typicality**.  Plaintiffs' claims are typical of those of the Class.  Plaintiffs and all

members of the Class were all injured by the same unlawful conduct, which resulted in all of them

paying more for flights than they otherwise would have in a normal, competitive market.

87.     **Predominance**.  Questions of law and fact common to the members of the Class will

predominate over questions, if any, that may be individual to individual Class members, since

Defendants have acted and refused to act on grounds generally applicable to the Class.

88.     Questions of law and fact common to the Class include:

        (a)     whether Defendants have entered into a formal or informal contract,

combination, conspiracy, or common understanding to artificially inflate price and/or artificially

suppress supply of flights originating or landing in the aforementioned airports;

(b)      if Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates §1 of the Sherman Antitrust Act, 15 U.S.C. §1, under the *per se*, quick look, or rule of reason modes of analysis;

(c)      if Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply in the Relevant Market;

(d)      the proper measure of damages; and

(e)      the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

89.      **Adequacy**.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.  Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are not antagonistic to the Class.

90.      Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this Action.

4875-6712-4302.v1

**COUNT**

**For Violation of §1 the Sherman Antitrust Act (15 U.S.C. §1)**
**Against All Defendants**

91.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

92.     Beginning at a time currently unknown to Plaintiffs and members of the Class, Defendants colluded to artificially inflate the price of flights to and from Boston Logan, LaGuardia, JFK, and Newark Liberty airports.

93.     Defendants' cartel has caused Plaintiffs and members of the Class to suffer overcharge damages.

94.     There are no procompetitive justifications for Defendants' agreement, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

95.     Defendants' cartel is unlawful under a *per se* mode of analysis.

96.     In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

97.     Defendants' conduct caused Plaintiffs and the members of the Class to pay supracompetitive prices for airline tickets to and from Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the Relevant Market.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

4875-6712-4302.v1

     A.     The Court determine that this Action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this Action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

     B.     The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1;

     C.     Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

     D.     Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the Alliance or any conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

     E.     Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company information;

- 28 -

F.      Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and the members of the Class have such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  February 3, 2023                    ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                                            DAVID W. MITCHELL (admitted *pro hac vice*)
                                                            STEVEN M. JODLOWSKI (admitted *pro hac vice*)


                                                                    s/ David W. Mitchell
                                                            DAVID W. MITCHELL

                                                            655 West Broadway, Suite 1900
                                                            San Diego, CA  92101
                                                            Telephone:  619/231-1058
                                                            619/231-7423 (fax)
                                                            davidm@rgrdlaw.com
                                                            sjodlowski@rgrdlaw.com

DATED:  February 3, 2023                    ISRAEL DAVID LLC
                                                            ISRAEL DAVID
                                                            BLAKE HUNTER YAGMAN
                                                            HAYLEY LOWE*
                                                            MADELINE SHEFFIELD*


                                                                    s/ Israel David
                                                            ISRAEL DAVID

- 29 -

17 State Street, Suite 4010
New York, NY  10004
Telephone:  212/739-0622
israel.david@davidllc.com
blake.yagman@davidllc.com
hayley.lowe@davidllc.com
madeline.sheffield@davidllc.com

*Pro Hac Vice* forthcoming

Interim Co-Lead Class Counsel

- 30 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 3, 2023, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ David W. Mitchell
DAVID W. MITCHELL

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  davidm@rgrdlaw.com

4875-6712-4302.v1

# Mailing Information for a Case 1:22-cv-07374-AMD-TAM Berger v. JetBlue Airways Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alexandra P. Clark**
  alexandra.clark@lw.com,alexandra-clark-4246@ecf.pacerpro.com,ny-courtmail@lw.com,new-york-ma-2860@ecf.pacerpro.com

- **Matthew L. Craner**
  matthew.craner@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Jessica K Delbaum**
  jessica.delbaum@shearman.com

- **Elizabeth C. Gettinger**
  elizabeth.gettinger@lw.com,elizabeth-gettinger-9182@ecf.pacerpro.com,ny-courtmail@lw.com,new-york-ma-2860@ecf.pacerpro.com

- **Brian Hauser**
  brian.hauser@shearman.com

- **Steve Michael Jodlowski**
  sjodlowski@rgrdlaw.com,dwatts@rgrdlaw.com,ckopko@rgrdlaw.com

- **Allyson M. Maltas**
  allyson.maltas@lw.com

- **David W. Mitchell**
  DavidM@rgrdlaw.com,slandry@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Seung Paik**
  seung.paik@lw.com,seung-wan-andrew--paik-5877@ecf.pacerpro.com,ny-courtmail@lw.com,new-york-ma-2860@ecf.pacerpro.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard F. Schwed**
  rschwed@shearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Marguerite Sullivan**
  marguerite.sullivan@lw.com,ny-courtmail@lw.com,marguerite-sullivan-6830@ecf.pacerpro.com

- **Jesse Aaron Vella**
  jesse.vella@lw.com,ny-courtmail@lw.com,new-york-ma-2860@ecf.pacerpro.com,jesse-vella-4487@ecf.pacerpro.com

- **Blake Hunter Yagman**
  blake.yagman@davidllc.com,Blake.yagman@davidllc.com,Israel.david@davidllc.com,BYagman@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)