UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

In re AMERICAN AIRLINES/JETBLUE
ANTITRUST LITIGATION

————————————————————

This Document Relates To:

*Katrina Berger v. American Airlines Group
Inc. and JetBlue Airways Corp.*, No. 1:22-cv-
07374-AMD-TAM (E.D.N.Y.)

*Toni Guerin v. American Airlines Group Inc.
and JetBlue Airways Corp.*, No. 1:22-cv-
07423-AMD-TAM (E.D.N.Y.)

*Dianne Buehler v. American Airlines Group
Inc. and JetBlue Airways Corp.*, No. 1:23-cv-
04089-AMD-TAM (E.D.N.Y.)

————————————————————

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
x

Lead Case No. 1:22-cv-07374-AMD-TAM

(Consolidated with Case No. 1:22-cv-07423-
AMD-TAM)

CLASS ACTION

THIRD CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SHERMAN
ANTITRUST ACT

DEMAND FOR JURY TRIAL

Plaintiffs Katrina Berger, Toni Guerin, Dianne Buehler, and Sheftal Frankel (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Third Consolidated Amended Class Action Complaint for Violations of the Sherman Antitrust Act (the "Action") under §1 of the Sherman Antitrust Act, 15 U.S.C. §1, for actual damages, treble damages, punitive damages, declaratory and injunctive relief, costs of suit, pre-and post-judgment interest, and other relief, and allege as follows:

## NATURE OF THE ACTION

*The question before the Court is whether the [Northeast Alliance ("NEA"), or ("Alliance")] suppresses or promotes competition.  The record supports only one answer.  The NEA, operating as it was designed and intended by American [Airlines Group Inc. ("American Airlines")] and JetBlue [Airways Corp. ("JetBlue")], substantially diminishes competition in the domestic market for air travel.*[1]

*– Hon. Leo T. Sorokin*

1.      This is an action under §1 of the Sherman Antitrust Act, 15 U.S.C. §1, to restrain the anticompetitive conduct of Defendants JetBlue and American Airlines (collectively, the "Defendants") to remedy the effects of Defendants' unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to consumers who purchased airline tickets from Defendants.

2.      In 2019, Defendants began to discuss what the U.S. Department of Justice ("DOJ") and a bipartisan group of Attorneys General from various states would, in their own lawsuit against Defendants, call "*a modern-day version of a nineteenth-century business trust*" that harms consumers to the tune of nearly $700 million annually.  The agreement, which eliminates head-to-head competition between Defendants at four of the largest airports in the United States (Boston

---

[1]    *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558, (the "DOJ Action"), ECF 344 (D. Mass. May 19, 2023) (the "Findings of Fact and Conclusions of Law").  The Findings of Fact and Conclusions of Law are incorporated herein as if fully set forth in this Complaint.

Logan International Airport ("Boston Logan"), LaGuardia Airport ("LaGuardia"), John F. Kennedy International Airport ("JFK"), and Newark Liberty International Airport ("Newark Liberty") (collectively, the "Alliance Airports"), leads to supracompetitive prices for consumers, like Plaintiffs and the members of the Class (defined below), who bought airline tickets from Defendants after the agreement was formally entered into on July 15, 2020.

3.      The agreement has been challenged in various courts, mostly notably by the DOJ and Attorneys General from various states, as violating federal antitrust laws.  After an almost month-long trial involving over two dozen witnesses, more than 1,400 exhibits, and over 600 pages of post-trial submissions, Judge Sorokin ruled that the agreement between Defendants "***plainly violates Section 1 of the Sherman Act***," and  permanently enjoined Defendants from continuing or implementing their anticompetitive agreement.

4.      The agreement between the Defendants is called the NEA and encompasses a set of contracts between the Defendants that define their partnership.  Upon reviewing these contracts, including the primary NEA Agreement and the Mutual Growth Incentive Agreement ("MGIA") (*i.e.*, the revenue sharing agreement), Judge Sorokin in the DOJ Action found that these contracts, together

> create a relationship between American and JetBlue that includes codesharing, schedule coordination, revenue sharing, reciprocal loyalty benefits, and joint corporate customer benefits, all of which extend to most of the carriers' flights to and from Logan, JFK, LaGuardia, and Newark ("the NEA airports"). . . .
>
> A "core feature of the NEA is the optimization of American's and JetBlue's route networks and scheduling of flight times and frequencies at the NEA Airports."

5.      The Alliance is unprecedented: "There is no evidence that any domestic airlines have formed relationships involving revenue sharing, pooling of slots and gates with joint decision-making about their use, allocation of markets, coordination of schedules, or broad efforts to operate

as one airline in a substantial region of the country. ***At least, that was the case until American Airlines and JetBlue formed the NEA***."[2]

6.      Furthermore, as Judge Sorokin found, "***the overarching purpose of the NEA is anticompetitive. Through the NEA, American Airlines and JetBlue cease to compete and, instead, operate as a single carrier in the northeast. That is the core of the relationship, and it is a naked assault on competition***."

7.      Consumers paid higher prices on average at the Alliance Airports where the NEA had taken effect. Indeed, as recently as late January 2023, prior to Defendants being enjoined from continuing their anticompetitive scheme, JetBlue's Chief Executive Officer ("CEO") Robin Hayes stated, in an ill-fated pronouncement that JetBlue was looking forward to continuing the "momentum" that the Alliance created, momentum which netted JetBlue over $100 million in 2021 alone.

8.      As such, Plaintiffs and the members of the Class bring this Action for damages, trebled damages, and reasonable attorneys' fees against Defendants due to their violation of the Sherman Antitrust Act, 15 U.S.C. §1. Additionally, Plaintiffs seek injunctive relief on behalf of themselves and the members of the Class, including, but not limited to, the disbanding of the Alliance.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, as this Action arises out of federal law: §1 of the Sherman Antitrust Act (15 U.S.C. §1), and §§4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§15 and 26).

---

[2]    "Slots" refer to take-off and landing authorizations issued by the FAA during a particular period of time. Slot control enables FAA to regulate air traffic in high demand areas.

4868-1051-7625.v1

10.     This Court has personal jurisdiction over Defendants under §12 of the Clayton Act (15 U.S.C. §22).  Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, are found in and transact business in this District.  Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of airline tickets to consumers like Plaintiffs and the members of the Class.

11.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and the federal venue statute (28 U.S.C. §1391), because JetBlue is headquartered in this District, and American Airlines operates a hub, or a center of its business activity, at JFK, which is within this District.  Furthermore, Defendants committed certain unlawful acts alleged herein in this District, and had effects within this District.

## PARTIES

**Plaintiff Katrina Berger**

12.     Plaintiff Katrina Berger, a natural person and a resident of the state of New York, is a direct purchaser of flights from JetBlue, and has purchased its services at least once during the proposed Class Period, including on September 30, 2021, on flights originating out of and returning to New York's airports.  Plaintiff Katrina Berger has paid JetBlue directly either through JetBlue's mobile application or through the JetBlue website for her tickets purchased in order to travel on these respective flights.

**Plaintiff Toni Guerin**

13.     Plaintiff Toni Guerin, a natural person and a resident of the state of New York, is a direct purchaser of flights from JetBlue, and has purchased its services at least once during the proposed Class Period, including on September 30, 2021, on flights originating out of and returning to New York's airports.  Plaintiff Toni Guerin has paid JetBlue directly either through JetBlue's

- 4 -

mobile application or through the JetBlue website, for her tickets purchased in order to travel on these respective flights.

**Plaintiff Dianne Buehler**

14.     Plaintiff Dianne Buehler, a natural person and a resident of the state of Massachusetts, is a direct purchaser of flights from JetBlue in 2022 and 2023.  Plaintiff Dianne Buehler initially booked travel on JetBlue for herself, her husband, and her daughter for a trip from Boston Logan to Savannah/Hilton Head International Airport in February 2022.  The Buehler family had to postpone the trip as originally scheduled, but rebooked the trip, using credits from the original booking, later that year.  Ms. Buehler subsequently purchased airfare from JetBlue for trips on August 14, 2022, January 11, 2023, and May 23, 2023, from Boston Logan to Fort Lauderdale, Florida, on January 16, 2023 from Miami, Florida to Boston Logan, and on December 15, 2022 from Boston Logan to Orlando, Florida.

**Plaintiff Sheftal Frankel**

15.     Plaintiff Sheftal Frankel, a natural person and a resident of the state of New York, is a direct purchaser of flights from American Airlines, and has purchased its services at least once during the proposed Class Period, in February 2022.  Plaintiff Sheftal Frankel directly booked travel on American Airlines using the AA.com website.  He purchased round trip travel from New York City to Miami, flying from JFK to Miami International Airport ("MIA"), and returning from MIA to LaGuardia.

**Defendant JetBlue Airways Corporation**

16.     Defendant JetBlue Airways Corporation is a Delaware corporation with its headquarters located in Long Island City, New York.  In 2019, the last full year before the establishment of the Alliance and the last full year before the onset of COVID-19, JetBlue made

- 5 -

roughly $8 billion in revenues.  Despite the 2020 onset of the COVID-19 pandemic and its effects on the airline industry, JetBlue's 2022 revenue was approximately $8.57 billion.

**Defendant American Airlines Group Inc.**

17.    Defendant American Airlines Group Inc. is a Delaware corporation with its headquarters located in Fort Worth, Texas.  In 2019, the last full year before the establishment of the Alliance and the last full year before the onset of COVID-19, American Airlines made roughly $45 billion in revenues.  Despite the 2020 onset of the COVID-19 pandemic and its effects on the airline industry, American Airlines's 2022 revenue was approximately $48.97 billion.

### THE MARKET FOR SCHEDULED AIR PASSENGER SERVICE

18.    Plaintiffs' antitrust claim arises from Defendants' violations of §1 of the Sherman Antitrust Act by entering into and abiding by an unlawful agreement to restrain trade in the relevant product market.

#### A.    Relevant Market

19.    Insofar as Plaintiffs are required to plead the relevant product and geographic market to establish the antitrust violations alleged herein, Plaintiffs allege the relevant market at issue and have pleaded how Defendants' conduct has harmed competitive processes in this market.

20.    The relevant market in this Action is the market for scheduled commercial air passenger service in the United States (the "Relevant Market").

21.    Millions of consumers flying into, out of, or connecting through the Alliance Airports depend on the airline industry to be able to travel both domestically and internationally.  These consumers depend on competition among the airlines who fly into, out of, or through the Alliance Airports to drive innovation, cost competition/affordability, consumer choice, and quality of service. Defendants know this.

4868-1051-7625.v1

22.     Indeed, prior to the Alliance, JetBlue was known in the airline industry for continually lowering fares in order to attract consumers shopping for affordable flights, including those arriving at, departing from, or connecting through the Alliance Airports.  For example, when JetBlue initially began offering service at JFK and Boston Logan in the early 2000s, JetBlue's persistent lowering of fares caused competitors to lower theirs as well, leading to something that travel industry gurus called the "JetBlue effect."  For consumers, this meant that when JetBlue would enter a respective route or start to offer service at a different airport, fares on that route offered by competitors would eventually drop due to the price competition that JetBlue's quality combined with JetBlue's low fares created.

23.     Prior to the Alliance, and as a result of JetBlue's price competition, JetBlue quickly gained significant market share.  For example, JetBlue became the number one airline originating out of Boston Logan.  This was due in part to low fares for consumers.  JetBlue itself has calculated that it had saved consumers flying in and out of Boston Logan more than $3 billion since it began serving the airport in 2004.

24.     The Relevant Market satisfies the test for market definition used by federal antitrust enforcement agencies widely known as the "SSNIP test."  The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a significant number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist.  If the SSNIP is profitable, the market is properly defined.  If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

25.     Here, the SSNIP test is satisfied and the market is properly defined.  As described above and below, pursuant to Defendants' agreement, consumers collectively overpay by hundreds

of millions of dollars annually due to the Alliance's propensity to raise prices, throttle competition, and reduce consumer choice, and yet those increases have not driven enough consumers out of the market such that the SSNIP has become unprofitable to Defendants.

### B. Geographic Market

26.     In this Action, the Geographic Market is the entirety of the United States – as the anticompetitive effects of the Alliance can be felt throughout the country.

27.     While this Action is focused on Plaintiffs and Class members – airline customers who flew into, out of, or connecting through the Alliance Airports from the date the Alliance went into effect, through the date on which the anticompetitive effects of the Alliance cease, the Alliance impacts a much broader swath of the economy and interstate commerce than just the immediately visible higher prices for consumers flying into or from those four Alliance Airports..

28.     The "spirit of partnership" that JetBlue and American Airlines claimed underpinned the Alliance

> will diminish competition between the defendants **outside the NEA region**. . . .  It is neither logical nor possible to view the NEA's impact on the defendants' competitive relationship as confined to the northeast.  Both carriers have a strong and vested interest in the NEA's success.  They intended to form a long-term partnership, and they each have invested substantial time and resources in developing and implementing the partnership.  All of this materially changes the competitive relationship between American and JetBlue, increasing their mutual interest in the success and survival of the other **within the NEA and beyond**.

## FACTUAL ALLEGATIONS

*With the NEA, American and JetBlue transformed themselves from competitors to collaborators, joining forces to create a single "optimized network." They design that network together, jointly determining which airline will fly which routes in and out of the NEA region, how often and on what schedule they will serve each route, and which aircraft (i.e., how many seats) will be used on each route. To further promote the arrangement, American and JetBlue share the revenues each generates within the NEA.*

*– Hon. Leo T. Sorokin*

**A.      Developing Weaknesses in Defendants' Businesses Set the Stage for the Scheme**

**1.      JetBlue Airways Corporation**

29.      JetBlue is a New York-based corporation which markets itself as a low-cost airline carrier providing flights to consumers both domestically and internationally.

30.      JetBlue's operations in New York are robust for a relatively new airline (as compared to Delta Air Lines, Inc. ("Delta"), United Airlines, Inc. ("United"), and American Airlines). While smaller than American Airlines, JetBlue ranks as the sixth-largest airline in the United States and it operates in six "focus cities": New York City, New York; Boston, Massachusetts; Fort Lauderdale/Hollywood and Orlando, Florida; Los Angeles, California; and San Juan, Puerto Rico.

31.      According to JetBlue's 2021 Annual Report, JetBlue calls itself "New York's Hometown Airline" as "[a]pproximately one-half of [JetBlue's] flights originate from or are destined for the New York metropolitan area." Additionally, JetBlue is "the largest carrier at Boston[] Logan."

32.      Indeed, "approximately three-quarters of JetBlue's operations have either Boston or New York as an origin or destination."

33.      Initially JetBlue's business model was aggressively focused on growth, providing high-quality service yet affordable fares, and taking market share from the larger carriers like

- 9 -

American Airlines.  JetBlue had, in its early years, established a reputation as a "'maverick'" competitor and priding itself on its "'disruptor'" status.

34.     However, by 2020, JetBlue's growth in New York had stalled due to an inability to obtain additional slots at LaGuardia or JFK.  JetBlue also knew that Delta, who had been investing in growth in Boston, was gearing up to mount a challenge to JetBlue's dominance of Boston.

35.     Until the Alliance in 2020, American Airlines and JetBlue directly and vigorously competed with each other in all markets both carriers served, including in the northeast.

### 2.     American Airlines Group Inc.

36.     American Airlines is a Texas-based corporation and is arguably one of the most powerful airlines in the world, offering flights to consumers both domestically and internationally. American Airlines's dominant position was created over decades by way of a combination of mergers, alliances, and joint ventures, including those aimed specifically at strengthening its network in the northeast.

37.     Focusing on growth, American Airlines sought to establish relationships with other domestic and international carriers, the most notable one being the **one**world alliance.  Through the **one**world alliance, American Airlines relies on partner airlines to complete itineraries in other countries involving routes which American Airlines is precluded from servicing. Members of **one**world alliance can accrue or spend American Airlines's frequent flyer program miles on all legs of their trip.  The purpose or goal of these international agreements, like **one**world alliance, is to provide customers with access to "a global network no member airline alone could replicate." However, international alliances like **one**world are reviewed by government regulators and require immunity because of the extent to which the carriers' operations are intertwined.

4868-1051-7625.v1

38.     Previously, carriers like American Airlines had limited their coordination with other domestic carriers focusing on interline agreements (which allow rebooking of passengers in the event of a cancelled flight on an interline partner's flights) and codesharing agreements, such as the one JetBlue has with Hawaiian airlines.

39.     Then, in 2019, American Airlines began to establish more involved partnerships with other domestic carriers as a way to address its perceived weaknesses on each coast.  In February 2020, American Airlines introduced the West Coast International Alliance ("WCIA") it formed with Alaska Airlines ("Alaska").  Among other things, the WCIA was important to American Airlines because it strengthened its position relative to Delta, United, and Southwest Airlines, each of which had a more substantial presence on the west coast.[3]

40.     American Airlines was also worried about its operations on the east coast, particularly in New York.  While American Airlines arguably had a strong position in New York – it controlled the second-most slots at LaGuardia and the third-most slots at JFK – it was worried that Delta (at LaGuardia and JFK) and United (at Newark) posed threats to its operations in the region.  Around the same time, American Airlines believed that certain of its valuable assets (*i.e.*, slots at JFK) were potentially at risk.

---

[3]   Unlike with the Alliance, the WCIA does not include any coordination of capacity, scheduling or network planning nor does it grant or cede "to one partner any markets previously served by both partners."  Essentially the WCIA replaced a pre-existing, more limited partnership between American Airlines and Alaska.

- 11 -

B.    **JetBlue and American Airlines Create the Alliance as a Means to Defeat Competition by Other Carriers Such as Delta**

41.    Prior to the Alliance, in 2019, JetBlue had the fourth-largest market share for flights to and from the northeastern United States (16% of capacity) and American Airlines had the largest market share for flights in the same region (21% of capacity). Both airlines were in fierce competition with each other, which had resulted in lower prices and increased consumer choice, such as greater flight frequencies.

42.    Before the Alliance, price competition between Defendants was intense, with JetBlue moving aggressively to win market share on routes out of Boston and other major airports in the northeast. In November 2018, JetBlue launched a regional fare sale on routes in several of its focus cities, including Boston, which American Airlines matched. According to testimony from American Airlines' Regional Sales Director, Paul Swartz, at trial, JetBlue's $99 fully-refundable fare for corporate travelers flying from Boston Logan to Ronald Reagan Washington National Airport ("DCA" or "Reagan") and increased frequencies on that route created a "problem" for American Airlines in 2019, and JetBlue's regional fares triggered a fare war between Defendants, with each matching the other's pricing decreases.

43.    In May 2019, in the face of JetBlue's competitive pressure, American Airlines attempted two system-wide price increases on its fares. However, those attempted price increases failed in markets where JetBlue competed against American Airlines non-stop and did not increase its prices. American Airlines was forced to lower its prices.

44.    In December 2019, JetBlue added "shuttle flights" from Boston Logan to LaGuardia, DCA, and Philadelphia International Airport ("PHL") in an effort to compete with American Airlines and Delta. Responding to this increased competition, American Airlines approved higher shuttle discounts for corporate customers on Boston Logan to LaGuardia routes in order to "keep

- 12 -

[JetBlue] out of the shuttle routes." American Airlines's published fares on these routes decreased. Under the Alliance, on January 4, 2022, American Airlines exited the Boston Logan to LaGuardia route, transferring that route entirely to JetBlue.

45.     JetBlue's competitive measures also helped lower fares on other heavily trafficked routes.  In 2014, JetBlue launched its revolutionary new product, Mint.  Mint, originally offered on flights between New York and Los Angeles and New York and San Francisco, featured lie-flat seats and suites, a small plates menu, free Wi-Fi, extra seat and leg space, and enhanced entertainment options.

46.     When JetBlue entered the JFK to Los Angeles ("LAX") route with Mint service in June 2014, American Airlines and Delta lowered their fares to match JetBlue.  As a result, business class fares on the JFK to LAX route decreased.  Refundable walk-up fares decreased 65%, non-refundable walk-up fares decreased 49%, and non-refundable 30-day advance purchase fares decreased 79% following JetBlue's Mint entry on the JFK to LAX route.

47.     In 2015 and 2016, JetBlue announced expansions of its Mint service, adding substantially more routes, including routes from Boston to LAX and San Francisco.  Prices on these routes fell following JetBlue's introduction of its Mint service, with American Airlines's lowest fares dropping 50%.  Mint was revolutionary in the transcontinental markets, resulting in lower premium fares.

48.     On the JFK to LAX route, in particular, American Airlines and Delta fares dropped significantly after JetBlue introduced Mint.  Before Mint, the lowest premium fare offered was $3,000; after JetBlue entered the market, American Airlines and Delta both offered $599 fares in 2016, and $659 fares in 2018.  In March 2020, American Airlines lowered fares on JFK to LAX, and JetBlue matched those lower fares.  Similar price reductions were seen on the JFK to San Francisco

- 13 -

("SFO") route, where American Airlines and Delta lowered their premium fares from about $2,000 to $506.  The introduction of Mint also resulted in competing airlines increasing the number of fare options and the number of business class seats, decreasing ancillary fees, such as change fees, and upgrading aircraft equipment.

49.    All of this changed when, on July 16, 2020, Defendants announced the Alliance via a press release, which stated, in relevant part:

> JetBlue Airways Corp. and American Airlines Group Inc. today announced a strategic partnership that will create seamless connectivity for travelers in the Northeast and more choice for customers across their complementary domestic and international networks.  In addition, the relationship will accelerate each airline's recovery as the travel industry adapts to new trends as a result of the pandemic.
>
> The partnership includes an alliance agreement that proposes codeshare and loyalty benefits that will enhance each carrier's offerings in New York and Boston, providing strategic growth and driving value for customers and crewmembers of both airlines.

50.    As discussed below, as a result of the Alliance and due to the agreement, Defendants have stopped competing with one another on routes subject to the Alliance.  Defendants have reduced capacity on overlapping routes, depriving consumers of increased choice and higher quality service and causing consumers to pay more for fares.  Indeed, JetBlue's capacity in the first quarter of 2022 was lower than in 2019, but revenue was at record high levels.  Additionally, the Alliance has allowed Defendants to "recapture" each other's prospective and actual consumers.  In other words, because of the size of the Defendants' collective market share, if consumers felt a price at one of the two airlines was too high, they would likely end up migrating their business to the other airline because that airline also had a significant market share.  Taken together, their dominant collective market shares over the routes that the Alliance implemented complimented each other's businesses, and, because the two sides share revenue made from the Alliance, business lost to the other airline is recouped to a significant extent through the MGIA.

- 14 -

51. Defendants touted the new partnership and released infographics to show the full details of what was foreseen by Defendants in terms of the Alliance's benefit for consumers of the two airlines:



52. However, the infographics failed to discuss the reductions in competition – specifically for customers of the affected routes – and how those reductions in competition between Defendants would harm consumers. While the infographics touted the Alliance's alleged proclivity to "create[] more competitive options and choice for customers in the northeast[ern United States]," the infographics failed to discuss the harms caused by Defendants' new combined market share in the northeastern United States and how those harms would actually lead to fewer options and higher prices for consumers.

4868-1051-7625.v1

53.     Combined, the two entities now represent and/or represented at least a 37% market share for flights to and from the northeastern United States.

**C.     The Alliance Becomes the Subject of Regulatory and Legal Challenges**

**1.     The Department of Transportation's Review of the Alliance**

54.     Defendants first discussed forming the Alliance in 2019.  The idea originated with Vasu Raja, American Airlines's Senior Vice President of Strategy (who would later go on to become American Airlines's Chief Research Officer in 2020 and then its Chief Operating Officer in 2021).

55.     At first, American Airlines and JetBlue discussed only the possibility that JetBlue might lease some slots from American Airlines at JFK. But their discussion quickly grew to consideration of a broader domestic partnership.  Each company formed a "'[c]lean [t]eam,'" and the clean teams were able to discuss the shape and scope of a potential deal, informed by access to each other's confidential information, to test and confirm that the agreement would have the desired effect – increasing their market power and revenue by restricting output and raising prices.

56.     From that process arose the Alliance – an interrelated set of agreements that required American Airlines and JetBlue to consult with one another in optimizing their respective schedules, alert each other of upcoming changes in schedules so that they could "'plan resources effectively,'" and pool "'airport infrastructure, such as takeoff and landing slots . . . and airport gates.'"

57.     The Northeast Alliance is memorialized in a set of related agreements: (1) the Northeast Alliance Agreement; (2) the Codeshare Agreement; (3) the Mutual Growth Incentive Agreement; (4) the Bilateral Special Prorate Agreement; (5) two Frequent Flyer Program Agreements; and (6) multiple Slot Lease Agreements.  The two companies signed the bulk of these agreements on July 15, 2020 (the Bilateral Special Prorate Agreement and the slot lease agreements

- 16 -

were signed later, in August and October 2020, respectively). Some of the material provisions of some of these agreements are discussed below.

58.     First, there is the Northeast Alliance Agreement – the governing agreement for the Alliance.  The agreement covers all domestic routes covered by American Airlines and JetBlue, and long-haul flights by American Airlines, with the possibility of expanding to cover JetBlue long-haul flights as well.  In it, American Airlines and JetBlue agreed to coordinate on all aspects of network planning at Boston Logan, JFK, LaGuardia, and Newark Liberty, including the flight route, flight schedule, flight airline, flight aircraft to be deployed, and whether American Airlines or JetBlue would run the flight.  They also agreed to optimize their respective network plans and capacity, and communicate those plans to allow their partner to plan resources effectively.   In the Northeast Alliance Agreement, "'optimizing'" capacity meant "coordinating" capacity.  American Airlines and JetBlue also agreed to market and sell services, co-locate at airports, coordinate assets and facilities, and lease slots to one another.  The Northeast Alliance Agreement was later amended in September 2020 to prevent either company from selling or transferring slots at the four airports to any other airline, ensuring that capacity remained constrained.

59.     Second, there is the Codeshare Agreement. Codesharing is an arrangement in which one carrier (the "marketing carrier") places its airline code on a flight operated by another carrier (the "operating carrier").  The JetBlue-American Airlines Codesharing Agreement enabled American Airlines and JetBlue to sell each other's flights as their own.  In the Codeshare Agreement, the two airlines agreed to "coordinate" their service schedules and pool their slots at JFK and LaGuardia.  And they formed a joint management committee to identify ways to increase the benefits afforded to American Airlines and JetBlue – but notably not passengers or purchasers – under the agreement.

60.     Third is the MGIA. Its goal was "to align the parties incentives" and achieve what the parties called "metal neutrality" – an industry term meaning an indifference on the parts of JetBlue and American Airlines as to whether a passenger flew on an American Airlines plane or a JetBlue plane.  "Metal neutrality within the NEA region – that is, on flights to or from the four Alliance Airports – is a cornerstone of the NEA."  The MGIA accomplished this by requiring the two airlines to pool their net revenue on flights to, from, or through the four Alliance Airports, and then share that income according to an agreed-upon formula.[4]  While Defendants claim that the MGIA incentivizes growth and spurs continued competition, "[i]t is implausible that revenue-sharing terms designed and intended to align the parties' economic incentives and foster decision-making in the best interests of the partnership will simultaneously spur the partners to compete vigorously with one another in terms of growth."  So while the MGIA may have been designed to provide the guise of encouraging competition, it actually had a strong tendency to suppress competition.  It ensured the Alliance will last by "overwhelm[ing] any incentive for intra-partnership competition the MGIA might facially appear to create."

61.     On or about July 22, 2020, Defendants submitted the Alliance agreement to the U.S. Department of Transportation ("DOT") for review under 49 U.S.C. §41720, which requires each of the major air carriers who entered into the agreement to submit a copy of the agreement and related materials to the Secretary of Transportation at least 30 days before the agreement takes effect. Under 49 U.S.C. §41712, "[t]he Department [of Transportation] retains independent statutory

---

[4]     The MGIA provides for each company to recover a baseline revenue, and a proportional share of all excess revenue. It defines the baseline as a company's 2019 revenue per equivalent seat mile (RESM – a standard industry revenue measure), multiplied by current capacity, and multiplied by a "stage length adjuster," which adjusts for flight length.  That baseline revenue is subtracted from pooled total revenue to determine the excess, or "incremental," revenue.  JetBlue and American Airlines then split that incremental revenue according to current capacity.

authority under 49 U.S.C. §41712 to prohibit unfair methods of competition in air transportation to further its statutory objectives to prevent predatory or anticompetitive practices and to avoid unreasonable industry concentration."

62.     On August 20, 2020, the DOT extended the waiting period for the code-sharing agreement to take effect 90 days from August 21, 2020 to November 19, 2020.  Ultimately, the DOT did not render a decision based on the legality of the Alliance, allowing the Alliance's code-sharing agreement to take effect in January 2021.

63.     The reasons for this, according to the DOT, were two-fold: first, because the DOT stated that "the Department intends to defer to DOJ, as the primary enforcer of Federal antitrust laws to resolve the antitrust concerns that the DOJ has identified with respect to [the Alliance]" and, second, because §41720

> does not provide the Department authority to approve or disapprove agreements submitted for review under that section; rather, the section gives the Department a limited period of time to review the agreements before such agreements may take effect.  DOJ, which is responsible for enforcing Federal antitrust laws and has also been conducting its own review of the [Alliance], had not concluded its investigation at the time DOT's review period ended . . . .
>
> In this context, DOT's review of the [Alliance] under [S]ection 41720 was not designed to approve or disapprove the alliance.

64.     The DOT, during the limited window it had to review the Alliance, was able to reach an agreement for minor concessions by Defendants but stated that the agreement "did not address all of the Department's concerns resulting from the [Alliance]'s impacts on competition, but instead sought concessions from the carriers that were intended to mitigate some of the anticompetitive harm while providing a means for monitoring the [Alliance's] implementation."[5]

---

[5]     Defendants entered into an agreement with the DOT on January 10, 2021 which included, among other things, agreements by each Defendant to divest a number of slot pairs at JFK and Reagan

- 19 -

65.     Critically, "[t]he parties to the [DOT Agreement] recognized that the [A]lliance was still subject to the antitrust laws, that DOJ was continuing its review, and that DOT retained its authority to remedy any anticompetitive harm."   Historically, under 49 U.S.C. §41712, the DOT "prohibits anticompetitive conduct that (1) violates the antitrust laws, (2) is not yet serious enough to violate the antitrust laws but may well do so if left unchecked, or (3) although not a violation of the letter of antitrust laws, is close to a violation or is contrary to their spirit." *See, e.g.*, *ASTA v. United Airlines, Inc.*, No. OST-99-6410, Order 2002-9-2 (Dep't of Transp. Sept. 4, 2002) (citing *E.I. DuPont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-37 (2d Cir. 1984)).

**D.      Spirit Airlines, Inc. and Others Complain About the Alliance to the Department of Transportation; Department of Justice and Several States' Attorneys General Sue to Stop the Alliance**

66.     On January 7, 2021, Spirit Airlines, Inc. ("Spirit Airlines") filed a formal complaint with the DOT regarding the Alliance.   Complaint of *Spirit Airlines, Inc.*, Docket No. OST-2021-0001 (Dep't of Transp. Jan. 7, 2021).   Additionally, Spirit Airlines claimed that the information disclosed about the Alliance to the public was insufficient during the DOT's review and that "the remedies agreed to in the DOT Agreement [between the DOT, JetBlue, and American Airlines] were insufficient to address anticompetitive concerns."   The Spirit Airlines complaint led to other groups filing public comments about the Alliance being anticompetitive, including other airlines, an airline association, a non-profit focused on competition, and a consumer advocacy organization.   However, these comments were filed after the public release of the agreement made between the DOT, JetBlue, and American Airlines.

---

upfront and divest additional slots at JFK and LaGuardia if Defendants failed to "meet certain annual capacity-growth targets" at those airports.

67.     The DOT stayed the proceedings in the matter of the complaint of *Spirit Airlines, Inc.* while the DOJ's action proceeded.  While Spirit Airlines's complaint against American Airlines and JetBlue was stayed, JetBlue announced a hostile takeover of Spirit Airlines.  Its effort (currently the subject of a second antitrust suit by the DOJ), if successful, would not only moot Spirit Airlines's complaint, dampening the scrutiny the Alliance receives, but also remove yet another competitor from the already consolidated market.

68.     On September 21, 2021, the DOJ, along with the State of Arizona, the State of California, the District of Columbia, the State of Florida, the Commonwealth of Massachusetts, the Commonwealth of Pennsylvania, and the Commonwealth of Virginia, sued Defendants under §1 of the Sherman Antitrust Act, 15 U.S.C. §1, stating: "[T]o prevent the harm to consumers that will occur" from the Alliance.

69.     The DOJ Action Complaint alleged:

> By consolidating [defendants'] businesses in this way, American and JetBlue will effectively merge their operations on flights to and from the four airports . . . .  In so doing, the Northeast Alliance will eliminate significant competition between American and JetBlue that has led to lower fares and higher quality service for consumers traveling to and from those airports.  It will also tie JetBlue's fate to that of American, diminishing JetBlue's incentives to compete with American in markets across the country.  The United States and Plaintiff States bring this action to prevent the hundreds of millions in harm to consumers that will occur if these two rivals are permitted to maintain this [Alliance].

70.     As the DOJ Action Complaint states, American Airlines, which is the largest airline domestically and internationally, is led by management which has "long been a 'proponent of consolidation in the industry'" and that "'[d]omestic consolidation' remains one of American Airlines's 'long term projects.'"  Indeed, internally, the DOJ reports that American Airlines's former CEO and current Chairman Doug Parker has been referred to as "'the Godfather of consolidation,'" having led numerous mergers previously: as CEO of America West, Parker led a merger with US

- 21 -

Airways; as CEO of US Airways, Parker led a merger with American Airlines; and now, at American Airlines, Parker has engaged in the Alliance as described herein, what the DOJ calls a "*modern-day version of a nineteenth-century business trust*."

71.     JetBlue, being a smaller airline with a slimmer market share than American Airlines, had opposed consolidation before the Alliance.  JetBlue's CEO stated two years before the Alliance that consolidation "'has come at a cost to consumers.  Just look at the fares in some of the fortress hubs and in some of the legacy-dominated markets without low-fare competition.  Chances are, you'll see fares that are higher than they should be and in that construct there's very little incentive to provide great service or to innovate.'"

72.     As noted above, the DOJ Action trial began in late September 2022 and concluded in November 2022 after hearing testimony from 24 live witnesses, receiving deposition testimony into evidence from an additional 17 witnesses, the introduction of more than 1,400 exhibits, and over 600 pages of post-trial submissions.  At trial, the DOJ and the Plaintiff States attested to government economists' estimates that consumers have been and would continue to be harmed and that, because of JetBlue's removal as a low-cost carrier, other airlines would be less incentivized to participate in price competition after the Alliance.

## THE ANTICOMPETITIVE EFFECTS OF THE ALLIANCE

73.     The anticompetitive effects of the Alliance on Plaintiffs and consumers are multifaceted and well-established.  Based on the abundance of evidence presented in the DOJ trial, the Alliance has been found to have the following anticompetitive effects.

74.     As a result of the Alliance, JetBlue and American Airlines no longer compete with each other for airline passenger travel with the northeast region covered by the Alliance; "[r]ather, they function like a single airline in the NEA region, as much as possible. . . . [Including] when

choosing which routes to fly, when to fly them, and which aircraft (and which partner) will do so." This is contrary to assertions by Defendants that they continue to view each other as competitors. Rather:

> the record confirms what common sense suggests: in forming the NEA, American [Airlines] and JetBlue decided to stop competing and start cooperating with one another in the northeast. Airlines engaged in competition with one another would tactically respond to each other's fares. They would consider launching new service to directly compete with a rival's service on an O&D. They would not cede certain routes to a competitor. Within the NEA, American [Airlines] and JetBlue no longer adhere to these competitive practices with respect to one another. In that region, **competition between them has effectively ceased**.

75.     Another effect of the Alliance is that American Airlines and JetBlue have compromised their growth in other markets in order to focus on the Alliance region. Defendants have adjusted their priorities, focusing resources towards growth in New York and Boston thereby sacrificing growth of their businesses in other regions. For example, before the Alliance, American Airlines had plans for growth in Philadelphia; but by September 2020, those Philadelphia plans had been deprioritized in favor of JFK such as by moving aircraft out of its Philadelphia hub to JFK to launch new flights out of JFK.[6] Similarly, JetBlue has had to pause or reconsider its pre-Alliance growth plans in cities like Fort Lauderdale as a result of the Alliance. Since airlines, at any given time, have only a finite number of aircraft to service their routes, a decision to increase service in one market necessarily means a reduction in service in another market. As such, because of the Alliance, JetBlue had to reconfigure its fleet so it could cover the slots leased to it and markets allocated to it by American Airlines.

---

[6]     "Reflecting that American's 'block hours,' a measure related to the length of a flight that is used in determining pay of flight crews, had increased by eight percent within the NEA region but had decreased by twelve percent across the rest of American [Airlines]'s system."

76.     And American Airlines and JetBlue have worked cooperatively to stave off further scrutiny from the DOT by using American Airlines's slots at JFK and LaGuardia "more heavily and efficiently."  But these changes are not some procompetitive benefit of the Alliance: rather, JetBlue and American Airlines were already intended to execute exactly this sort of slot lease ***before*** they conspired to form the Alliance.

77.     While touting the Alliance as an attempt to provide more competitive options and choice to consumers, the Alliance's "schedule optimization and capacity coordination process[es]" have actually resulted in decreased capacity, fewer flights, and fewer choices on many routes, including some heavily-traveled routes.  The decrease in capacity and choice stems from the fact that, under the Alliance, Defendants have allocated or divided up certain markets among themselves. For example, in markets with flights between LaGuardia (on one end) and Boston Logan, Philadelphia, Charleston, or Orlando (on the other end), "the number of competitors has literally decreased by one, leaving customers with one fewer option when traveling between these pairs of cities."  There is no reason to believe that Defendants' allocation of markets between them will stop unless they are forced to.  Moreover, even in markets where a Defendant has not ceded a route entirely to the other, the Alliance's goal of an "optimized" schedule (*i.e.*, a schedule aimed at eliminating instances in which the Defendants offer flights departing at or around the same time) by its very nature decreases frequencies or capacity on those routes, thereby lessening competition and providing fewer options for consumers.

78.     Another effect of the Alliance is that JetBlue has put its business model and long-term growth, domestically and abroad, at risk.  Founded on the principle of offering low-cost, high-quality air travel, the Alliance has actually increased JetBlue's operating costs.  Additionally, aligning itself as closely as it has with American Airlines under the Alliance has caused JetBlue to lose its

- 24 -

perceived status as a "low-cost" airline thereby causing it to lose bids for additional slots and capacity at London's Heathrow Airport and at Newark Liberty.  Together, the hit to JetBlue's bottom line and lost opportunities for growth weaken JetBlue's ability to provide the "disruptive" competition it had in the past.  This is to the detriment not only of JetBlue and its reputation, but also to consumers who have historically benefitted from the JetBlue effect of bygone days.

## THE ALLIANCE'S ANTICOMPETITIVE EFFECTS HARM COMPETITION AND CONSUMERS

*[L]ike partners in nearly any joint venture, both American and JetBlue have a strong and admitted interest in ensuring the NEA succeeds over the long term. Common sense suggests, and the Court finds based on all of the testimony and evidence, that a spirit of partnership between the two carriers will overwhelm any incentive for intra-partnership competition the MGIA might facially appear to create.  American and JetBlue "now function as a single airline" when they decide how to "optimiz[e] capacity" in the NEA region, and they "don't compete with each other directly" on NEA routes. [citation omitted].  It is implausible that revenue-sharing terms designed and intended to align the parties' economic incentives and foster decision-making in the best interests of the partnership will simultaneously spur the partners to compete vigorously with one another in terms of growth.*

*– Hon. Leo T. Sorokin*

79.     The Alliance is unlawful due to its anticompetitive nature: the harms caused by the Alliance are so "***considerable and obvious***," that "***no deep and searching analysis is required in order to discern its unlawfulness***."

80.     Competition and consumers alike are harmed as a result of the Alliance, including, but not limited to, the following effects: (1) the Alliance eliminates head-to-head competition between Defendants, reducing consumer choice as well as price competition in the relevant market; (2) JetBlue's status and unique role of a "'maverick'" competitor – which operated as a competitive check on the conduct of larger carriers – has been sacrificed as a result of its agreement with

- 25 -

American Airlines; and (3) the Alliance has allowed Defendants to engage in unlawful market allocation and division (*i.e.*, assignment of routes to either JetBlue or American Airlines).

### A. The Alliance Eliminates Competition Between Two of the Four Largest Carriers in the Northeast

81. The Alliance has caused actual competitive harm:

. . . [T]he NEA has *eliminated the once vigorous competition between two of the four largest domestic carriers in the northeast, replacing it with broad cooperation in pursuit of the shared interests of their partnership*. American and JetBlue no longer operate in the northeast as two distinct carriers engaged in direct competition with one another. *Rather, they work together as one combined carrier with a single "optimized" network*. . . .

The two carriers pool their resources and decide together what routes to fly within the NEA and on what schedule. As to each O&D, they decide together which partner should operate the route –a decision which determines what aircraft will be used and, thus, what capacity (and what amenities) will be available. *In other words, they coordinate in a way that impacts their output within the NEA.* If both carriers will operate the same route, they do so on an "optimized" schedule they jointly design to minimize (and, ideally, eliminate) instances in which the two offer flights departing at or around the same time. This optimized NEA schedule emulates that of a single carrier. Though American and JetBlue do not discuss the fares they will set, they otherwise strive to provide a seamless product by operating, as much as they can, as a single airline would. *Put simply, the NEA has replaced direct and aggressive competition between American and JetBlue on nearly every front (including routes, schedules and capacity) with cooperation. This, in and of itself, is a fundamental assault on competition and an actual harm the Sherman Act is designed to prevent.*

82. Testimony given during the DOJ trial by Defendants' senior executives shows that Defendants' knew the Alliance would eliminate competition between JetBlue and American Airlines in the region:

(a) Paul Swartz, American Airlines's Regional Sales Manager, when asked "[s]o you no longer compete with JetBlue," answered "[Y]es";

(b) Brian Znotins, American Airlines's Vice President, Network & Regional Schedule Planning, when asked "[s]o you are no longer competitors [with JetBlue] on those [Alliance] routes from a network perspective," answered "Yes";

(c) Robin Hayes, JetBlue's CEO, when asked "you would agree that, within the [Alliance], where the two airlines are coordinating capacity, JetBlue and American

- 26 -

no longer compete with each other, correct?," answered "[W]e don't compete with each other directly"; and

(d)     Scott Laurence, American Airlines's SVP of Partnership Strategy, when asked "[w]ith the [Alliance] in place, do you agree that the revenue sharing component means that it makes more sense to cooperate with American than compete?," answered "For [Alliance] routes, yes."

83.     The harm caused by the loss of competition between American Airlines and JetBlue is particularly noticeable in two cities within the region served by the Alliance.  At Boston Logan, after the Alliance, 73% of domestic flights are now controlled by 2 (versus 3) entities – Delta and the Alliance.  In New York, which was already a highly constrained market due to the scarcity of slots at JFK and LaGuardia, the Alliance results in 84% of the slots at JFK and LaGuardia being held by the same 2 (versus 3) entities that also control Boston Logan – Delta and the Alliance.  According to a report by the New York Port Authority, which measured overall share and examined the effect of the Alliance, "[p]ost-NEA, effectively three marketing carriers account for 72% of the capacity at Port Authority airports."

84.     The DOJ Court found that the collaboration by Defendants, including the pooling of valuable and scarce resources (slots, access to gates, and runway time), created significant barriers to entry by other carriers.  Because the markets at issue were already constrained and concentrated, the "reduction in competition and choice resulting from the [D]efendants' cooperation is a real and substantial harm."

85.     In addition to the testimony and findings in the DOJ Action, Defendants publicly admitted that agreements (like the Alliance) with other airlines can be harmful to competition: American Airlines, in its 2021 Annual Report, discusses how "additional mergers and other forms of industry consolidation" could harm American Airlines's bottom line and market share:

Depending on which carriers combine and which assets . . . [American Airlines's] competitive position relative to the post-combination carriers or other carriers that

acquire such assets could be harmed.  In addition, as carriers combine through traditional mergers or antitrust immunity grants, their route networks will grow, and that growth will result in greater overlap with our network, which in turn could decrease [American Airlines's] overall market share and revenues.

86.     Additionally, JetBlue executives repeatedly warned – prior to the Alliance – that consolidation leads reduced capacity, higher costs, and ultimately less choice for consumers.

87.     Defendants' direct competitors in the Relevant Market have likewise recognized the harm to consumers and competition.  Some of the concerns articulated by competitors include harm to consumers (in the form of higher prices, reduced choice, and, subsequently, being priced out of the Relevant Market), blocking new entrants into the market (because Defendants control the available slots at airports which would be needed in order to viably compete), and other types of harm.

**B.     JetBlue's Unique Role as a "'Maverick'" Competitor was Weakened by the Alliance, Further Decreasing Competition**

88.     As noted above, until recently, JetBlue touted itself as an industry "'disruptor,'" aggressively pursuing growth, offering significantly cheaper rates, and attempting to chip away at the market shares of the larger airline carriers.  The "JetBlue Effect" was real and resulted in other airlines dropping their prices to compete with JetBlue.

89.     Yet, as a result of the Alliance with American Airlines, JetBlue lost opportunities to secure sought-after access to busy, constrained markets where its historically disruptive methods would have operated as an important competitive check on the conduct of larger carriers.  For example, JetBlue lost out on valuable slots in key markets (London, Heathrow and Newark, NJ) because regulators believed that JetBlue's alliance with American Airlines altered its status as a low-cost carrier in those markets.

90.     Additionally, its alliance with American Airlines has seriously undermined JetBlue's incentive to compete, aggressively, against American Airlines with respect to fares on certain routes. At its core, the MGIA is designed to "make the two carriers indifferent to whether a customer chooses to purchase a flight from American or from JetBlue"; in other words, the goal of the MGIA is achieve "metal neutrality" – meaning, for purposes of the Alliance, it makes no difference whether a passenger, flying on a route covered by the Alliance, flies on a JetBlue or an American Airlines plane.  The Alliance did just that.  This aspect of the Alliance thus alters JetBlue's motivations regarding pricing and other decisions regarding its own service both inside and outside the region covered by the Alliance.

## C.     A Core Feature of the Alliance is Unlawful Market Allocation

91.     "[A]t least one of the NEA's core features closely resembles a restraint that is per se illegal: the [D]efendants' assignment of various routes to either American [Airlines] or JetBlue as part of their 'optimization' of the combined NEA network."  Competitors at the same level of a market structure who enter into an agreement to allocate territories so as to minimize competition commit a "classic example[] of a per se violation" of the Sherman Antitrust Act.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

92.     JetBlue and American Airlines are horizontal competitors who have, under the terms of the Alliance, agreed to make network decisions together with respect to their services in the northeast, deciding which routes to serve and which partner should operate any given route.  Since implementing the Alliance, Defendants have allocated markets to one or the other of them, either by one partner exiting a market both had previously served or by one partner halting its plans to enter a market already served by the other.

- 29 -

93.     In fact, since implementation of the Alliance, American Airlines has ceased service on over a dozen routes that both Defendants serviced prior to the Alliance, including many high-traffic routes.  For example, as a result of the Alliance, American Airlines exited the Boston Logan to LaGuardia route.  Further, JetBlue has agreed to take over from American Airlines the JFK to SFO route, with American Airlines planning to exit that route.

**D.     The Alliance Empowered American Airlines to Reacquire Control Over Slots It Had Previously Been Forced to Divest to Preserve Competition**

94.     Previously, the DOJ had required American Airlines (and US Airways, which merged with American Airlines in 2013) to divest a number of resources to low-cost carriers in order to ensure that US Airway's slot swap with Delta in 2011 and American Airlines's merger with US Airways in 2013 did not foist anticompetitive consequences on purchasers.

95.     JetBlue acquired a number of slots at Reagan and LaGuardia as a result of these divestitures and used them to create rigorous head-to-head competition with American Airlines's Boston-Washington, D.C. route.

96.     But after American Airlines entered into the Alliance, those slots are once more under American Airlines's effective control.  In the Alliance, American Airlines and JetBlue agreed to coordinate – meaning that JetBlue needed American Airlines's sign off on how to use those slots. That is precisely the kind of market power that the DOJ sought to keep American Airlines from exercising over those slots when it forced American Airlines (and its predecessor) to divest.

97.     And when American Airlines formed its joint venture with Alaska, it was prohibited from offering service along certain routes, including one between JFK and Seattle and another between Newark and Seattle.

98.     After American Airlines entered into the Alliance, however, its codesharing agreements with JetBlue and Alaska, when combined, mean that American Airlines was able to

- 30 -

market routes between JFK and Newark, on one end, and Seattle on the other by putting its code on legs of that trip separately operated by JetBlue and Alaska.  In other words, by entering into the Alliance with JetBlue, American Airlines was able (with JetBlue's help) to evade a federal court order.

99.    The Alliance undermined the DOJ's and a federal court's efforts at creating competition.  As a result of the Alliance (together with American Airlines's deal with Alaska) two-thirds of the slots that American Airlines's predecessor US Airways was forced to divest in the Delta-US Airways slot swap deal and almost 50% of the Reagan slots American Airlines had to divest in its merger with US Airways were once again under American Airlines's direct influence. And American Airlines was able to offer itineraries along routes that a court forbid it from flying.

## DEFENDANTS' POST-ALLIANCE REVENUE SHARES DEMONSTRATE HIGHLY CONCENTRATED MARKETS INDICATING ANTICOMPETITIVE HARM

100.    The Alliance combines Defendants respective market share at the four Alliance Airports.  Prior to the Alliance, JetBlue already had the largest market share at Boston Logan, which only grew with the agreement between Defendants to enter the Alliance.

101.    Specifically, for routes between Boston Logan and 12 major airports, Defendants have a combined revenue share of over 49.8% for each of those routes, as listed below:

(a)    Boston – Charlotte: 96.1% (combined revenue share);

(b)    Boston – Chicago: 48.5%;

(c)    Boston – Dallas: 83.6%;

(d)    Boston – Los Angeles: 62.6%;

(e)    Boston – Miami: 76.5%;

(f)    Boston – New York City (JFK or LaGuardia): 49.8%;

(g)    Boston – PHL: 86.8%;

- 31 -

(h)      Boston – Phoenix: 85.2%;

(i)      Boston – Rochester: 86.2%;

(j)      Boston – Syracuse: 82.1%; and

(k)      Boston – Washington D.C. (DCA): 88%.

102.    Each of these revenue shares is considered to be anticompetitive under the conventional Herfindahl-Hirschman Index ("HHI") test, which measures market concentration and potential for anticompetitive conduct.  Market concentration harms consumers because it eliminates consumer choice, throttles price competition, reduces incentives to increase supply and to innovate, and tends to negatively influence downward pricing pressure.

103.    A route is considered highly concentrated if the calculated HHI value is 2500 or higher. All but one of these Boston-related routes was already considered extremely concentrated prior to the Alliance, with HHIs ranging from 2,721 to 5,727 points.

104.    When a market event, such as a merger or partnership, raises an HHI by more than 200 points, that event presumptively harms competition.  When American Airlines and JetBlue entered into the Alliance, they increased the HHI for each of the Boston-related routes by at least 940 points, and as much as 3,870 points.  The resulting HHI on each of these Boston-related routes far exceeds 2,500 (ranging from 3,661 to 9,245).  Because American Airlines and JetBlue's conduct raised the HHI on each of these routes by more than 200 points, to a total in excess of 2,500 points, the Alliance presumptively enhanced market power and harm competition at Boston Logan, according to the guidelines established by the DOJ and FTC.

105.    The only Boston-related route that was not already highly concentrated before American Airlines and JetBlue entered into the Northeast Alliance, between Boston Logan and Los Angeles, was already moderately concentrated – barely missing the 2,500 point benchmark for being

- 32 -

considered highly concentrated – at 2,463.  But that does not mean American Airlines and JetBlue did not have an anticompetitive effect on that route.  The Alliance raised that baseline by 1,941 points, for a resulting HHI of 4,404 points.  Because Defendants' conduct raised the HHI on these routes by more than 200 points, to a level exceeding 2,500, their conduct is deemed, under the DOJ and FTC's guidelines, to be "highly likely to raise significant competitive concerns."

106.    Additionally, for routes between JFK/LaGuardia or Newark Liberty and 18 major airports, Defendants have a combined revenue share of over 31% for each of those routes, as listed below:

(a)    New York (JFK/LaGuardia) – Austin: 44.6%;

(b)    New York – Charleston: 43.6%;

(c)    New York – Chicago: 36.2%;

(d)    New York – Las Vegas: 46.5%;

(e)    New York – Los Angeles: 57%;

(f)    New York – Martha's Vineyard: 92.5%;

(g)    New York – Miami: 55.9%;

(h)    Newark Liberty – Miami: 31%;

(i)    New York – Nantucket: 96.8%;

(j)    New York – Orlando: 55.3%;

(k)    New York – Phoenix: 61.5%;

(l)    New York – Portland: 37.4%;

(m)    New York – Raleigh-Durham: 47.8%;

(n)    New York – San Diego: 44.7%;

(o)    New York – San Francisco: 45.7%;

- 33 -

     (p)     New York – Savannah: 46.5%; and

     (q)     New York – West Palm Beach: 60%.

107.    Each of these revenue shares is considered to be anticompetitive under the conventional HHI test, which measures market concentration and potential for anticompetitive conduct.  Prior to the Alliance, competition on each of these routes was already highly consolidated, with HHI values between 2,525 and 8,057.  By entering into the Alliance, American Airlines, and JetBlue raised the HHI on each of these routes by between 207 and 2,584 points, resulting in even higher post-Alliance HHIs between 2,732 and 9,091.  Because American Airlines and JetBlue's conduct raised the HHI on each of these routes by more than 200 points, to a total in excess of 2,500 points, the Alliance is presumed to enhance market power and harm competition in the New York City airports.

108.    In 2019, prior to the Alliance, the general, non-route specific market share of each of the two airlines in the New York City and Boston metro areas were as follows:

     (a)     New York City:

          (i)     JetBlue: 24%

          (ii)     American Airlines: 16%

     (b)     Boston:

          (i)     JetBlue: 35%

          (ii)     American Airlines: 16%

109.    The combined market share in 2019 of the two previously independent entities is as follows:

     (a)     New York City:  JetBlue and American Airlines: 40%

     (b)     Boston:  JetBlue and American Airlines: 51%

110.     Thus, "the domestic airline industry in general and the markets within the NEA in particular are highly concentrated, and that the NEA renders them more so."

111.     These dominant market shares in highly concentrated markets allow Defendants to dictate flight availability, fare pricing, and other variables at these respective airports.  Moreover, these dominant market shares also drive up prices for flights on other airlines, which respond to higher prices and a decreased ability to usher out flights from the airports at-issue.

112.     For example, when JetBlue left the JFK to Richmond route, fares rose by 65% and passenger counts fell by 49%.  According to testimony and documents presented at the DOJ trial, when American Airlines stopped flying JFK to San Diego ("SAN") due to the 737 MAX grounding, JetBlue "'ignor[ed] AA pricing, until it becomes clear they will re-enter the market,'" and JetBlue "'down-bucketed its entire fare structure in JFK to San Diego,'" which "'effectively increased fares by $20-$40 throughout the structure.'"  As a result, JFK to SAN was "'one of the highest-fare trans-con markets in the system.'"  Additionally, on at least eight routes out of New York City, JetBlue increased its prices, on average, by 7.8%.

113.     The competitive harm caused to Plaintiffs and the Class, by way of increased prices, is supported by the economic analysis conducted by experts in the DOJ Action and by Spirit Airlines in its antitrust complaint with the DOT.  In the DOJ Action, Judge Sorokin considered evidence presented by the parties' experts who provided testimony about the features and effects of the Alliance.  Specifically, Judge Sorokin accepted the expert analysis regarding the upward pricing pressure created by the Alliance, noting that this conclusion was "well supported by basic economic principles and incentives."

114.     Similarly, in the Spirit Airlines complaint, the analysis conducted demonstrated consumers would be harmed by the Alliance:

## The Strategic Partnership Is Likely to Harm Consumers

A 5% fare benefit from the AAdvantage program is likely and would result in $383 million in higher costs for Air Travelers and the increase fares would price 2.7 million O&D passengers out of the air travel market.

| | Passengers Subject to Fare Increase | | Average Fare Increase | | Revenue Impact of Higher Average Fares | Passengers Lost Due to Higher Average Fares |
|---|---|---|---|---|---|---|
| Total | 37,476,531 | $ | 10.24 | $ | 383,767,385 | 2,712,778 |
| BOS | 12,188,847 | $ | 9.54 | $ | 116,272,321 | 882,303 |
| JFK | 24,404,280 | $ | 10.66 | $ | 260,202,725 | 1,766,530 |
| EWR | 478,667 | $ | 8.79 | $ | 4,208,268 | 34,649 |
| LGA | 404,737 | $ | 7.62 | $ | 3,084,071 | 29,297 |

115.    Specifically, Spirit Airlines conducted an analysis of how the Alliance would impact consumer pricing, and found that even marginal increases in airfares as a result of the Alliance would result in hundreds of millions of dollars of revenue for Defendants on an annual basis:

## Impact of Higher Fares on Consumer Prices
(Increased revenue in millions, annually)

Given JetBlue's recent fare trends it is likely that the Strategic Partnership will increase fares in the range of 5% or more.  Each 1% increase will raise the cost to consumers by roughly $80 million annually

| Market | 1% Increase | 3% Increase | 5% Increase |
|---|---|---|---|
| **Total** | $ 81.2 | $ 236.9 | $ 383.8 |
| BOS | $ 24.6 | $ 71.8 | $ 116.3 |
| JFK | $ 55.1 | $ 160.6 | $ 260.2 |
| EWR | $ 0.9 | $ 2.6 | $ 4.2 |
| LGA | $ 0.7 | $ 1.9 | $ 3.1 |

- Given the scope of the Strategic Partnership and the leverage and market power of the AAdvantage program, an increase of 5% is likely if not conservative

116.    And, as a result of these increases in price, more consumers would be "priced out of the market" for airfare.  Spirit Airlines also did an analysis of the effect of higher prices on consumer demand:

## Impact of Higher Fares on Consumer Demand
(Lost passengers in thousands, annually)

As price increases, more passengers will be priced out of the market.  For each 1% increase in price, slightly more than half a million travelers will be lost; the impact of the Strategic Partnership will negatively impact over 2.5 million.

| Market | 1% Increase | 3% Increase | 5% Increase |
|---|---|---|---|
| **Total** | 542.6 | 1,627.7 | 2,712.8 |
| BOS | 176.5 | 529.4 | 882.3 |
| JFK | 353.3 | 1,059.9 | 1,766.5 |
| EWR | 6.9 | 20.8 | 34.6 |
| LGA | 5.9 | 17.6 | 29.3 |

- The displaced demand of higher fares would normally present an opportunity for more efficient competitors to enter the market and satisfy that demand, but congestion at these airports limit effective new entry.

117.    These analyses by Spirit Airlines illustrate the impacts of the Alliance on consumers: higher prices leading to a decline in demand due to "more passengers [being] priced out of the market."

118.    Additionally, this was also the conclusion of the States' Attorneys General and the DOJ which assert that the Alliance caused up to $700 million in higher fares for consumers annually.[7]

119.    During the Class Period, both Defendants have cut routes and reduced the amount of planes in the air "in an effort to stabilize operations."  This is direct evidence that consumers are experiencing reduced output and diminished service quality.  Indeed, American Airlines's own internal assessment of whether the Alliance was resulting in higher quality of service ("QSI") at Alliance Airports shows that, first, other airlines' QSI improved more than either American Airlines or JetBlue during the Alliance implementation, and second, that JetBlue actually lost QSI share.

120.    These are the types of harms to competition that the antitrust laws were intended to combat and prevent.  Additionally, there are threats to consumers beyond just price and output.  As stated by FTC Commissioner Lina Khan in her paper, *Amazon's Antitrust Paradox*:

> [L]ong-term interests of consumers include product quality, variety and innovation – factors best promoted through both a robust competitive process and open markets. By contrast, allowing a highly concentrated market structure to persist endangers these long-term interests, since firms in uncompetitive markets need not compete to improve old products or tinker to create [new] ones.

121.    Indeed, the antitrust laws were intended to prevent all of these types of harms caused by a lack of competition.  The legislative history for the Sherman Antitrust Act called "for diversity and access to markets [and in opposition to] high concentration and abuses of power."  United States

---

[7]   Judge Sorokin concluded the Alliance harmed consumers, including through increased pricing for flights, but did not reach the issue of a specific damage figure or model.

Senator John Sherman himself, the Senator from Ohio who was the architect of the Sherman

Antitrust Act, stated:

> If we will not endure a king as a political power, we should not endure a king over
> the production, transportation, and sale of any of the necessities of life.  If we
> would not submit to an emperor, we should not submit to an autocrat of trade, with power to
> prevent competition and to fix the price of any commodity.

122.    As such, Plaintiffs and the members of the Class bring this Action to rectify the harms

as alleged herein.

## DEFENDANTS PROFIT FROM THE ALLIANCE

123.    Ultimately, the Alliance was formed because, as other airline mergers and quasi-

mergers have shown, controlling a dominant market share over (and stamping out competition for)

some of the most travelled routes in the Relevant Market is highly profitable.   Defendants have

profited substantially as a result of the Alliance.  For example, in JetBlue's 2021 Annual Report,

JetBlue states that it reached $100 million in gross code-share revenue generated by the Alliance.  In

that same Annual Report, JetBlue states it

> continue[s] to seek additional strategic opportunities through new commercial
> partners as well as assess ways to deepen existing airline partnerships, including the
> [Alliance].  [JetBlue] plan[s] to do this by expanding codeshare relationships and
> other areas of cooperation such as frequent flier programs.  [JetBlue] believe[s] these
> commercial partnerships allow [it] to better leverage [its] strong network and drive
> incremental traffic and revenue.

124.    If the goal of the Alliance was to provide lower fares to consumers, "driv[ing]

revenue" directly clashes with that goal.  Indeed, at the core of the Alliance is the MGIA agreement

between Defendants that establishes the revenue sharing feature of the Alliance.

125.    The Defendants, since the filing of the initial complaint in this Action, have opted to

continue to expand the reach of the Alliance, despite the anticompetitive nature of the Alliance.

American Airlines had announced that it would be "launching" six new Alliance routes out of

LaGuardia; JetBlue announced that it would offer four new routes from LaGuardia, a new route from Boston Logan, and a new route from JFK.

## "PLUS FACTORS" IN THE RELEVANT MARKET PROVIDE YET ADDITIONAL EVIDENCE OF A PRICE FIXING CONSPIRACY

126.    The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the Relevant Market highly conducive to collusion.  While the Alliance in and of itself constitutes an express agreement to engage in price fixing, the following plus and super plus factors offer further evidence of a price fixing conspiracy.

127.    Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[8]  "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."

128.    The following plus and super plus factors support an inference that Defendants' actions constituted an unlawful price fixing conspiracy, not merely parallel conduct.  Namely, the Relevant Market: (i) is highly concentrated; (ii) has high barriers to entry for would-be competitors; (iii) has high switching costs for consumers; (iv) has inelastic demand; and (v) offers a fungible product.  In addition, Defendants (vi) exchange competitively sensitive information; and (vii) have motive and opportunities to collude.

---

[8]    William E. Kovacic, *et al.*, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393 (2011).

A.      **The Relevant Market is Highly Concentrated**

129.    The Relevant Market is highly concentrated.  There are relatively few airlines, including JetBlue and American Airlines, which control a significant number of slots at the Alliance Airports at issue in this Action.  Commenting upon the high level of concentration in the airline industry, JetBlue's chief executive officer previously stated that: "'this is a startling concentration of power.'"

130.    Defendants are two of the four largest carriers operating in New York, as well as two of the largest three in Boston.  Other than Defendants, Delta is the only other carrier with a large presence in Boston.  And, other than the Defendants, Delta and United are the only other carriers that "match[] or approach[] in size the [D]efendants' respective positions in New York."  "American and JetBlue control a significant share in an already concentrated market."

B.      **High Barriers to Entry**

131.    Defendants**,** an "alignment of two distinct and powerful competitors in a unique and congested region," wield market power in a highly concentrated market with significant barriers to entry.

132.    With respect to entering the airline industry generally, potential new entrants face significant barriers to entry, including the enormous financial resources and time needed to develop an airline through either organic growth or an acquisition.  New entrants into a specific route "face significant barriers . . . including difficulty in obtaining access to slots and gate facilities; the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier."  Under such circumstances, "entry is highly unlikely on routes where the origin

or destination airport is another airline's hub, because the new entrant would face substantial

challenges attracting sufficient local passengers to support service."

133.    With respect to the Relevant Market specifically:

> Challengers seeking to enter or expand in New York would first need to secure gates
> from which to operate, as well as schedule authorizations from federal regulators
> who control air traffic in one of the most congested markets in the world.  Both the
> gates and authorizations are exceedingly difficult to acquire.  [Additionally,
> c]hallengers seeking to enter or expand in Boston would need to secure gates, which
> are also in scarce supply.

Because of these significant barriers, "[Defendants'] positions at or near the top of these constrained

markets had proven relatively robust and durable over the decade or so preceding the onset of the

COVID-19 pandemic."  Opportunities to enter or expand in the Relevant Market are "vanishingly

rare."

### C.    High Switching Costs for Consumers

134.    Significant switching costs, largely due to the Defendants' combined market share,

prevent effective price competition in the Relevant Market.  Defendants' market share impacts the

slots available at the Alliance Airports in the Relevant Market as well as the flights available for

specific routes between the Alliance Airports.

135.    Due to the Alliance and the dominant market position that Defendants enjoy in the

Relevant Market, consumers who wish to fly certain routes have fewer alternatives to choose from.

This in turn forecloses competition, resulting in reduced choice, higher prices, and throttled

incentives to innovate for those consumers.

136.    Departing consumers who live in the areas surrounding the Alliance Airports in the

Relevant Market do not have different airports to choose from and thus cannot easily switch to a

different airport free of the Defendants' collusive conduct.  Likewise, arriving consumers flying into

New York or Boston cannot simply avoid Defendants' market share by flying into an alternative

- 42 -

airport which might have cheaper flights or more competitive options.  The Alliance "'deprives the marketplace of the independent centers of decisionmaking [sic] that competition assumes and demands,'" and "'suddenly increases the economic power moving in one particular direction' in Boston and in New York."  Thus, as a result of the Alliance, consumers have little room to choose a different airline originating from or flying to the Relevant Market.

### D.    Inelasticity of Demand

137.    The demand for flights in the Relevant Market is highly inelastic, meaning an increase in prices in the Relevant Market results in increased profits to the Defendants without triggering substitutions sufficient to outweigh the benefit of profits reaped from flights sold at higher price points.  Within the Relevant Market, the primary alternative to flying is to either drive or take a train.  Needless to say, these are not viable options for the vast majority of consumers, either logistically or financially.  Owing to this and the high switching costs detailed above, no reasonable substitutes exist to discipline cartel pricing.

### E.    Airline Flights are a Fungible Product

138.    When controlling for certain characteristics of airline travel, including among other things, the type of plane, the size of the plane, amenities and bathrooms aboard the plane, location of the plane, the age of the plane, and other characteristics, seats on competing airlines are generally interchangeable.  That is, each flight has the basic requirements a traveler would need in order to get to their destination safely.

### F.    Defendants Exchange Competitively Sensitive Information

139.    The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.

140.    The Alliance openly calls for the Defendants to share competitively sensitive information pursuant of the terms of the Alliance.  The Alliance creates a relationship between American Airlines and JetBlue that includes "codesharing, schedule coordination, revenue sharing, reciprocal loyalty benefits, and joint corporate customer benefits, all of which extend to most of the [Defendants'] flights to and from Logan, JFK, LaGuardia, and Newark."  It requires that both Defendants "use commercially reasonable efforts to coordinate the NEA Services."  The Alliance also requires that Defendants: "'endeavor in good faith to optimize their respective, individual network plans . . . after due consultation on all aspects of . . . network plans related to the NEA Services'" and to "'develop a process to ensure timely communication of such schedules between the [Defendants] to allow adequate lead times for each [Defendant] to plan resources effectively.'"

### G.    Motive, Opportunities, and Invitations to Collude

141.    **Motive**.  The motive of the Defendants is a financial one.  As long as Defendants control two of the largest markets (New York and Boston) in the United States for air travel, they have the ability to dictate pricing to consumers beyond a competitive level and to exclude competition in the Relevant Market.

142.    Due to the size of JetBlue's operations in the Relevant Market, JetBlue has every motive to collude with American Airlines, as "[n]early three-quarters of JetBlue's overall operations are flights in or out of the NEA."  Additionally, due to the size of American Airlines' operations in the Relevant Market, American Airlines has every motive to collude with JetBlue, as "American counts New York among its hubs and is the third-largest carrier operating in Boston."

143.    "These atmospherics set the scene for negotiations between American and JetBlue that culminated in the NEA."

> JetBlue knew that Delta was mounting a challenge to its dominance in Boston…
> Meanwhile, JetBlue's growth in New York had stalled due to its inability to secure

- 44 -

> access to more slots at LaGuardia or JFK.  Around the same time, American was
> fretting about its operations in New York.  It had a historical position there,
> controlled the second-most slots at LaGuardia and the third-most slots at JFK, and
> counted New York among its hubs.  Nevertheless, American did not consider its
> operations in New York to be sufficiently profitable . . . .

Put simply, the motive for the Alliance is to reap supracompetitive profit, notwithstanding that

JetBlue and American Airlines each already had sizable and successful operations in the Relevant

Market.

144.    **Opportunity and Invitation to Collude**.  Defendants have had regular opportunities

to conspire (and, as Judge Sorokin held, did conspire) during the lead up to, the execution of, the

implementation of, and the day-to-day maintenance of the Alliance.  Of course, the Alliance creates

a relationship between American Airlines and JetBlue that encompasses conduct beyond a mere

opportunity and invitation to collude; it is an express agreement to collude.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this Action on behalf of themselves and all others similarly situated

pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) as representatives of the Class, which is

defined as follows:

> **Nationwide Class**.  All direct purchasers of airline tickets going to or from Boston
> Logan International Airport, LaGuardia Airport, John F. Kennedy International
> Airport, and Newark Liberty International Airport from Defendants JetBlue Airways
> Corporation and American Airlines Group Inc. from when the Northeast Alliance
> was officially established on July 15, 2020, until the anticompetitive effects of
> Defendants' conduct ceases (the "Class Period").

146.    **Numerosity**.  The Class is so numerous that joinder of all members in this Action is

impracticable.  There are millions of members in the proposed Class who, like Plaintiffs, bought

tickets from JetBlue and/or American Airlines directly during the proposed Class Period for flights

which either originated from or landed at Alliance Airports.

- 45 -

147.  **Typicality**.  Plaintiffs' claims are typical of those of the Class.  Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for flights than they otherwise would have in a normal, competitive market.

148.  **Predominance**.  Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual Class members, since Defendants have acted and refused to act on grounds generally applicable to the Class.

149.  Questions of law and fact common to the Class include:

(a)  whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of flights originating or landing in the Alliance Airports;

(b)  if Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates §1 of the Sherman Antitrust Act, 15 U.S.C. §1, under the *per se*, quick look, or rule of reason modes of analysis;

(c)  if Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply in the Relevant Market;

(d)  the proper measure of damages; and

(e)  the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

150.  **Adequacy**.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.  Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are not antagonistic to the Class.

4868-1051-7625.v1

151. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this Action.

## COUNT

### For Violation of §1 the Sherman Antitrust Act (15 U.S.C. §1)
### Against All Defendants

152. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153. Beginning in 2019, Defendants colluded to artificially inflate the price of flights to and from Alliance Airports.

154. Defendants' cartel has caused Plaintiffs and members of the Class to suffer overcharge damages.

155. There are no procompetitive justifications for Defendants' agreement, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

156. Defendants' cartel is unlawful under a *per se* mode of analysis.

157. In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

158. Defendants' conduct caused Plaintiffs and the members of the Class to pay supracompetitive prices for airline tickets to and from Alliance Airports in the Relevant Market.

- 47 -

4868-1051-7625.v1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A.      The Court determine that this Action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this Action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1;

C.      Plaintiffs and the Class be awarded damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the Alliance or any conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company information;

F.      Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and the members of the Class be granted such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  August 21, 2023            ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   DAVID W. MITCHELL (admitted *pro hac vice*)
                                   ALEXANDRA S. BERNAY (admitted *pro hac vice*)
                                   ARTHUR L. SHINGLER III (admitted *pro hac vice*)


                                   _____
                                        s/ David W. Mitchell
                                        DAVID W. MITCHELL

- 49 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com

ISRAEL DAVID LLC
ISRAEL DAVID
BLAKE HUNTER YAGMAN
HAYLEY LOWE*
MADELINE SHEFFIELD*

Dated:  August 21, 2023

                          s/ Israel David
                        ISRAEL DAVID

17 State Street, Suite 4010
New York, NY  10004
Telephone:  212/739-0622
israel.david@davidllc.com
blake.yagman@davidllc.com
hayley.lowe@davidllc.com
madeline.sheffield@davidllc.com

Interim Co-Lead Class Counsel

- 50 -

4868-1051-7625.v1

Dated:  August 21, 2023

BERMAN TABACCO
KATHLEEN M. DONOVAN-MAHER*
STEVEN L. GROOPMAN
KRISTIE A. LASALLE*
CHRISTINA L. GREGG*


_s/ Steven L. Groopman_
STEVEN L. GROOPMAN

One Liberty Square
Boston, MA  02109
Telephone: 617/542-8300
617/542-1194 (fax)
kdonovanmaher@bermantabacco.com
sgroopman@bermantabacco.com
klasalle@bermantabacco.com
cgregg@bermantabacco.com

BERMAN TABACCO
TODD A. SEAVER*
MATTHEW D. PEARSON*
425 California Street, Suite 2300
San Francisco, CA  94104
Telephone: 415/433-3200
415/433-6382 (fax)
tseaver@bermantabacco.com
mpearson@bermantabacco.com

Counsel for Plaintiff Dianne Buehler and the
Proposed Class

*_Pro Hac Vice_ forthcoming

- 51 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 21, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ David W. Mitchell
DAVID W. MITCHELL

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  davidm@rgrdlaw.com

4868-1051-7625.v1

# Mailing Information for a Case 1:22-cv-07374-AMD-TAM Berger v. JetBlue Airways Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alexandra S. Bernay**
  xanb@rgrdlaw.com,E_File_SD@rgrdlaw.com,dwatts@rgrdlaw.com,ckopko@rgrdlaw.com

- **Matthew L. Craner**
  matthew.craner@shearman.com,managing-attorney-
  5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Israel David**
  israel@israeldavidllc.com

- **Jessica K Delbaum**
  jessica.delbaum@shearman.com

- **Steven Lev Groopman**
  sgroopman@bermantabacco.com,bdentremont@bermantabacco.com

- **Brian Hauser**
  brian.hauser@shearman.com

- **Allyson M. Maltas**
  allyson.maltas@lw.com

- **David W. Mitchell**
  DavidM@rgrdlaw.com,slandry@rgrdlaw.com,E_File_SD@rgrdlaw.com,dwatts@rgrdlaw.com,ckopko@rgrdlaw.com

- **Seung Paik**
  seung.paik@lw.com,seung-wan-andrew--paik-5877@ecf.pacerpro.com,ny-courtmail@lw.com,new-york-ma-
  2860@ecf.pacerpro.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan Salvetti**
  ssalvetti@zsz.com,inquiry@zsz.com

- **Richard F. Schwed**
  rschwed@shearman.com,managing-attorney-
  5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Arthur L Shingler , III**
  ashingler@rgrdlaw.com

- **Marguerite Sullivan**
  marguerite.sullivan@lw.com,ny-courtmail@lw.com,new-york-ma-2860@ecf.pacerpro.com,marguerite-sullivan-
  6830@ecf.pacerpro.com

- **Justin M. Tarshis**
  jtarshis@zsz.com

- **Kimon Triantafyllou**
  kimon.triantafyllou@lw.com

- **Jesse Aaron Vella**
  jesse.vella@lw.com,ny-courtmail@lw.com,new-york-ma-2860@ecf.pacerpro.com,jesse-vella-4487@ecf.pacerpro.com

- **Blake Hunter Yagman**
  blake.yagman@davidllc.com,Blake.yagman@davidllc.com,Israel.david@davidllc.com,BYagman@ecf.courtdrive.com

- **Robin F. Zwerling**
  rzwerling@zsz.com,inquiry@zsz.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)