UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re AMERICAN AIRLINES/JETBLUE ANTITRUST LITIGATION | x<br>:<br>:<br>: | Lead Case No. 1:22-cv-07374-AMD-CHK<br><br>(Consolidated with Case No. 1:22-cv-07423-AMD-TAM) |
| This Document Relates To:<br><br>ALL ACTIONS. | :<br>:<br>:<br>x | **CLASS ACTION**<br><br>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION<br><br>**HEARING AND ARGUMENT REQUESTED** |

**[FILED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER (ECF 95)]**

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

BACKGROUND ........ 11

A. Competition In The Airline Industry Occurs At The Route Level ........ 11

B. Airline Pricing Is Route-Specific, Highly Variable, And Dynamic ........ 13

C. The NEA Did Not Involve Fare Coordination ........ 16

D. The NEA Was Implemented Over Time On Different Routes ........ 17

E. The DOJ Action ........ 18

F. The Instant Lawsuit ........ 19

ARGUMENT ........ 21

I. PLAINTIFF HAS NOT SATISFIED RULE 23(A)(2)'S COMMONALITY REQUIREMENT ........ 22

II. PLAINTIFF CANNOT SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT ........ 24

A. Schwartz's Model Ignores The Realities Of The Airline Industry ........ 26

1. Schwartz's Model Does Not Account For The Numerous Individualized Issues Involved In Route-Specific Fare-Setting ........ 26

2. Schwartz's "Supply Substitution" Theory Is Unsupported And Unprecedented ........ 30

3. Schwartz's Within-Route Correlation Is Untested And Incorrect ........ 34

B. Schwartz's Average Masks Many Uninjured Proposed Class Members ........ 35

C. Schwartz's "Parallel Trends" Assumption Is Invalid ........ 38

D. Schwartz's Model Does Not Isolate Harm Attributable To The NEA ........ 39

III. PLAINTIFF HAS NOT MET RULE 23(B)(3)'S SUPERIORITY REQUIREMENT ........ 42

IV. PLAINTIFF CANNOT ESTABLISH STANDING, TYPICALITY, OR ADEQUACY ........ 43

A. Plaintiff Has Failed To Establish Article III Standing ....................................... 43

B. Plaintiff Is Not Typical Of The Putative Class ............................................. 46

C. Plaintiff Is An Inadequate Class Representative ............................................. 46

V. PLAINTIFF WAIVED THE RIGHT TO BRING THIS CLASS ACTION .................... 47

CONCLUSION ................................................................................................ 50

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022) ........ 31

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ........ 21

*Behrend v. Comcast*,
655 F.3d 182 (3d Cir. 2011) ........ 36

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ........ 48

*Blades v. Monsanto*,
400 F.3d 562 (8th Cir. 2005) ........ 26

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ........ 44

*Bombin v. Southwest Airlines Co.*,
2023 WL 5832166 (E.D. Pa. Sep. 7, 2023) ........ 47

*Breier v. Cong. Casa Grande*,
2026 WL 2837782 (S.D.N.Y. Sep. 22, 2026) ........ 50

*Brown v. Nat'l Football League, Inc.*,
825 F. Supp. 3d 265 (S.D.N.Y. 2026) ........ 44

*Candelaria v. Conopco, Inc.*,
2025 WL 1826454 (E.D.N.Y. July 2, 2025) ........ 43

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
433 F.3d 181 (2d Cir. 2005) ........ 43, 45

*Cleary v. Am. Airlines, Inc.*,
2022 WL 5320126 (N.D. Tex. July 22, 2022) ........ 48

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........ 24, 39

*Copeland v. Energizer Holdings, Inc.*,
2026 WL 2913693 (N.D. Cal. Sep. 28, 2026) ........ 38

*Desarrolladora La Ribera v. Anderson*,
2024 WL 5186600 (S.D.N.Y. Dec. 20, 2024) ........ 50

*Eduoard v. Nikodemo Operating Corp.*,
2019 WL 3557687 (E.D.N.Y. Aug. 5, 2019) ........ 21

*Flecha v. Medicredit, Inc.*,
946 F.3d 762 (5th Cir. 2020) ........ 42

*Geiss v. Weinstein Co. Holdings LLC*,
383 F. Supp. 3d 156 (S.D.N.Y. 2019) ........ 49

*Gerber v. Delta Airlines*,
1996 WL 557853 (N.D. Ga. Aug. 6, 1996) ........ 28

*Gilbert v. Dell Techs., Inc.*,
415 F. Supp. 3d 389 (S.D.N.Y. 2019) ........ 49

*Glover v. Bob's Disc. Furniture, LLC*,
621 F. Supp. 3d 442 (S.D.N.Y. 2022) ........ 50

*Gross v. N.Y.C. Health & Hosps. Corp.*,
122 A.D.2d 793 (2d Dep't 1986) ........ 49

*Hahn v. JetBlue Airways Corp.*,
2022 WL 22908406 (E.D.N.Y. Aug. 25, 2022) ........ 47, 48

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ........ 21

*Hughes v. The Ester C Co.*,
317 F.R.D. 333 (E.D.N.Y. 2016) ........ 39

*In re Air Passenger Computer Rsrvs. Sys. Antitrust Litig.*,
694 F. Supp. 1443 (C.D. Cal. 1988) ........ 30

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ........ passim

*In re Digit. Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017) ........ 25, 26, 46

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
407 F. Supp. 3d 422 (S.D.N.Y. 2019) ........ 46

*In re Google Digit. Advert. Antitrust Litig.*,
2025 WL 3562687 (S.D.N.Y. Dec. 12, 2025) .......... 24

*In re Int. Rate Swaps Antitrust Litig.*,
2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) .......... 24, 35, 41

*In re Lipitor Antitrust Litig.*,
2026 WL 2350732 (3d Cir. Aug. 13, 2026).......... 46

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .......... 24

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014).......... 37

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) .......... 23

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016).......... 46

*In re Plastics Additives Antitrust Litig.*,
2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) .......... 37

*In re Platinum & Palladium Commodities Litig.*,
2014 WL 3500655 (S.D.N.Y. July 15, 2014) .......... 23

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015).......... 39

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017) .......... 43

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .......... 25, 39

*In re Wholesale Grocery Prods. Antitrust Litig.*,
2018 WL 3862773 (D. Minn. Aug. 14, 2018) .......... 36

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
387 F.3d 163 (2d Cir. 2004).......... 48, 49

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015).......... 21, 42

*Lanqing Lin v. Everyday Beauty Amore Inc.*,
2019 WL 3037072 (E.D.N.Y. July 11, 2019).......... 21

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
19 F.4th 58 (2d Cir. 2021) .......... 44

*Mahaffey v. Detroit Newspaper Agency*,
969 F. Supp. 446 (E.D. Mich. 1997) .......... 44

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......... 48

*Miami Prods. & Chem. Co. v. Olin Corp.*,
2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023) .......... 24, 25

*Moss v. BMO Harris Bank, N.A.*,
24 F. Supp. 3d 281 (E.D.N.Y. 2014) .......... 49

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) .......... 21

*N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*,
710 F. Supp. 3d 1090 (D. Utah 2023) .......... 35

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
272 F.R.D. 160 (S.D.N.Y. 2011) .......... 43

*Nypl v. JP Morgan Chase & Co.*,
2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) .......... 35

*Plaza 22, LLC v. Waste Mgmt. of La., LLC*,
2015 WL 1120320 (M.D. La. Mar. 12, 2015) .......... 22

*Pulver v. Dougherty*,
58 A.D.3d 978 (3d Dep't 2009) .......... 49

*Rambarran v. Dynamic Airways, LLC*,
2015 WL 4523222 (S.D.N.Y. July 27, 2015) .......... 42

*Rodney v. Nw. Airlines, Inc.*,
146 F. App'x 783 (6th Cir. 2005) .......... 30

*Ross v. American Express Co.*,
547 F.3d 137 (2d Cir. 2008) .......... 50

*Series 17-03-615 v. Express Scripts, Inc.*,
2024 WL 1834311 (N.D. Ill. Apr. 26, 2024) .......... 36

*Simon & Simon, PC v. Align Tech., Inc.*,
350 F.R.D. 565 (N.D. Cal. 2023) .......... 46

*Spread Enters., Inc. v. First Data Merch. Servs. Corp.*,
298 F.R.D. 54 (E.D.N.Y. 2014) .......... 22

*Thomas v. AAM Holding Corp.*,
2025 WL 2617450 (S.D.N.Y. Aug. 26, 2025) .......... 47

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 44

*United States v. Am. Airlines Grp. et al.*,
No. 21-cv-11558, ECF No. 306 .......... 12

*United States v. American Airlines Group Inc.*,
675 F. Supp. 3d 65 (D. Mass. 2023) .......... passim

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008) .......... 44

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... passim

*Won v. Amazon.com Servs. LLC*,
807 F. Supp. 3d 178 (E.D.N.Y. 2025) .......... 43, 45

## STATUTES

15 U.S.C. § 4 .......... 18

Sherman Act § 1, 15 U.S.C. § 1 .......... 1, 18, 19, 44

## RULES

Fed. R. Civ. P. 23 .......... 1, 21, 25, 43

Fed. R. Civ. P. 23(a) .......... 21, 24

Fed. R. Civ. P. 23(a)(2) .......... 22

Fed. R. Civ. P. 23(b)(3) .......... 21, 35, 41

Fed. R. Civ. P. 23(c)(1)(A) .......... 42

Fed. R. Evid. 702 .......... 2

## REGULATIONS

14 C.F.R. § 253.5(b)(2) .......... 47

## OTHER AUTHORITIES

1 McLaughlin on Class Actions § 5:36 (22nd ed.) ....................24

Manual for Complex Litigation (Fourth) §§ 21.141-142 (2024) .................... 42

## INTRODUCTION

In moving to certify her proposed class, Plaintiff relies heavily on Judge Sorokin's decision in *United States v. American Airlines Group Inc.*, 675 F. Supp. 3d 65 (D. Mass. 2023). But nothing in that decision supports class certification. Judge Sorokin held that the Northeast Alliance ("NEA") violated the Sherman Act because it reduced competition between Defendants on routes touching Boston Logan International Airport ("Boston"), John F. Kennedy International Airport ("JFK"), LaGuardia Airport ("LGA"), and Newark Liberty International Airport (collectively, the "NEA Airports"). He made no finding that the NEA caused *any* passenger to pay a supracompetitive fare on *any* ticket. Indeed, Plaintiff has abandoned that allegation in her complaint and dramatically narrowed the proposed class precisely because her own proposed expert could not find *any* overcharge at three of the four NEA Airports. That alone defeats any argument that the NEA uniformly increased prices.

To meet her burden under Federal Rule of Civil Procedure 23, Plaintiff must demonstrate *class-wide fare increases* caused by the NEA with common evidence that predominates over the individualized issues inherent in airline fare-setting. Judge Sorokin's decision does not address that question. This Court must answer the Rule 23 questions for itself, applying the required "rigorous analysis." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Setting aside whether Plaintiff waived her right to bring a class action, the Court must resolve at this stage (1) whether Plaintiff paid an increased fare caused by the NEA, and thus has Article III standing; (2) if so, whether her claim is typical of those of other putative class members; and (3) whether alleged antitrust injuries among putative class members are sufficiently common to be adjudicated most efficiently and effectively through a class action. The answer to each question is no.

The NEA never involved fare coordination. There is no evidence that Defendants ever discussed fares on any route, or that either airline changed the factors it considered or the methods

it used when setting fares during the NEA. Lacking any evidence that any fare on any route (let alone all fares on every route touching Boston) was jointly set, Plaintiff relies exclusively on the opinions of her proposed expert, Jonathan Schwartz.

Schwartz presents a model that purports to show a uniform fare overcharge for every American itinerary and a separate uniform fare overcharge for every JetBlue itinerary touching Boston from April 1, 2021 through July 28, 2023 (the "Proposed Class Period"). That model strains credulity. It is riddled with errors that render Schwartz's opinion economically indefensible, unreliable, and irrelevant to the question before the Court. Defendants have moved on that basis to exclude Schwartz's opinions under Rule 702 and *Daubert*.

Critically, Schwartz concedes that he can find no harm to passengers who flew to or from any of the three New York airports. On the contrary, he found the NEA *benefited* those passengers by expanding capacity and lowering fares. Schwartz is thus left to explain how the same NEA that benefited Defendants' New York customers somehow harmed *every* customer who flew in and out of Boston to the exact same degree (differentiating only on whether they flew American or JetBlue). His explanations for this remarkable conclusion ignore how the industry operates and how airlines compete. His assumptions are unsupported and contradicted by the evidence, his methods are fundamentally unsound, and he never tested his approach or his conclusions. Because Plaintiff relies solely on Schwartz to support her motion for class certification, these and other deficiencies merit a detailed preview.

*First*, Schwartz assumes, but does not prove, that millions of passengers flying different routes, at different times, in different product classes all suffered the same harm. His regression analysis purports to measure more than 18 million separate passenger itineraries on over 230 routes flown over nearly 28 months, yet its output makes only two distinctions: whether the passenger

flew on American or JetBlue, and whether the itinerary touched Boston or New York. As to Boston, Schwartz purports to find a single, uniform overcharge paid by *every* passenger on *any* flight at *any* time during the Proposed Class Period—6.7% for American flights and 5.0% for JetBlue flights—regardless of which route was traveled, which fare class was selected (among dozens of options), when the ticket was purchased, or any other factor that determines the price of a particular ticket. That result may be convenient for Plaintiff's class certification argument, but it bears no relation to the realities of how airlines plan their networks or set their prices or how passengers make their choices when buying those services.

In rejecting the notion that a well-constructed regression analysis can reliably identify important *route*-based differences, Schwartz is wildly out of step with the relevant economic literature. Courts, regulators, and academics overwhelmingly agree that service on *individual routes*, not combined service *across airports* (Schwartz's approach), is the correct way to evaluate airline competition. The DOJ took that approach in its case against the NEA, and Judge Sorokin adopted it.

Route-level analysis is neither surprising nor controversial. Demand for, and supply of, airline services are determined at the route level. On the demand side, a passenger who wants to travel from Boston to Los Angeles, for example, does not compare the cost and services on flights to Syracuse. On the supply side, airlines make capacity decisions route by route, considering factors such as existing capacity and competition on the route and its overall fit within the broader network (such as operational efficiency and the expected demand from direct and connecting passengers). Airlines then set fares independently, dynamically, and route by route, based on market conditions specific to each route, such as how many seats remain unfilled, which other airlines serve the route, and what those competitors charge. Each of these route-specific factors

affected the fare every proposed class member paid, and together they defeat Schwartz's conclusion that a single common damages calculation applies across millions of passengers on itineraries as different as a 30-minute coach hop to Syracuse on a regional jet and a cross-country first-class flight to Los Angeles.

Schwartz's assumption of a unified class-wide effect is further strained by Plaintiff's theory of liability—the one Judge Sorokin adopted. Under that theory, the NEA's competitive impact should vary based on the competition among airlines on the routes the NEA is alleged to have affected. *See Am. Airlines Grp.*, 675 F. Supp. 3d at 92-93, 117. At one end, where that impact would be greatest, are routes on which American and JetBlue both had direct service that together gave the partnership the dominant share of the traffic. On these routes, the NEA had the greatest potential to enhance market power that could manifest as higher fares. Importantly, the most concentrated of these routes—those with only one or two other competitors—were carved out of the NEA. At the other end are the routes that neither American nor JetBlue served directly before the NEA. Customers on these routes would have benefited from new and more convenient service. In between are a range of possibilities, such as routes served by only one Defendant or routes with a large number of competitors.

Consider the Boston to Fort Lauderdale route, a route Plaintiff flew on a ticket purchased with dollars rather than frequent flyer miles. She paid JetBlue $111 for her ticket coupon, while other coach passengers on the same flight paid fares ranging from $46 to $218. *See* Ex. 1 to Decl. of Jason Burt, Expert Report of John Johnson ("Johnson Rpt.") ¶¶ 129-30 & Exs. 30, 32-33. On average, capacity on that route increased during the NEA period: in January 2023, one of the months Plaintiff flew the route, capacity was about 90,000 seats, compared with about 84,000 seats in January 2019. *Id.* ¶ 128, Ex. 31. While air traffic to and from Boston overall remained below

2019 levels during the NEA, the Boston to Fort Lauderdale route did not. By all appearances, then, Plaintiff benefited just as the New York City passengers did—with access to more seats and flight options. In Schwartz's view, however, none of these distinctions matter. Similarly, Schwartz opines that a passenger on a route like Boston to Key West, which had no pre-existing non-stop service from either American or JetBlue, was harmed in the same way, and to the same extent, as a passenger on a route like Boston to Washington Reagan, one of the few routes with pre-existing non-stop service from both Defendants that was flown by only one other airline. *See id.* ¶ 72, Ex. 14. Schwartz has no basis to conclude that passengers on routes with such vastly different pre-existing market structures were equally affected. Indeed, he refused to even look.

To be clear, no regression analysis, however well-constructed, that fails to identify route-level effects can answer the question in this case: whether there is a basis to assume common harm among all Boston-based class members. Every route had a different demand profile and pre-existing market structure, so it is unreasonable to assume the NEA had common effects on every itinerary flown while the NEA operated. Schwartz's regression asks a different question—whether average fares at Boston during the NEA were higher than average fares at other airports. That analysis sheds no light on whether millions of fares paid by passengers flying to or from Boston were all equally inflated by the NEA's alleged anticompetitive effects, as Schwartz assumes, such that any reasonable finder of fact could conclude there was a common class-wide harm.

Schwartz offers one other analysis as evidence of class-wide harm—a study of capacity changes at Boston during the NEA. *See* ECF No. 136-1, Expert Rpt. of Jonathan Schwartz ¶¶ 91-105 ("Schwartz Rpt."). That study says nothing about fares, let alone validates his Boston-wide regression analysis. Nor does it isolate changes in capacity caused by the NEA from those caused by other economic factors. As explained by Defendants' experts, Drs. Bernheim and Johnson,

Schwartz makes no attempt to conduct a statistical analysis that could account for the impact of these factors—the most important of which was COVID-19, as explained below. *See* Ex. 2 to Decl. of Jason Burt, Expert Report of B. Douglas Bernheim ¶¶ 167-177 ("Bernheim Rpt."); Johnson Rpt. ¶¶ 131-36.

*Second*, Schwartz's reliance on his unprecedented "supply substitution" theory is inconsistent with the realities of the airline industry and is readily rebutted by the evidence. Schwartz attempts to excuse his failure to consider route-specific effects with two arguments, neither of which is convincing. He first argues that route-specific regressions are unreliable because routes are subject to "idiosyncratic" changes in prices. That argument is specious. Regressions measuring fare effects at the route level are the norm in the industry, and they often produce meaningful, statistically significant results on which judges, juries, regulators, and academics rely. As Dr. Bernheim explains, economists have tools to assess whether regression results are likely skewed by random noise in the data. He conducted those tests here and found Schwartz's concerns unfounded. Bernheim Rpt. ¶¶ 105-107, App'x D.

With the facts and the data running contrary to his conclusions, Schwartz (who has no prior relevant experience analyzing the airline industry) retreats to his own theory of how airlines make and implement capacity decisions. This "supply substitution" theory posits that Schwartz's calculated overcharge applied uniformly across routes because American and JetBlue would have equalized the consumer harm caused by the NEA by seamlessly, and instantaneously, moving capacity from routes with low overcharges to routes with higher overcharges. Dr. Bernheim addresses that theory in detail. *See id.* ¶¶ 86-95. Among other criticisms, Dr. Bernheim notes that airlines do not (and cannot) attempt to calculate or assess "overcharges" as defined by Schwartz. *Id.* ¶¶ 87-88. Airlines track route profitability, but profitability and Schwartz's calculated

overcharge are very different metrics. Johnson Rpt. ¶¶ 149-150. A route may be highly profitable for any number of reasons unrelated to any exercise of ill-gotten market power, including demand- and supply-side factors. *See* Bernheim Rpt. ¶¶ 88-89. Even if route profitability were an appropriate proxy for Schwartz's "overcharge," airlines do not seek to maximize profit at the airport level. They make capacity decisions to maximize network-wide profitability. *See id.* ¶ 91. Thus, in deciding whether to add or remove capacity on a Boston route, network planners compare that route's profitability not merely to other Boston routes, but to routes across the entire network. Indeed, airlines often fly unprofitable routes for strategic or network fit reasons. Schwartz's hypothesized seamless flexibility between routes also runs into myriad operational issues, none of which Schwartz made any effort to study, understand, or address. *See id.* ¶ 90; Johnson Rpt. ¶ 146.

In the end, the evidence is most telling. Had the airlines been seamlessly equalizing profitability across Boston routes, those profits would have been equalized *before* the NEA and would have remained so during it. Unsurprisingly, airlines carefully track route profitability. That data, which Schwartz never requested, let alone studied, shows tremendous (and persistent) *variation* in the profitability of both airlines' Boston routes. In sum, Schwartz's supply substitution theory finds no support in the academic literature, is not validated by any quantitative analysis, and is rebutted by the evidence. It is *ipse dixit* from a proposed expert with little to no relevant airline expertise, and it cannot substitute for the route-specific analysis necessary to determine whether putative class members, in fact, suffered a common injury.

*Third*, Schwartz's attempt to control for the effects of COVID-19 is wholly inadequate. For the airline industry, COVID-19 was an unprecedented event that led to dramatic swings in air travel and fares. At the outset of the pandemic, traffic dropped by more than 90%, causing huge disruptions in labor force and supply chains. And when recovery began, it was uneven, with some

locations experiencing an explosion in traffic, sometimes exceeding pre-pandemic levels, and others recovering far more slowly. Boston's recovery in air traffic lagged behind that of other regions, including other Northeastern metropolitan areas, and the NEA was launched in the middle of the pandemic. If Schwartz cannot adequately account for the impact of COVID-19, his regression cannot produce a reliable answer (even as to the wrong question it purports to ask).

Schwartz's treatment of COVID-19 suffers from two defects, either of which is fatal to his analysis. Schwartz first assumes he can control for COVID-19 impacts simply by including the number of reported COVID-19 cases in the origin and destination cities in his regression. That simplistic, untested approach ignores any number of facts, including that reporting of COVID-19 cases was spotty and inconsistent across jurisdictions, government officials in different regions responded to COVID-19 in different ways (some more restrictive, others less), and business travel was hit especially hard. It is thus unsurprising that a market like Boston, with a high percentage of business travel, was hit harder and recovered more slowly than other markets less dependent on business travel (such as Florida)—all facts that are readily evident in the data and not adequately explained by relying solely on reported cases. *See* Bernheim Rpt. ¶¶ 169-172.

Schwartz's other fatal defect is that he uses pre-COVID-19 data as a pre-NEA benchmark to show decreased capacity during the NEA. Specifically, Schwartz compares capacity during the NEA against the average available seat miles ("ASMs") in 2019, which he calls the 2019 average, *before* the onset of COVID-19. This means that Schwartz conflates the effect of the NEA, if any, with the effects of flight capacity caused by the COVID-19 pandemic. Indeed, when Q1 2021 is used (the period immediately before NEA implementation and after the capacity shocks caused by COVID-19) as a baseline period, the data shows drastic *increases* in capacity during the NEA, increases that were *greater* in Boston than at non-NEA airports. *See* Johnson Rpt. ¶¶ 134-36, Exs.

35-36. Schwartz also could have used a post-NEA baseline period (Q4 2024), a comparison period after the shock of the COVID-19 pandemic, but he chose not to. Making matters worse, Schwartz omits all of 2020 and Q1 of 2021 from his analysis entirely, yet he offers no explanation for why his use of reported COVID-19 cases was adequate to control for the pandemic's impact on air travel in Q2-Q4 of 2021 but not for 2020 or Q1 of 2021, and he cites no evidence to support this exclusion. *See* Bernheim Rpt. ¶¶ 166-67.

Ultimately, by using the wrong benchmark, Schwartz completely misses the shock of COVID-19 on the airline industry and simply attributes capacity levels during the NEA vis-à-vis levels pre-COVID-19 to the NEA. As Dr. Bernheim and Dr. Johnson demonstrate, however, Schwartz has failed to present a method that is able to disentangle the impact of COVID-19, rendering his DiD-based conclusion that the NEA caused overcharges unreliable. *See* Bernheim Rpt. ¶¶ 169, 172 & Fig. 11.

*Fourth*, Schwartz's method fails standard tests. Dr. Bernheim's and Dr. Johnson's reports identify significant defects in Schwartz's econometric modeling, but two are worth highlighting up front. Economists (and courts) recognize that a regression analysis should exhibit "parallel trends" before the treatment period. If the regression analysis adequately controls for other confounding effects, pricing trends in the control group and the treatment group should rise or fall roughly in tandem. If they move in different directions or by different magnitudes, other factors are likely causing the control and treatment groups to diverge, and the regression will be unable to separate the pre-existing unknown cause from the conduct being analyzed. Here, Dr. Bernheim has shown that the regressions Schwartz used incorrectly assumed that the baseline fare trajectories during the NEA period would have been parallel across Boston and non-NEA markets, despite the

many differences between those markets. *Id*. ¶ 175. Consequently, Schwartz falsely attributes *all* divergences between the price trajectories for Boston and non-NEA markets to the NEA. *Id.*

A second well-established test determines whether the regression analysis is prone to producing false positives. Dr. Johnson ran that test here by comparing the results Schwartz's analysis produced for Boston with the results of running the same analysis on American's top 15 non-NEA airports. In 10 of the 15, Dr. Johnson obtained positive, statistically significant results, comparable in size to the effect Schwartz purports to find in Boston for American. *See* Johnson Rpt. ¶¶ 119-21, Exs. 2, 27. In other words, Schwartz's regression analysis finds overcharges at 10 non-NEA airports where none should exist, proving that his model does not isolate the effects of the NEA. Similarly, for JetBlue, Dr. Johnson obtained positive, statistically significant results for non-NEA airports, including an overcharge above 12% for itineraries flying Boston to Buffalo, *more than double* the estimated effect Schwartz purports to find at Boston and New York. *Id.* ¶ 122, Ex. 28. Whether Schwartz's regression analysis produces a statistically significant "overcharge" is roughly a coin flip; a more *unreliable* regression analysis is difficult to imagine.

Given these (and many other) deficiencies in Schwartz's analysis, and because Plaintiff relies solely on Schwartz to support her Motion, the Motion fails. Schwartz has not presented a reliable common method that can determine whether all or nearly all proposed class members suffered antitrust injury in the form of an overcharge caused by the NEA, nor has he shown that such a method would predominate over the myriad individual factors that affect airfares.

Plaintiff's motion is defective for several additional reasons. Plaintiff has not demonstrated Article III standing. She relies entirely on Schwartz's damages model to establish harm to herself and the proposed class, but that model *excludes* all of the tickets Plaintiff purchased during the Proposed Class Period because of the characteristics of those itineraries and the circumstances of

her purchases. Nor has Plaintiff established that she is a typical or adequate class representative. Finally, Plaintiff waived the right to bring class claims when she purchased tickets governed by JetBlue's contract of carriage, which contains an enforceable class action waiver that also applies to American. Each of these is an independent ground for denying the Motion.

## BACKGROUND

### A. Competition In The Airline Industry Occurs At The Route Level

Airlines decide which routes to fly, and when to fly them, on a route-by-route basis—i.e., separately for each origin and destination ("O&D") pair. This is because passengers decide which airline to fly and which flight to purchase based on the specific route they want to fly. For example, a passenger who wants to fly from Boston to Los Angeles is not concerned with the cost and convenience of airline services from Boston to Syracuse; demand for these different routes is wholly unrelated. Johnson Rpt. ¶ 89. The same is true for the supply on any given route. Airlines therefore make decisions to enter, exit, or adjust capacity on the route level based on numerous factors unique to that route, including: the number of available seat miles ("ASMs") (the standard measure of capacity) already deployed on a given route; the number and types of competitors flying that route; the opportunity cost of deploying additional capacity to one O&D pair relative to its next best usage; the demand for that route; strategic priorities; the extent to which serving a given route feeds connecting flights within the airline's broader network; and the mix of business and leisure travelers. Johnson Rpt. ¶¶ 37-40, 146 n.256. Airlines also must consider minimum utilization requirements to maintain gate access at some airports. Boston requires airlines to maintain daily jet operations at greater than 75% of the airport-wide average, meaning an airline must use its gates at Boston at a similar level to its competitors or risk losing them. *See* Ex. 1,

AA-NEA-01149284 at 298.[1] All those considerations lead to individualized route and scheduling determinations.

As a result, competition in the airline industry occurs at the route level, and it is intense. Airlines have adopted different business models to win passengers' business for specific routes, based on each airline's costs, breadth of network, and demand, among other things. Johnson Rpt. ¶¶ 39-40. For instance, American is a network carrier. It uses a hub-and-spoke model to connect thousands of O&D pairs through its airport bases (referred to as "hubs") around the U.S. Ex. 2, AA-NEA-01830184 at 0254; Ex. 3, AA-NEA-00090087. Boston is a spoke in American's network, meaning that most of American's flights touching Boston have one of its hubs at the other end point. *See* Ex. 2, AA-NEA-01830184. JetBlue, however, largely operates a point-to-point system, meaning that it offers nonstop, point-to-point flights that are not specifically timed to facilitate connections. *See United States v. Am. Airlines Grp. et al.*, No. 21-cv-11558 ("DOJ Action"), ECF No. 306 at 32:17-18. As part of that system, JetBlue tends to concentrate its flights in a small number of "focus cities," and Boston is a focus city. Johnson Rpt. ¶ 33; *see* DOJ Action, ECF No. 301 at 12:8; Ex. 4, JBLU00889999. Defendants operated flights on many routes in and out of Boston, many of which only one Defendant flew. *See* Johnson Rpt. ¶ 72 & Ex. 14 (noting that, before the NEA, only one Defendant served more than 40 routes non-stop).

The variety of fare products that airlines offer further underscores the intense nature of route-by-route competition. Airlines provide distinct seat configurations, amenities, and levels of flexibility, reflecting that demand for air travel is highly individualized and depends on consumers' wide range of preferences. JetBlue offers a "Mint" business-class cabin on transcontinental flights

---

[1] Unless noted otherwise, in all quotations, emphases and alterations are added, and internal quotation marks and citations are omitted; and all references to "Ex. __" are to the Declaration of Marguerite M. Sullivan.

(such as Boston to Los Angeles), which provides a "more traditional . . . first class experience" with lie-flat seats and premium service. *See* DOJ Action, ECF No. 297 at 110:3-5. JetBlue's "Blue" main cabin fares include in-flight entertainment, additional legroom, free live TV, and free Wi-Fi, DOJ Action, ECF No. 299 at 42:16-24, while "Blue Basic" fares provide fewer amenities and restrictions on carry-on baggage and seat selection, *see* Bernheim Rpt. ¶ 157 n.213. American offers First Class, Premium Economy, Economy, and Basic Economy fare types on many flights. Ex. 5, AA-NEA-00089573 at 5. American's Basic Economy fares compete with lower-cost airlines by offering lower prices with unbundled products, meaning that services like baggage and seat selection are sold separately. *See id.* at 19-20. Because these products differ in their rules and restrictions—including refundability, minimum stay requirements, and amenities—they are fundamentally different travel experiences, even on the same route. Johnson Rpt. ¶ 51.

### B. Airline Pricing Is Route-Specific, Highly Variable, And Dynamic

There is no dispute that each Defendant independently relies on myriad route-specific factors to set fares, resulting in highly variable fares across and within routes that constantly change. Schwartz Rpt. ¶¶ 29-32. All airlines price itineraries dynamically, and pricing varies by type of itinerary and is subject to continuous monitoring and changes. For nonstop service, airlines price by O&D pair. As a Delta employee testified, it "is the industry standard . . . across the world" for airlines to set airfares for "every single origin/destination combination that can be served[.]" Ex. 6, Vincent Dep. (2026) at 20:7-21; Ex. 7, Jarashow Dep. (2021) at 229:16-23 ("There's a whole host of factors that go into determining what fare [] we make available."); Ex. 8, Roberts Dep. (2021) at 36:13-37:6 ("[American] price[s] on an O&D basis"); Ex. 9, AA-NEA-00787635 at 19. For connecting itineraries, airlines price based on factors such as the ultimate destination, the itinerary's components, or a combination of both. Ex. 10, AA-NEA-00098408 at 17-23; Ex. 7, Jarashow Dep. (2021) at 208:13-210:3; Ex. 8, Roberts Dep. (2021) at 36:13-37:25.

Airlines publish and update pricing information multiple times daily, enabling near-constant competitor tracking. *Am. Airlines Grp.*, 675 F. Supp. 3d at 76-77; Ex. 8, Roberts Dep. (2021) at 35:24-36:2; Ex. 11, Laurence Dep. (2025) at 88:25-89:6; Ex. 12, Jarashow Dep. (2025) at 44:24-46:9. Airlines often attempt to match competitors' fares and schedules on a route based on the competitive dynamics and macroeconomic conditions of that route. *See* Ex. 13, Casey Dep. (2022) at 63:21-64:11; Ex. 11, Laurence Dep. (2025) at 53:12-54:9; Ex. 6, Vincent Dep. (2026) at 117:5-118:21; Ex. 14, AA-NEA-03218866 at 5; Ex. 15, JBLU-LIT-01737718 at 722, 740. The specific approach varies by airline, by route, and over time. For all airlines, fares change continually in response to route-specific considerations. *Am. Airlines Grp.*, 675 F. Supp. 3d at 77; Ex. 16, Raja Dep. (2021) at 23:23-24:8, 32:15-33:2; Ex. 6, Vincent Dep. (2026) at 117:5-118:21.

American's pricing strategies reflect this dynamic process, resulting in individualized fares across routes and at different time periods. *See* Ex. 8, Roberts Dep. (2021) at 58:17-59:7 (American's "overall strategy" is to be "competitive based on the specific market performance and based on [American's] individual strategy of that market"); Ex. 17, AA-NEA-00787635 at 19. American adjusts its pricing strategies, including whether to initiate its own fare or match a competing airline's fare, depending on the competitive conditions and demand on a particular route and traffic on the broader network, including connecting traffic. Johnson Rpt. ¶¶ 56-60, Exs. 8-10; Ex. 18, AA-NEA-01862910; Ex. 19, AA-NEA-02388438. American's pricing depends on several additional factors, including passenger type, supply and demand, route-level competition, seasonality, day and time of travel, fare class, product, aircraft type, and the timing of purchase, among others. *See* Ex. 41, Znotins Dep. (2022) at 68:9-14 (pricing factors include "supply and demand, schedule sensitivity, business/leisure mix"); Ex. 8, Roberts Dep. (2021) at 73:2-74:7;

Ex. 13, Casey Dep. (2022) at 63:21-64:11; Ex. 21, NEALIT-AA_185430 at 2; Ex. 22, AA-NEA-00124798 at 25-26.

JetBlue's pricing strategies reflect a similar dynamic process that results in individualized, constantly changing fares across and within routes. JetBlue's pricing depends on "the day of the week, the time of day, the distance or time between departure and when the shopping is actually occurring as well as things like . . . what class of service is actually available on a specific flight." Ex. 12, Jarashow Dep. (2025) at 53:6-17; Ex. 23, Jarashow Dep. (2022) at 39:2-13. JetBlue focuses primarily on nonstop routes and does not benchmark connecting itineraries because it considers those "a different service." *See* Ex. 24, JBLU00942884 (market-level pricing strategy document showing [redacted]"); Ex. 7, Jarashow Dep. (2021) at 230:20-24; Ex. 25, JBLU-LIT-00292673 at -675 [redacted] During the Proposed Class Period, the vast majority of JetBlue's fares [redacted] were "self-initiated" rather than competitor-matched. Johnson Rpt. ¶ 61, Ex. 8.

Schwartz acknowledges that pricing is route-specific. *See* Schwartz Rpt. ¶ 31. Because fares are set at the route level, the fare paid by any passenger for a particular flight at a particular time depends on numerous factors, including the O&D; the nonstop or connecting competition on that route; the frequency of service (*e.g.*, year-round or seasonal, number of departures per day); the time of year; the day of the week; the time of day; the class of fare; how far in advance the ticket is purchased; demand on the route; supply on the route (*e.g.*, the number of seats available at the time of purchase); macroeconomic factors (such as COVID-19); and the passenger's preferences (*e.g.*, airline preference, loyalty mileage earnings, upgrade eligibility, ticket flexibility, and refundability); among many others. *See* Johnson Rpt. ¶¶ 25, 42-43, 48, 51, 61-63; Bernheim

Rpt. ¶ 71. Passengers on the same flight on the same day may pay vastly different fares for different reasons. *See* Johnson Rpt. App'x C ¶ 8, Ex. C-4 (showing that on an American flight from Boston to Phoenix on June 27, 2023, one passenger paid $200.52 and another paid $720 for a Main cabin class ticket). And passengers who travel for business may pay different fares than leisure travelers, given that airlines negotiate corporate rates for business travel. *See, e.g.*, Ex. 26, NEALIT-AA_160701.

### C. The NEA Did Not Involve Fare Coordination

Defendants formed the NEA in July 2020 to compete more effectively against Delta and United in Boston and New York. *See Am. Airlines Grp.*, 675 F. Supp. 3d at 85 ("The express purpose" of the NEA was "to strengthen the competitive position of American and JetBlue with respect to Delta and United in the Northeast."); Ex. 27, AA-NEA-01396354 at 2-3.[2] The NEA was an alliance designed to "optimize each Party's network" and "enhance the experience of passengers" traveling to and from the NEA Airports. *See Am. Airlines Grp.*, 675 F. Supp. 3d at 84; Ex. 30, AA-NEA-03296127 at 128.

The NEA included codesharing,[3] schedule optimization,[4] revenue-sharing,[5] reciprocal

[2] Competitors recognized the NEA strengthened Defendants' competitive positions in Boston. Ex. 28, DL-NEALIT-00000315 (Delta—the NEA "creates #1 position in JFK and BOS"); Ex. 29, AS CID 0000115 at 001.

[3] Codesharing is an arrangement whereby one carrier places its airline "code" on a flight operated by another, allowing the former to sell seats on it. *See Am. Airlines Grp.*, 675 F. Supp. 3d at 81.

[4] Schedule optimization refers to Defendants' efforts to optimize each airline's "route networks and scheduling of flight times and frequencies at the NEA Airports." *Id.* at 85.

[5] Defendants pooled defined categories of passenger-related revenue from flights touching the NEA Airports, and divided the pooled revenue annually based on an agreed formula. *Id.* at 86.

loyalty benefits,[6] and joint corporate customer benefits[7] for routes touching the NEA Airports. *See Am. Airlines Grp.*, 675 F. Supp. 3d at 85-86. The NEA, however, *did not include fare or pricing coordination*. *See id.* at 85 (stating that Defendants "continue[d] to make independent decisions regarding pricing" during the NEA); DOJ Action, ECF No. 297 at 167:23-168:10; DOJ Action, ECF No. 300 at 101:6-25; DOJ Action, ECF No. 306 at 8:2-4. Defendants continued to set fares independently based on the same factors that each employed before the NEA. Ex. 30, AA-NEA-03296127 at Recital 5, Section 3.1.1 ("[E]ach Party will continue to make independent decisions regarding pricing[.]"); Johnson Rpt. ¶¶ 28 & n.32, 48-49, 56-64, Exs. 8-11.

### D. The NEA Was Implemented Over Time On Different Routes

Defendants signed the NEA Agreement, the primary contract that governed the terms of the NEA, on July 15, 2020. *See* DOJ Action, ECF No. 301 at 95:21-23. Following a review by the Department of Transportation, Defendants carved out of the NEA six routes to and from Boston: Boston-Charlotte, Boston-Dallas/Fort Worth, Boston-Philadelphia, Boston-Phoenix, Boston-Rochester, and Boston-Syracuse, with additional routes added to that list. *See* Ex. 32, AA-NEA-03287991 at ¶ 1.2; DOJ Action, ECF No. 310 at 146:19-23.

The NEA was publicly announced on July 15, 2020. *Am. Airlines Grp.*, 675 F. Supp. 3d at 84. Implementation began in early 2021 and involved a sequence of route, slot, aircraft, codeshare, and connection-specific changes that occurred over time. Defendants periodically expanded or changed the scope of codesharing to add routes and tailor the rollout to customer demand. *See* Ex. 33, AA-NEA-03276248 at ¶ 2.1; DOJ Action, ECF No. 310 at 51:10-18,

---

[6] Reciprocal loyalty benefits refers to an agreement whereby travelers could accrue and redeem miles on either Defendant's frequent flyer program. *See id.* at 126.

[7] Defendants agreed to develop joint bids incorporating discounts for corporate customers to encourage flying on both airlines and extended existing discounts to each other's corporate customers. *See* Ex. 30, AA-NEA-03296127 at 005; Ex. 31, JBLU-LIT-01968924 at -925.

56:24-57:4. Route-level schedule changes also followed different timelines: for example, only three Boston routes were subject to NEA-related scheduling changes at the start of Plaintiff's Proposed Class Period. *See* Ex. 34, JBLU-LIT-03524009 at -013.

Over the course of the NEA, Defendants increased capacity in the Northeast, with growth at the NEA Airports substantially outpacing growth by other airlines. *See* DOJ Action, ECF No. 311 at 56:23-57:14, 58:1-4, 59:6-17, 62:23-63:5; Ex. 35, AA-NEA-01747162 at 002; Ex. 36, JBLU-LIT-02517768 at 772, 779, 787-791. They collectively entered 18 new routes in Boston, experienced a more-than-200% increase in ASMs[8] in the NEA region, and increased frequencies on more than 130 routes. *See* Ex. 35, AA-NEA-01747162 at 003; DOJ Action, ECF No. 313 at 68:11-69:9, 78:11-83:16; DOJ Action, ECF No. 311 at 53:20-22; Ex. 37, AA-NEA-01748798 at 008; Ex. 36, JBLU-LIT-02517768 at 788.

### E. The DOJ Action

The DOJ and several state attorneys general sued to enjoin the NEA, alleging that it violated Section 1 of the Sherman Act, 15 U.S.C. § 1. *Am. Airlines Grp.*, 675 F. Supp. 3d at 104. The DOJ Action plaintiffs pursued only injunctive relief under 15 U.S.C. § 4; they were not required to prove, and did not prove, that the NEA caused any consumer harm or fare increase on any route. *See* DOJ Action, ECF No. 1, ¶ 14; *Am. Airlines Grp.*, 675 F. Supp. 3d at 119 n.89 ("Neither the direct nor indirect theories of antitrust liability require proof of price increases . . ."). They alleged merely that the NEA was likely to have anticompetitive effects because it reduced competition between Defendants. DOJ Action, ECF No. 80 at 11, 14, 23. Judge Sorokin found that the NEA violated Section 1 under the rule of reason. *Am. Airlines Grp.*, 675 F. Supp. 3d at

[8] "Capacity in the airline industry is generally measured in terms of [ASMs] . . . . One ASM is one seat on one plane flying one mile. Thus, an airline can increase its ASMs by operating more planes, offering more seats, or flying longer routes." *Am. Airlines Grp.*, 675 F. Supp. 3d at 76 n.5.

112-26. He found that it reduced competition between Defendants on 13 routes where one airline exited because of the NEA, and on eight other routes where one Defendant removed flights that departed at the same time as the other airline's flights. *See id.* at 92-93. Judge Sorokin did not find that *any* consumer paid an inflated fare on *any* NEA route, including routes touching Boston.

### F. The Instant Lawsuit

In August 2023, four Named Plaintiffs filed the Third Consolidated Amended Class Action Complaint ("TCAC," ECF No. 53), alleging that consumers who purchased tickets on NEA routes while the NEA was in effect were harmed. *See* TCAC ¶¶ 12-15. Though the Named Plaintiffs rely heavily on the outcome of the DOJ Action as the backbone of their case, this Court made clear during a recent hearing that "antitrust injury wasn't litigated in the DOJ case." ECF No. 127 at 7:24-25. To prevail *in this case*, the Named Plaintiffs must prove that the NEA injured all members of the proposed class.

The Named Plaintiffs, consisting of purchasers of JetBlue's and American's tickets, initially proposed a class of "[a]ll direct purchasers" of Defendants' tickets for flights to or from Boston, LGA, JFK, and Newark from July 15, 2020, "until the anticompetitive effects of Defendants' conduct ceases." TCAC ¶ 145. Plaintiff Buehler now proposes a different class. She seeks to represent a class comprising "[a]ll direct purchasers" of Defendants' tickets for flights *to or from Boston* "for travel within the United States, excluding U.S. Territories," during the Proposed Class Period. Pl.'s Mot., ECF No. 133 at 3. Thus, the revised proposed class definition *excludes* purchasers of tickets for flights traveling to or from *three out of the four* NEA Airports.

In support of her Motion, Plaintiff relies entirely on a regression model prepared by Schwartz. Schwartz's model measures fares at the airport level, and he concludes that capacity in Boston was lower overall while the NEA was in effect than it was on average from 2017-2019. Schwartz Rpt. ¶ 21. He then compares Defendants' fares in Boston to their fares at non-NEA

airports and concludes that, on average, they were 6.7% higher for American's flights in Boston and 5.0% higher for JetBlue's flights. *Id*. ¶ 131. Despite the undisputed facts that Defendants make capacity decisions and set fares at the route level, *see* disc. *supra* at 11-16, Schwartz does not do any route-by-route overcharge analysis. He asserts that a route-level analysis would be unreliable due to "noise" in the data that the model would be unable to distinguish from the effects of the NEA. *Id*. ¶¶ 107-130. Instead, he hypothesizes that airlines can shift capacity among routes and would allocate capacity to the routes with the "higher overcharge." *Id*. ¶ 149. He likewise surmises that Boston was "gate constrained," such that non-Defendant airlines could not add capacity in Boston to compete with the Defendants. *Id*. ¶¶ 86-87, 148-49. From these two conclusory premises, which Schwartz describes as "supply substitution," Schwartz asserts that his single average overcharge for each Defendant applies uniformly to *every* Boston route throughout the Proposed Class Period. *Id*. ¶¶ 144, 157. He then relies on a separate correlation analysis, which measures whether fares for different products on a route generally move together over time, to conclude that these overcharges apply to every itinerary within *any given* route. *Id*. ¶¶ 158-170.

Plaintiff purchased tickets from JetBlue for flights on three routes: Boston-Fort Lauderdale, Boston-Orlando, and Boston-Miami. Johnson Rpt. ¶ 126. Plaintiff's purchases included itineraries with redeemed points/credit awarded by JetBlue, "open jaw" itineraries (e.g., where the outbound arrival airport is different from the inbound departure airport), and an exchanged itinerary.[9] *Id.* ¶ 171. Significantly, Schwartz does not include Plaintiff's purchases (or millions of other itineraries) in his model. *Id.*, Ex. 30; *see* Schwartz Rpt. ¶ 10 & App'x C ¶¶ 3, 6-7.

[9] An "exchanged itinerary" refers to a ticket on which one or more flight segments (coupons) were changed or rebooked after the original purchase. *See* Schwartz Rpt. App'x C ¶¶ 1, 5-6.

## ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348. A plaintiff seeking certification must therefore "actually prove" that "their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Here, Plaintiff must "establish[ ] by a preponderance of the evidence" that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy are met. *Dukes*, 564 U.S. at 350; *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Because Plaintiff seeks certification under Rule 23(b)(3), she must also establish "(1) predominance—that the questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) superiority—that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

These are "stringent requirements . . . that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). To satisfy them, a plaintiff must provide "significant" and "convincing" evidence that each requirement is met. *Lanqing Lin v. Everyday Beauty Amore Inc.*, 2019 WL 3037072, at *1 (E.D.N.Y. July 11, 2019); *see Eduoard v. Nikodemo Operating Corp.*, 2019 WL 3557687, at *1 (E.D.N.Y. Aug. 5, 2019). A court must conduct a "rigorous analysis" of that proffered evidence, and certification is proper only where the court is convinced that each prerequisite is met and that adjudication of the claims will fairly resolve the claims of the putative class. *Dukes*, 564 U.S. at 350. Plaintiff has not made the required showing.

## I. PLAINTIFF HAS NOT SATISFIED RULE 23(A)(2)'S COMMONALITY REQUIREMENT

Rule 23(a)(2) "requires the plaintiff to demonstrate that the class members have suffered the same injury" and that their claims "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality is not satisfied where a plaintiff "fail[s] to demonstrate that there has been an injury common to all potential Class members." *Spread Enters., Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 73 (E.D.N.Y. 2014). Plaintiff cannot "demonstrate that the class members have suffered the same injury," such that "a class-wide proceeding [would] generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350.

Plaintiff relies exclusively on Schwartz to present a common method of demonstrating class-wide harm. As explained below, however, Schwartz's regression analysis resulting in a single "overcharge" specific to each airline, and his two theories for extending this overcharge across every Boston route (supply substitution) and every fare within each route (correlation analysis), are fatally flawed, unreliable, and contradicted by the record evidence. *See* disc. *infra* at 29-35. This alone defeats commonality.

But Schwartz's model is worse than that. Using his own model, Schwartz found no overcharges at three of the four NEA Airports, and when his model is allowed to estimate a separate effect for each Boston route, it shows that nearly 6.9 million tickets purchased by the proposed class members experienced *undercharges* or *no statistically significant* overcharges. Johnson Rpt. ¶ 100, Ex. 17. Thus, applying Schwartz's own method, there is no common answer to the proposed common question of whether the NEA caused overcharges, because the answer is "no" or "the opposite" for significant numbers of proposed class members. *See, e.g.*, *Plaza 22,*

*LLC v. Waste Mgmt. of La., LLC*, 2015 WL 1120320, at *4 (M.D. La. Mar. 12, 2015) (finding commonality not met where, "considering the different types of customers and the different contractual terms at issue, the Court would be required to conduct more individualized inquiries into the assessment of any injuries and the types of damages").

Schwartz's model also fails to account for the undisputed fact that the NEA was not a price-fixing agreement, and when it was in place Defendants did not coordinate on, or even discuss, their pricing. Each airline continued to make independent pricing decisions throughout the Proposed Class Period as it had always done. *See* Ex. 30, AA-NEA-03296127 at Recital 5 (NEA Agreement provides that both parties "will retain full control over all aspects of their respective businesses, including setting pricing for their services"); *id.* at Section 3.1.1; DOJ Action, ECF No. 297 at 167:23-168:10; DOJ Action, ECF No. 306 at 8:2-4; Johnson Rpt. ¶ 48 ("American and JetBlue independently set fares on a route-by-route basis (including those in and out of Boston) multiple times each day."). There simply is no "uniform [pricing] practice" or proof that the mere existence of the NEA (an operational agreement with a suite of operational initiatives but no pricing coordination) establishes that every class member on every route at every point in time paid more for their ticket than they otherwise would have paid and were therefore injured. *See Dukes*, 564 U.S. at 355 (no commonality where there was no "uniform employment practice" tying company-wide policy to individual employment decisions); Bernheim Rpt. ¶ 64; Johnson Rpt. Section VII.

This case thus bears no relation to the authorities Plaintiff relies on for commonality, all of which involved allegations of price fixing, an agreement to coordinate prices, or a specifically identifiable add-on surcharge, inflated fee, or premium. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 52 (E.D.N.Y. 2019) (defendants "conspired to fix

prices and impose supracompetitive interchange fees on merchants that accept Visa and Mastercard debit and credit cards"); *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (defendants "manipulated the futures or physical markets for platinum or palladium"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 502 (S.D.N.Y. 1996) (defendants conspired to fix, raise, and maintain artificially inflated bid/ask spreads on Nasdaq securities)[10]; *In re Google Digit. Advert. Antitrust Litig.*, 2025 WL 3562687, at *2-3 (S.D.N.Y. Dec. 12, 2025) (Google unlawfully monopolized and tied its digital advertising ad-server and ad-exchange products). Here, there is simply no "common contention . . . capable of classwide resolution . . . in one stroke." *Dukes*, 564 U.S. at 350.

## II. PLAINTIFF CANNOT SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT

Plaintiff separately cannot meet Rule 23(b)(3)'s predominance requirement, which "is even more demanding" than the commonality requirement in Rule 23(a). *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). In the antitrust context, "[w]ithout common proof of injury and causation, antitrust plaintiffs *cannot* establish predominance." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 45 (S.D.N.Y. 2020); *In re Int. Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *5 (S.D.N.Y. Dec. 15, 2023); *see* 1 McLaughlin on Class Actions § 5:36 (22d ed.) ("The most fundamental prerequisite to certification of an antitrust class is the identification of a common methodology capable of allowing the trier of fact to determine that each member of the proposed class suffered antitrust injury and damages as a result of the challenged conduct."). In determining whether the predominance requirement is met, a court must consider whether pricing relies on a host of individualized factors and is highly variable. *Miami Prods. & Chem. Co. v. Olin Corp.*,

[10] *In re NASDAQ* is further distinguishable because it was decided before *Dukes* and thus applied an outdated and more lenient framework. 169 F.R.D. at 504.

2023 WL 8946114, at *18-19 (W.D.N.Y. Dec. 28, 2023) (finding predominance not met where defendants "charged different prices to different customers and adjusted their pricing at different times and by different amounts"); *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 92 (S.D.N.Y. 2017) ("[T]he prevalence of price variability in the but-for world . . . would require the Court to perform a host of individualized inquiries."). Here, Schwartz has no reliable methodology that is capable of demonstrating that all proposed class members were injured by the NEA. Johnson Rpt. ¶¶ 6-8.

Instead, to determine whether any proposed class member paid higher fares than they would have paid but for the NEA, and thus suffered antitrust injury, the Court needs to analyze each ticket purchased and the factors that drove pricing for that product at that particular point in time. *Id.* ¶ 130 ("An individualized inquiry is required to determine whether, and how, fares that were set using different pricing mechanisms, and that were derived from different supply and demand conditions, would have changed absent the NEA."). Indeed, because the price of any ticket during the Proposed Class Period depended on numerous individualized factors (including, for example, the route's competition, the pricing strategy the airline used, the inventory and fare class, and the timing of purchase), individualized issues predominate over any common issues that might exist. Johnson Rpt. ¶¶ 56-57, 155-56; *see Miami Prods.*, 2023 WL 8946114, at *18-19; *Digit. Music*, 321 F.R.D. at 92.

Plaintiff tries (but fails) to counter the reality of fare-setting with Schwartz's regression-based model. Where "an expert's model is the basis for a plaintiff's claim of class-wide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage." *Aluminum Warehousing*, 336 F.R.D. at 46; *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Rule 23 not only authorizes a

hard look at the soundness of statistical models . . . [,] the rule commands it."). An expert opinion that (1) "yields false positives," (2) "masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class," or (3) "measures harm not attributable to the conspiracy," among other things, will "result in denial of class certification." *Aluminum Warehousing*, 336 F.R.D. at 49.

Schwartz's model cannot withstand that rigorous assessment. Schwartz himself concedes that he does not believe there is a "reliable way to estimate a passenger-specific or route-specific or time period-specific overcharge." Ex. 38, Schwartz Dep. at 74:12-13. The numerous defects in his approach, each independently fatal, show why.

### A. Schwartz's Model Ignores The Realities Of The Airline Industry

#### 1. Schwartz's Model Does Not Account For The Numerous Individualized Issues Involved In Route-Specific Fare-Setting

Schwartz's model fails to recognize the numerous factors involved in an airline's fare decisions. But the predominance inquiry *requires* that such individualized factors be accounted for and that the ultimate question of class-wide injury be provable through common proof. Where that requirement is not met, certification must be denied. *See Blades v. Monsanto*, 400 F.3d 562, 570 (8th Cir. 2005) (denying class certification where prices were "highly individualized depending on geographic location, growing conditions, consumer preference and other factors" and "the 'but-for' prices could be determined only through individualized inquiries for each potential class member"); *Digit. Music*, 321 F.R.D. at 92 (denying class certification where expert's model failed to account for price variability).

Schwartz employs a "difference-in-differences" ("DiD") regression[11] that compares the change in average fares between a pre-NEA period (2017-2019) and the Proposed Class Period for routes touching Boston against the change in average fares over the same periods for routes touching non-NEA airports. *See* Schwartz Rpt. ¶¶ 107-110, 114. He runs separate regressions for each airline, with different explanatory variables, and derives a single figure for each airline—6.7% for American and 5.0% for JetBlue—that he claims represents the *exact* overcharge on *every* ticket by *every* class member throughout the entire Proposed Class Period. *Id.* ¶¶ 121, 131; Ex. 38, Schwartz Dep. at 168:12-169:3 (confirming Schwartz's overcharge estimate "is identical" for "every passenger, at all points in time, on all flights"); *id.* at 140:21-25 (confirming the overcharge applies for "the entire class period"). Despite conceding that pricing and capacity decisions are made at the route level, he then applies the two figures uniformly to *all* American and JetBlue fares on itineraries touching Boston and calculates damages of approximately $141 million for American Boston itineraries and $144 million for JetBlue Boston itineraries. Schwartz Rpt. ¶¶ 131, 171-73; Johnson Rpt. ¶ 168. Schwartz never tests whether the NEA affected different routes or ticket types differently. Johnson Rpt. § VII; Schwartz Rpt. ¶¶ 109-110, 130-31.

Schwartz himself acknowledges that "[l]egacy carriers like American primarily rely on Origin and Destination (O&D) pricing, which bases fares on demand between a specific starting point and final destination"; have pricing departments that set fares based on "consumer behavior and competitive pricing"; and have yield management departments that "determine the allocation of seats offered at each fare for a given flight" based on "demand forecasts, booking trends, and broader market conditions" specific to that route and flight. Schwartz Rpt. ¶¶ 29-31. Schwartz

[11] A DiD model compares change in outcomes for a "treatment group," purportedly affected by relevant conduct, against outcomes for a "control group" (which is not affected) over two time periods, one before and one during the treatment. Bernheim Rpt. ¶ 60; Johnson Rpt. ¶ 113.

also concedes that, in antitrust cases, "relevant geographic markets for air transportation are generally defined as either airport pairs or city pairs of itinerary origins and destinations." *Id.* ¶ 144. Nevertheless, he fails to study route-by-route competition, fare-matching, inventory management, or the real-world and highly diverse capacity and scheduling decisions that Defendants made during the NEA. *See* Ex. 38, Schwartz Dep. at 99:13-15 ("I did not analyze capacity changes on a [] route specific basis"); *id.* at 128:15-16 ("I did not do a route-by-route analysis of [] the schedule."). Further, although Schwartz identifies itineraries sold under corporate contracts through "ticket designators," he does not study whether or how prices vary between different ticket designators or corporate contracts; he compares only, in the aggregate, itineraries with ticket designators to those without. *See* Johnson Rpt. ¶ 85 n.177; Schwartz Rpt. ¶¶ 125, 165. These omissions undermine the reliability of his model to demonstrate class-wide injury. *See* Johnson Rpt. ¶¶ 158-160.

Schwartz also fails to account for the multitude of individualized factors unique to each passenger, flight, and route. *See Gerber v. Delta Airlines*, 1996 WL 557853, at *3-4 (N.D. Ga. Aug. 6, 1996) (denying class certification because individualized inquiries were required into, among other things, travel dates, airline preferences, and purchase timing to determine injury). Each airline independently sets its fares for each O&D pair, with pricing analysts adjusting fares in real time—resulting in thousands of fare decisions *every day*. Johnson Rpt. ¶¶ 48-50. Based on yield and demand forecasts, airlines open and close fare classes on a flight-by-flight and day-to-day basis, producing vastly different pricing for passengers who purchase tickets at different times and under different conditions. *Id.* § V.B.3. For example, two passengers purchasing Main cabin tickets on the same American flight from Boston to Phoenix on June 27, 2023, paid drastically different fares of $720 and $200.52. *See id.*, App'x C, Ex. C-4. Product variations

further impact pricing. For instance, on JetBlue's Boston-Los Angeles route, fares ranged from $51 for Blue Basic to over $1,100 for Mint. *Id.* App'x C n.6. Contractual relationships impact pricing, too: corporate customers pay negotiated rates, including fixed fare arrangements. DOJ Action, ECF No. 299 at 217:9-12.

Moreover, Schwartz's analysis ignores the individualized inquiry that results from the staggered implementation of the NEA. That, too, makes clear that his model cannot establish class-wide injury via common proof. *See Aluminum Warehousing*, 336 F.R.D. at 56-57 (denying class certification where the challenged conduct "waxed and waned during the class period" and its "lumpiness" meant the expert's averaging methodology was "particularly troubling" given "significant variation in the level of purported conspiratorial activity at any given moment during the class period"). Schwartz's methodology assumes the NEA applied uniformly to all Boston routes from early 2021 through July 2023. In reality, the NEA's provisions did not apply uniformly to all Boston routes. Only five Boston routes had nonstop service from both Defendants and were subject to all NEA provisions; and six "carve-out" routes were excluded from revenue-sharing and network planning entirely. Johnson Rpt. ¶ 72, Ex. 14. And implementation was staggered—only three Boston routes were subject to NEA-related scheduling changes when implemented in April 2021, and by November 2021, only 74% of Boston routes had any codesharing. Schwartz Rpt. ¶ 55 & Fig. 1; Ex. 38, Schwartz Dep. at 109:2-12. As a result, the conditions under which each ticket was purchased and the extent to which the NEA provisions applied to the route vary widely over time. Thus, a proposed class member who purchased a ticket early in the Proposed Class Period (*e.g.*, April 2021) is fundamentally differently situated from one who purchased a ticket a year later. Schwartz's model ignores this. Ex. 38, Schwartz Dep. at 134:13-135:8.

### 2. Schwartz's "Supply Substitution" Theory Is Unsupported And Unprecedented

Despite acknowledging that airlines make fare decisions on a route-by-route basis based on factors specific to each route at specific points in time, Schwartz analyzes the NEA at the airport level, rather than at the route level. He attempts to justify that decision with his flawed "supply substitution" theory, which posits that American and JetBlue seamlessly shift capacity to any route with a higher overcharge so that overcharges are exactly the same across every route. Schwartz Rpt. ¶¶ 143-49. To make this theory work, he assumes that Boston's gate constraints would have prevented non-Defendant carriers from adding capacity on any routes, thereby enabling each Defendant to impose an artificially inflated overcharge across all of them. *Id.* ¶ 149. He also assumes that Defendants treated Boston as a stand-alone profit center, rather than one part of a global network, and sought at all times simply to maximize profitability for Boston routes. These untested assumptions are inconsistent with the facts and evidence.

At the outset, Schwartz's supply substitution theory is contrary to the extensive economic literature and case law analyzing airfares. The literature he cites examines airfares on an *individual route basis* without applying an average overcharge across all routes at an airport. Likewise, no court has ever adopted the supply substitution theory he advocates. Judge Sorokin examined competition at the route level. *See Am. Airlines Grp.,* 675 F. Supp. 3d at 92-93. Other courts have done the same. *See, e.g.*, *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 789-91 (6th Cir. 2005) (affirming class certification denial where "issues unique to each of the 74 different routes predominate on the question of antitrust injury" because "there are any number of reasons" for the competitive conditions on a route and "these reasons would likely be different from one route to the next"). Indeed, courts have rejected the assertion that all routes at an airport can be lumped together. *See In re Air Passenger Computer Rsrvs. Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1468

(C.D. Cal. 1988) ("A hub is merely a place to change planes during air travel between two other cities. Airlines do not sell air transportation to hubs, rather they sell air transportation between cities.").

Significantly, Schwartz did not test or validate either of the premises underlying his supply substitution theory—that airlines automatically shift capacity to higher profit routes and that non-Defendant airlines were gate constrained in Boston. Schwartz asserts that airlines have the *ability* to shift capacity to different routes, but he never analyzes the extent to which that happens in the real world, or whether it happened in Boston. His report contains no empirical or quantitative analysis of supply substitution. Ex. 38, Schwartz Dep. at 243:1-2 ("There is not an empirical analysis of supply substitution in my report"); Schwartz Rpt. ¶¶ 144-49; Johnson Rpt. ¶¶ 16, 145. He did not study route-specific profit margins, gate utilization, flight frequency, crew scheduling, maintenance requirements, or network-wide capacity constraints—all of which affect airlines' willingness and ability to shift aircraft between routes. Ex. 38, Schwartz Dep. at 243:3-245:13. And he performed no analysis of whether Defendants *actually* shifted capacity among Boston routes before, during, or after the NEA.

He also conceded during his deposition that there is no way to identify which routes have a higher overcharge at any point in time such that an airline even could engage in his version of "supply substitution," testifying instead that the decision would be based on a route's profitability, not whether the fares on that route were subject to overcharges. *Compare* Schwartz Rpt. ¶ 149 (asserting that "a higher overcharge on one route . . . would not generally be sustainable because of the incentives of the airlines . . . to shift capacity from the route with the lower overcharge to the route with the higher overcharge") *with* Ex. 38, Schwartz Dep. at 249:17-20 ("Airlines don't need to assess overcharges specifically. It would be based on the profitability of the route."). But

Schwartz did not study the extent to which Defendants shifted capacity in Boston to more profitable routes, *id*. at 243:1-8, 250:6-25, and he ignores that Defendants often operate routes that are *not* profitable, Johnson Rpt. ¶¶ 149-151, Exs. 40-41; Bernheim Rpt. ¶ 91 & n.149. This is fatal to Plaintiff's motion. *See Aluminum Warehousing*, 336 F.R.D. at 52-53 (denying class certification where plaintiffs' expert's model "fail[ed] to isolate the effects of the conspiracy," as he "failed to control" for a potential cause of the price increase); *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 450 (E.D.N.Y. 2022) (excluding plaintiff's expert at the class certification stage because "his methodology is not a theory or technique that has been 'tested,'" and his "core assumption" underlying his damages calculation was "not well-founded").

Schwartz's "supply substitution" theory is also contradicted by the record. Defendants do not make capacity decisions at a single airport based on the ability to impose an "overcharge," a concept that they cannot observe or calculate in real time or based solely on route-level profitability. They make capacity (and profitability) decisions at a network level, based on the composition of their aircraft fleet (because different aircraft types have different range capabilities and seat configurations that make them suitable only for certain routes), the needs of and impact on the airline's network (including whether a route feeds a hub or important international connection or is required by a large corporate customer), and relevance to their target customers (because airlines seek to remain competitive for certain corporate and leisure customers, even if individual routes are unprofitable), among other things. *See, e.g.*, Ex. 39, JBLU-NEA-LIT-00013084 at -115 (explaining specific aircraft "best matches stage and demand levels"); Ex. 40, JBLU-NEA-LIT-00139824 at -825; Ex. 41, Znotins Dep. (2022) at 42:7-21. As a result, Defendants operate routes with widely varying profit margins. Johnson Rpt. ¶¶ 149-151, Ex. 42, AA-NEA-01258502 at 32-33. They routinely fly routes that are unprofitable on a standalone basis

to compete with other airlines. For example, American operated the Boston-JFK route at margins of [redacted] Johnson Rpt. ¶ 150 n.262, because that route enabled American to remain relevant to large corporate customers that regularly traveled from Boston to New York for business, *id*. Dr. Johnson analyzed JetBlue's profit margins on several routes and found it continued to operate many routes at negative profit margins. Contrary to Schwartz's theory, Defendants did not shift capacity away from those routes. *Id.* ¶¶ 149-151 & Exs. 40-41.

Moreover, airlines often require significant lead time to reallocate aircraft because they must market schedules to passengers and build sufficient demand before committing to serve a route. *Id.* ¶ 38; Ex. 16, Raja Dep. (2021) at 32:15-33:1, 34:12-18. And factors such as the aircraft type, the aircraft's fuel range, the aircraft's seat configurations, pilot training, and the demand for leisure and/or business travel on the route also can restrict where an aircraft can fly or the speed and feasibility of shifting that aircraft to another route. Johnson Rpt. § V.B.2. Airlines cannot simply "shift capacity" to a route on short notice, as Schwartz's theory requires.

Finally, Schwartz's theory relies on an additional unsupported assumption that during the entirety of the NEA no other airline could shift capacity to take advantage of the supposed overcharges because they faced "gate constraints" (while Defendants could, according to Schwartz, do so seamlessly). Schwartz Rpt. ¶¶ 144-49. This theory is also untested and contradicted by record evidence. Unlike Schwartz, Dr. Johnson *did* study the gate-capacity assumptions and found no support for them. Johnson Rpt. ¶¶ 152-54 & Ex. 42. Among other things, Dr. Johnson found that following the onset of COVID-19, compared to Schwartz's own benchmark period of 2019, non-Defendant flight operations remained below pre-pandemic levels in all but six months during the Proposed Class Period, meaning that non-Defendants were not constrained in the number of flights they could operate at Boston. *Id.* ¶ 152, Ex. 42. If Schwartz's

supply substitution theory were valid, any non-Defendant could have entered any route to compete with Defendants. And in reality, non-Defendant airlines, including Delta, *did* enter certain Boston routes. *Id.* ¶ 153. Yet Schwartz fails to acknowledge, much less analyze, if those entries affected Defendants' fares or their capacity decisions. *Id.*

For all of these reasons, Schwartz's untested and unsubstantiated supply substitution theory is incapable of reliably assessing class-wide impact or damages using actual facts or data.

**3. Schwartz's Within-Route Correlation Is Untested And Incorrect**

Schwartz's correlation analysis is also divorced from reality. Schwartz not only assumes overcharges were identical *across* all Boston routes (his supply substitution theory), he opines that every passenger *within a route* faced the same overcharge. To support this, he performs a correlation analysis of certain fares within a route and concludes a "pricing structure exists" such that "all or nearly all" itineraries within a route would be impacted. Schwartz Rpt. ¶¶ 158-169, Tables 12-19. He then extends that "pricing structure" theory across all routes. *Id.* ¶¶ 158, 170.

As with his supply substitution theory, Schwartz did not actually test whether his correlation analysis comports with available real-world data. He did not run a cross-route analysis, even though he had the data to do so. Ex. 38, Schwartz Dep. at 193:12-14 ("I had data that if I had wanted to do correlation analysis across routes, I could have done it."). Using Schwartz's own methodology, Dr. Johnson *did* run Schwartz's own correlation analysis and found that fares *across* routes that touch the same airport are generally *not* correlated. Dr. Johnson found that 62% of JetBlue route pairs and 50% of American route pairs touching Boston have correlations of 0.5 or less, including 8% that are negative. Johnson Rpt. ¶ 165, Ex. 47. Moreover, even high correlation coefficients do not demonstrate common impact. Dr. Johnson found that Boston fares are positively correlated with New York fares (0.60 to 0.84), yet Schwartz himself found no overcharge in New York. *Id.* ¶¶ 163-64, Ex. 45; Schwartz Rpt. ¶ 131. Similarly, JetBlue fares in

Boston-Washington, D.C. and Boston-Los Angeles are not correlated, further undermining Schwartz's theory that all Boston routes experienced the same effects. Johnson Rpt. ¶ 164, Ex. 46. Thus, Schwartz's correlation analysis does not justify his use of an airport-level regression.

In sum, by estimating a single overcharge for each Defendant *at the airport level*, Schwartz's model ignores how the airline industry actually operates and instead relies on untested justifications that the facts contradict. It therefore cannot serve as the common proof of impact that Rule 23(b)(3) demands.

### B. Schwartz's Average Masks Many Uninjured Proposed Class Members

Schwartz's use of a single, airport-level average overcharge masks the many proposed class members who Schwartz's own model shows were not injured—and who in fact benefited from the NEA.[12] That is an independent basis to reject his model. *See Aluminum Warehousing*, 336 F.R.D. at 62 ("[A]t the class certification stage, a model proffered as common proof of classwide antitrust injury may be defective—thus necessitating individualized injury inquiries—where it relies on average impact and thereby masks the existence of uninjured class members."); *Nypl v. JP Morgan Chase & Co.*, 2022 WL 819771, at *8-9 (S.D.N.Y. Mar. 18, 2022) (denying class certification where the plaintiffs' model produced "an average estimate of damages" because there was "no evidence that the rate of any overcharge was consistent," and plaintiff provided "no means of screening out [uninjured] class members" or avoiding individualized proof); *Int. Rate Swaps*, 2023 WL 8675625, at *9-10 (denying class certification where determining which members "did and did not suffer injury would similarly entail individualized inquiries for each" putative class

---

[12] Schwartz concedes that he did not analyze whether any proposed class member benefited from the NEA, whether through codeshare convenience, loyalty benefits, improved scheduling, or increased capacity. Ex. 38, Schwartz Dep. at 100:15-101:6; 102:6-8; 103:13-20 ("I haven't done any analysis of [] whether there was any pro-competitive benefits to the NEA.").

member); *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 710 F. Supp. 3d 1090, 1109 (D. Utah 2023) (agreeing that the "use of a class-wide average is especially inappropriate in a monopolization case based on a differentiated product market with heterogeneous customers and individualized pricing"). Indeed, the results of averaging in a regression analysis offered as common proof of class-wide impact are "about as meaningful as saying that 'with one foot on fire and the other on ice, I am, on average, comfortable.'" *Behrend v. Comcast*, 655 F.3d 182, 223 (3d Cir. 2011) (Jordan, J., concurring and dissenting in part).[13]

Schwartz estimates a single overcharge of 6.7% for American and 5.0% for JetBlue and asserts that those averages prove injury across more than 18 million itineraries, as though every ticket touching Boston were the same transaction. *See* Schwartz Rpt. ¶¶ 109-110, 130-31; Schwartz Errata, Table 20. Although Schwartz denied at deposition that his figures are averages, he conceded that "[a] coefficient in a regression analysis is to some extent an average." Ex. 38, Schwartz Dep. at 73:4-5. The distinction he draws (that it is not an arithmetic average) is semantic. Schwartz admitted that the "best estimate is identical" for every passenger on every route at every point in time, *id*. at 169:2-3, which is simply a uniform average. His single per-carrier coefficient is by construction an average: it is one estimated effect derived from pooling millions of heterogeneous transactions and then applied to each of them as though every transaction shared the same features. *See* Johnson Rpt. ¶¶ 82, 96-100; Schwartz Rpt. ¶¶ 109-110, 130-31. Whatever

---

[13] Plaintiff's reliance on cases holding that a benchmark method is a generally accepted method for measuring antitrust impact and/or damages misses the point. That a particular model may be reliably applied in certain instances says nothing about its application in cases where, as here, the model rests on an unsupported and unreasoned foundation. *See, e.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773, at *8 (D. Minn. Aug. 14, 2018) (excluding opinions as unreliable when "benchmarking analysis and resulting opinions on antitrust injury and damages are fundamentally unsupported"); *Series 17-03-615 v. Express Scripts, Inc.*, 2024 WL 1834311, at *4 (N.D. Ill. Apr. 26, 2024) (excluding proposed benchmark approach).

the label, an estimate that reports the same percentage overcharge for a $51 Blue Basic fare purchased 43 days in advance for a trip to Florida and a $1,300 Mint fare purchased day of departure for a Chicago business meeting is not proof that either passenger was injured; rather, it is proof the model does not distinguish between them. Johnson Rpt. ¶¶ 82, 86, 97 & App'x C n.6.

Schwartz's use of an average also masks a significant number of uninjured class members. Dr. Johnson tested Schwartz's model allowing it to estimate separate effects for each route, consistent with the economic evidence that airlines set fares and capacity at the route level (not by airport). *Id.* ¶ 9. For American, over 35% of the relevant tickets do not demonstrate a positive, statistically significant fare overcharge (representing 2.5 million tickets), and of those, 17% showed a statistically significant *undercharge*. For JetBlue, Schwartz's model does not demonstrate a positive and statistically significant overcharge for 4.3 million tickets (nearly 40% of relevant tickets). *Id.* ¶¶ 9, 98-99. Thus, even if Schwartz's model were a proper regression analysis fit to this case (it is not), it would establish a significant number of members *benefited* from the NEA via lower ticket prices or, at the very least, were not overcharged. *Id.* ¶ 88.

To be clear, Defendants are not suggesting that running Schwartz's model route-by-route would cure its defects; the same transaction-specific factors described above operate within every route and Schwartz's model does not capture this dynamic price setting. *Id.* ¶ 110, Ex. 22. The point is narrower and fatal. Even based on the output of his own model, Schwartz's use of a single, average overcharge conceals a large number of proposed class members who were unharmed. It does not and cannot, therefore, represent common proof to establish class-wide injury. *See Aluminum Warehousing*, 336 F.R.D. at 62-63 (denying class certification where expert's averaging "yields false positives" and masks uninjured class members); *In re Plastics Additives Antitrust Litig.*, 2010 WL 3431837, at *15-16 (E.D. Pa. Aug. 31, 2010) (denying certification

where the expert's regressions produced "single, industry-wide estimates of increased price" that "tell us nothing about individual class member experience," and testing showed 99 of 155 customers received no statistically significant increase under proffered model); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (denying certification based on expert model that relied on an average and holding it could not "serve to establish that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct," noting that it "assume[d] the very proposition" the plaintiffs were attempting to show).

### C. Schwartz's "Parallel Trends" Assumption Is Invalid

For a DiD model to be reliable, it must satisfy the "parallel trends" assumption. Bernheim Rpt. ¶ 82; *Copeland v. Energizer Holdings, Inc.*, 2026 WL 2913693, at *6, 8, 10 (N.D. Cal. Sep. 28, 2026) (explaining that, to satisfy the "parallel trends" assumption, the expert must show that "the [treatment and control] groups' outcomes [ ] generally move[d] in parallel before the treatment" and "would have evolved in parallel without the treatment effect"). Here, Schwartz relies on the assumption that fares on Boston routes (his "treatment" routes) moved in parallel with fares on non-NEA routes (his "control" routes) *before the Proposed Class Period* and would have continued to do so but-for the NEA. Schwartz Rpt. ¶¶ 109-110. Schwartz does not validate his assumption; he relies instead on graphical analyses that compare capacity on NEA routes with non-NEA routes, *id.* Figs. 2 & 5, but he says nothing about pre-NEA fares. That omission is fatal to Schwartz's model. *See Copeland*, 2026 WL 2913693, at *7-11 (rejecting expert's DiD model).

Moreover, Dr. Bernheim's analysis shows that even Schwartz's graphical analyses are misleading because capacity in Boston and the non-NEA control markets already diverged before the Proposed Class Period. Bernheim Rpt. ¶¶ 168-69 & Fig. 11 (showing that, from July 2020 through March 2021, COVID-19 depressed capacity in Boston far more than in the control

markets). Thus, there is no support for the parallel trends assumption here, and Schwartz's model cannot support class certification for that reason too. *See Copeland*, 2026 WL 2913693, at *7-11.

**D. Schwartz's Model Does Not Isolate Harm Attributable To The NEA**

Schwartz's damages model also fails the requirement that it "measure only those damages attributable to" the plaintiff's theory of liability, and therefore cannot support class certification. *Comcast*, 569 U.S. at 35, 37-38; *Aluminum Warehousing*, 336 F.R.D. at 49, 63 (model fails where it "yields false positives" and "measures harm not attributable to the conspiracy"); *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 355 (E.D.N.Y. 2016) (proposed model could not "isolate the premium attributable to Plaintiffs' theory of the case"); *Rail Freight*, 725 F.3d at 254-55.

*First*, even if the model reliably showed injury via common proof, it cannot distinguish effects caused by the NEA from effects caused by other factors, including the COVID-19 pandemic. *See Aluminum Warehousing*, 336 F.R.D. at 52-53 (failure to control for an independent intervening change was "a classic *Comcast* infirmity"); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 161-62 (E.D. Pa. 2015) (similar). Schwartz observes a "noticeable shortfall" in Boston capacity relative to non-NEA airports during the Proposed Class Period, Schwartz Rpt. ¶ 99, but he concedes that that shortfall existed *before* implementation of the NEA, during the period Plaintiff's own Motion describes as reflecting "anomalous data" caused by the pandemic's onset. Pl.'s Mot. at 5; Ex. 38, Schwartz Dep. at 201:10-13 ("The shortfall during the COVID period of 2020 and the first quarter of 2021 is not something that I'm concluding is due to the NEA.").

Schwartz's model fails to account for the fact that those effects continued into the NEA period, meaning it picks up continuing effects from the pandemic rather than isolating effects from the NEA. Nor did Schwartz test whether the effects his model attributes to the NEA persisted after the NEA was terminated. Ex. 38, Schwartz Dep. at 79:12-16. Schwartz uses non-NEA routes as a benchmark for what would have happened in Boston absent the NEA. But COVID-19 affected

Boston differently from non-NEA markets, and Schwartz's controls cannot account for that divergence. *See* Bernheim Rpt. §§ V.C.5.a, V.C.5.b. This is borne out by the trajectory of the supposed "NEA effects" in Schwartz's model. Those "NEA effects" are larger for April-December 2021, when the NEA was in the early phases of implementation, than they are for the remainder of the Proposed Class Period (January 2022-July 2023). *See id.* § V.B.2 & Table 11. If the NEA were truly causing the "overcharge," the effect should grow stronger over time as coordination between Defendants increased. Instead, the effect diminishes. In fact, during April-December 2021, Boston's COVID-19 recovery lagged behind non-NEA markets. *See id.* Thus, Schwartz's model appears to simply be measuring impacts from the pandemic—not impacts from the NEA. Indeed, when the most egregious errors of his model are addressed, it shows no positive average overcharge for either airline in Boston. *Id.* at § V.D.

*Second*, Schwartz concedes that he ran no false positive tests and did not verify that his control routes were unaffected by the NEA. Ex. 38, Schwartz Dep. at 56:11-12, 241:20-25. Dr. Johnson did that work instead. Applying Schwartz's model to non-NEA airports, Dr. Johnson finds that, of the top 15 largest non-NEA airports for American, Schwartz's model generates *10* false positives. *See* Johnson Rpt. ¶¶ 119-122, Exs. 27-28. If the model were reliably isolating the NEA's effect, it should find no statistically significant overcharge at airports outside the NEA's scope. Instead, it finds overcharges comparable to or *exceeding* his results in Boston. For American, the model produces statistically significant "overcharges" of 4 to 5.2% on itineraries touching Dallas-Fort Worth, Philadelphia, Miami, Washington, D.C., Orlando, Las Vegas, and Denver, comparable to the 6.7% overcharge Schwartz attributes to the NEA at Boston. *Id.* ¶ 121, Ex. 27. For JetBlue, itineraries touching Buffalo show "overcharges" exceeding 12%, more than

double Schwartz's Boston result. *Id* ¶ 122, Ex. 28. These types of false positives demonstrate that the model does not measure purported impacts from the NEA.

*Third*, as explained above, Schwartz's model does not track the actual implementation of the NEA and is inconsistent with Plaintiff's theory of harm. If Schwartz's model were reliably measuring overcharges *caused by the NEA*, one would expect to see the model find larger fare effects on routes that were most susceptible to its purported anticompetitive aspects. Bernheim Rpt. § V.B. Dr. Bernheim tested this by allowing the purported NEA effects in Schwartz's model to differ across various categories of Boston itineraries, and his results show that this prediction does not hold. For example, Schwartz's regressions produce no larger estimated effects for both carriers on routes where Defendants' combined capacity share would trigger a presumption of anticompetitive effects under the DOJ's 2023 *Merger Guidelines*. Second, they do not produce larger effects for both carriers on routes where Defendants offered overlapping nonstop service pre-NEA, even though Defendants would have competed most directly on those routes absent the NEA. Third, on routes with greater potential for schedule optimization under the NEA, the regressions estimate smaller effects for both carriers than on routes with less potential. *Id.* All of these findings undermine Schwartz's assertion that his model measures harm caused by the NEA.

* * *

Predominance requires Plaintiff to "demonstrate that the elements of [her] underlying claims can be proven by common evidence," *Int. Rate Swaps*, 2023 WL 8675625, at *5, but Schwartz's model, the sole basis for Plaintiff's predominance showing, cannot establish class-wide injury because it is fundamentally flawed, ignores the many factors that drive ticket pricing, masks uninjured class members through averaging, and cannot isolate harm attributable to the NEA.

## III. PLAINTIFF HAS NOT MET RULE 23(B)(3)'S SUPERIORITY REQUIREMENT

Plaintiff contends that a class action is superior because few class members would have damages large enough to justify individual suits. But superiority requires more than an incentive to litigate; it requires that class treatment can fairly and efficiently resolve the claims. *See Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766, 769-70 (5th Cir. 2020) ("[T]he Supreme Court has made clear that fear of underenforcement is no justification for class certification."). In making that determination, courts consider, above all, the *feasibility* of managing a trial of the class claims. *See Nextel*, 780 F.3d at 147. Where "liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis, . . . a class action is not a superior method of litigating the case." *Id.* at 148; *Rambarran v. Dynamic Airways, LLC*, 2015 WL 4523222, at *11 (S.D.N.Y. July 27, 2015) (similar).

Here, answering the *prima facie* question of whether any proposed class member was actually injured would devolve into millions of mini-trials. For the reasons explained above, *see* disc. *supra* at 26-41, Schwartz's average overcharge figures are unreliable and cannot answer this question on a class-wide basis. Indeed, Schwartz concedes that he knows of no "reliable way to estimate a passenger-specific or route-specific or time-period-specific overcharge," Ex. 38, Schwartz Dep. at 74:11-13, meaning each inquiry would be individualized and fact-intensive.

Thus, for every proposed class member, the factfinder would have to weigh all of the individualized economic factors that affect that ticket's price to determine whether that price included an overcharge caused solely by the NEA. This evidence would include the numerous route-specific, transaction-specific, and passenger-specific factors described above. *See* disc. *supra* at 26-29; Johnson Rpt. ¶¶ 48-68. The fact that these issues would need to be individually adjudicated for over 18 million itineraries makes class treatment unmanageable, no doubt explaining why Plaintiff neglected to provide a trial plan with her motion. *See* Fed. R. Civ.

P. 23(c)(1)(A) advisory comm. note to 2003 amends. ("A critical need is to determine how the case will be tried."); Manual for Complex Litigation (Fourth) §§ 21.141-142 (2024) (trial plans help identify the "nature and extent of the individualized proof required"); *Candelaria v. Conopco, Inc.*, 2025 WL 1826454, at *10-11 (E.D.N.Y. July 2, 2025) ("Plaintiff's proposed trial plan, or lack thereof, underscores" how unmanageable the case would be if certified).

Courts find superiority lacking in cases that are more manageable than this one would be. For example, the Southern District of New York denied certification for a proposed class involving "analysis of the impact of the conspiracy on thousands of different styles of clothing." *Kendler v. Fed. Dep't Stores, Inc.*, 88 F.R.D. 688, 694-96 (S.D.N.Y. 1981). Here, Plaintiff's proposed class spans over *18 million* itineraries, all presenting numerous individualized inquiries Defendants are entitled to examine. Those types of "significant individualized inquiries regarding both injury and damages" rule out a class action as the superior method. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 144-45 (D.D.C. 2017); *N.J. Carpenters Health Fund v. Residential Cap., LLC*, 272 F.R.D. 160, 170 (S.D.N.Y. 2011) ("[The] necessity of hearing . . . individualized evidence . . . defeats the requisite superiority of class treatment.").

## IV. PLAINTIFF CANNOT ESTABLISH STANDING, TYPICALITY, OR ADEQUACY

### A. Plaintiff Has Failed To Establish Article III Standing

Independent of the Rule 23 factors, the Court should deny the Motion and dismiss Plaintiff's claim because she has not demonstrated Article III injury. To obtain class certification and avoid dismissal of her claim, a proposed class representative must establish Article III standing, including the requirement that she suffered an injury in fact that is fairly traceable to the challenged conduct. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) (a court lacks subject matter jurisdiction absent Article III standing and must dismiss); *Won v. Amazon.com Servs. LLC*, 807 F. Supp. 3d

178, 184-85 (E.D.N.Y. 2025) (similar). That, in turn, requires the proposed class representative to show that the complained-of conduct "personally" injured her, "not that injury has been suffered by other, unidentified members of the class." *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982); *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008).

The injury in fact must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). *TransUnion* holds that a statutory violation alone is not an injury in fact; plaintiffs must show "concrete injury even in the context of a statutory violation." *Id.* at 426-27; *see also Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021). Thus, Plaintiff cannot rely on Judge Sorokin's finding that the NEA violated Section 1 of the Sherman Act to establish Article III standing. Instead, to show injury here, Plaintiff must prove that she was *actually* harmed by the NEA. *See Brown v. Nat'l Football League, Inc.*, 825 F. Supp. 3d 265, 273 (S.D.N.Y. 2026); *Mahaffey v. Detroit Newspaper Agency*, 969 F. Supp. 446, 450 (E.D. Mich. 1997) ("[I]njury in fact does not automatically follow from the existence of an antitrust violation such as an output restriction."). She has not done so.

Plaintiff relies entirely on Schwartz's model to establish harm to herself and the proposed class. That model, however, *excludes* all tickets Plaintiff purchased during the Proposed Class Period.[14] *See* Johnson Rpt. ¶¶ 12, 124-26, 171, Ex. 30; Bernheim Rpt. ¶¶ 28, 76, 78-83, 212-15 & Tbl. 21. Thus, even if the Court accepted Schwartz's model (despite its fatal flaws), Plaintiff has offered *no* evidence of her own injury. Instead, the only methodology she proffers is one that, by its own terms, cannot generate a but-for fare for any ticket she bought, and she has put forward no

[14] Schwartz excluded Plaintiff's purchases because they (1) were purchased with redeemed points or credit, (2) contain "open-jaw" itineraries that return to an airport that is different from the airport of departure, (3) contain "destination open-jaw" itineraries that have a different outbound destination airport than the inbound origin airport, or (4) had a coupon missing from the data as a result of an exchange. *See* Johnson Rpt. ¶¶ 12, 126, Ex. 30; Schwartz Rpt. App'x C ¶¶ 5, 7-8.

alternative means of showing she was injured. *See* Ex. 43, Buehler Dep. (2025) at 89:15-90:16. Schwartz's exclusions also reveal why: the features of her purchases are precisely the types of transaction-specific characteristics that his model cannot price. *See* Bernheim Rpt. ¶¶ 217 ("[Plaintiff's expert's] model is not designed to capture the process of fare determination for tickets purchased with reward points, for tickets purchased for $0, or for open-jaw itineraries."); Johnson Rpt. ¶ 171. Plaintiff therefore has not carried her burden of establishing injury in fact.

Moreover, even if Schwartz's model were accepted (it should not be), the model proves that Plaintiff was *not* harmed. When Schwartz's model is allowed to estimate a separate effect for each route, it does not show a statistically significant overcharge on the Boston-Fort Lauderdale route that Plaintiff flew. *See* Johnson Rpt., Ex. 16. In fact, the model shows an *undercharge* on the Boston-Fort Lauderdale route during the quarters when Plaintiff purchased her tickets, meaning fares on that route were *lower* during the NEA than they otherwise would have been. Johnson Rpt. ¶ 105, Ex. 20. As for the remaining route between Boston and Miami, it is impossible for Schwartz's model to estimate any route-specific overcharge. His model estimates a fare effect by comparing how fares on a route changed from a pre-NEA benchmark period to the Proposed Class Period against the corresponding change on non-NEA routes. Schwartz Rpt. ¶¶ 109-110, 114. But JetBlue did not operate BOS-MIA pre-NEA, so there is no pre-NEA benchmark period. Johnson Rpt. ¶¶ 97 & n.198. Plaintiff therefore has not established that the NEA caused her to pay an artificially inflated fare during the Proposed Class Period and thus cannot establish injury.

In sum, Plaintiff has not demonstrated Article III injury, so the Court must deny the Motion and dismiss her claim.[15] *See Cent. States*, 433 F.3d at 198; *Won*, 807 F. Supp. 3d at 184-85.

---

[15] Plaintiff does not show that the other Named Plaintiffs who are not proposed class representatives suffered an injury. During the Proposed Class Period, those plaintiffs did not purchase a ticket for any JetBlue or American flight to or from Boston. *See* Ex. 44, Ex. 1 to

### B. Plaintiff Is Not Typical Of The Putative Class

To satisfy the typicality requirement, Plaintiff must establish that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Digit. Music*, 321 F.R.D. at 87. For the same reasons that Plaintiff has failed to establish Article III standing, it is clear that she would be "subject to unique defenses which threaten to become the focus of the litigation," defeating typicality. *See id*. Plaintiff purchased itineraries bought with redeemed points and credit, "open jaw" itineraries on which the outbound arrival airport is different from the inbound departure airport, and an exchanged itinerary, *from JetBlue only*. Johnson Rpt. Ex. 30. Schwartz "confirms the problem" of Plaintiff's atypicality by excluding 1.7 million of these types of itineraries from his regression models. *See* Schwartz Rpt. App'x C, ¶¶ 6-7; *see also Simon & Simon, PC v. Align Tech., Inc.*, 350 F.R.D. 565, 575 (N.D. Cal. 2023). Because Plaintiff is not typical of other JetBlue purchasers or of millions of putative class members who purchased from American, she cannot satisfy typicality.

### C. Plaintiff Is An Inadequate Class Representative

To satisfy the adequacy requirement, a proposed class representative must have "an interest in vigorously pursuing the claims of the class" and have "no interests antagonistic to the interests of the other class members." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016). Because Plaintiff lacks Article III standing (and antitrust standing) and waived her right to bring this class action (*see* Part V below), she is a *per se* inadequate representative. *See In re Lipitor Antitrust Litig.*, 2026 WL 2350732, at *1, 6 (3d Cir. Aug. 13, 2026) (named plaintiffs lacked antitrust standing and were inadequate representatives).

---

Berger's Resp. to Interrog. No. 1; Ex. 45, Ex. 1 to Frankel's Resp. to Interrog. No. 1; Ex. 46, Ex. 1 to Guerin's Resp. to Interrog. No. 1. It is undisputed they did not suffer an injury in fact and lack Article III standing.

In fact, applying Schwartz's model at the route level shows that Plaintiff *underpaid* for a ticket, meaning the NEA benefited her, creating a "fundamental conflict" that "undermines" Plaintiff's "incentive to pursue the class's claim[s]." Johnson Rpt. Ex. 30; *Aluminum Warehousing*, 336 F.R.D. at 39-40. Moreover, because she only took JetBlue flights, Plaintiff also lacks the personal stake to vigorously establish injury to American passengers. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 438 (S.D.N.Y. 2019).

## V. PLAINTIFF WAIVED THE RIGHT TO BRING THIS CLASS ACTION

The Court should deny the Motion for the independent reason that Plaintiff waived her right to bring a class action. Courts routinely deny class certification where, as here, the proposed class representative assented to a class action waiver. *See Thomas v. AAM Holding Corp.*, 2025 WL 2617450, at *1, 4 (S.D.N.Y. Aug. 26, 2025) (striking class allegations where plaintiff assented to a class action waiver); *Bombin v. Southwest Airlines Co.*, 2023 WL 5832166, at *15 (E.D. Pa. Sep. 7, 2023) (denying certification based on class action waiver incorporated into airline CoC).

This Court previously declined to dismiss or strike the class allegations at the pleading stage, determining that "[D]efendants' class action waiver affirmative defense therefore does not appear on the face of the complaint, and the Court defers consideration of it." ECF No. 76 at 9. Following the completion of discovery, this issue is now ripe for determination.

Like most U.S. airlines, both JetBlue and American include class action waivers in their contracts or conditions of carriage ("CoC") that are incorporated into every ticket sold. There is no dispute that JetBlue's and American's CoCs contained express class action waivers during the Proposed Class Period. *See* Ex. 3 to Decl. of Jason Burt, Gurdoglanyan Decl. ¶¶ 10-12 & Exs. 2-4; Ex. 4 to Decl. of Jason Burt, Grantvedt Decl. ¶¶ 11-13 & Exs. 2-3. When passengers purchase tickets from either airline, they waive their ability to bring class action claims against the airline for alleged damages stemming from the purchase. The FAA's regulations expressly permit airlines

to include such restrictions, *see* 14 C.F.R. § 253.5(b)(2), and courts have uniformly enforced them. *See, e.g.*, *Hahn v. JetBlue Airways Corp.*, 2022 WL 22908406, at *5-6 (E.D.N.Y. Aug. 25, 2022) (enforcing JetBlue's CoC class action waiver); *Hekmat v. TSA*, 237 F. Supp. 3d 427, 434 (S.D.N.Y. 2017) (enforcing JetBlue's CoC class action waiver); *Cleary v. Am. Airlines, Inc.*, 2022 WL 5320126, at *7 (N.D. Tex. July 22, 2022) (enforcing American's CoC class action waiver).

In *Hahn*, while noting that existence of a contractual waiver is an affirmative defense, the court upheld JetBlue's class action waiver as adequately disclosed and rejected arguments that it was unconscionable or barred by New York law. 2022 WL 22908406, at *5-9. Although the *Hahn* complaint challenged the CoC, this case is past the pleading stage and the Court is no longer confined to the allegations of the complaint, so *Hahn*'s reasoning applies with equal force here. Plaintiff alleges she purchased only JetBlue tickets, and, as in *Hahn*, there is no dispute she agreed to the JetBlue waiver with every purchase. *See* Gurdoglanyan Decl. ¶¶ 7-12; *see also* Ex. 43, Buehler Dep. (2025) at 136:21-137:13, 149:18-24.[16] Plaintiff is bound by those waivers.

JetBlue's class waiver bars "any lawsuit brought against [JetBlue] . . . related to this Contract of Carriage" or a passenger's "ticket." Gurdoglanyan Decl. ¶ 11 & Ex. 2 at 59, Ex. 3 at 58, Ex. 4 at 59. Such a suit "will be brought only in an individual capacity and may not be brought, alleged or asserted as part of a class action proceeding." *Id.* The use of the broad phrases "any lawsuit" and "related to," *id.*, makes it "presumptively applicable to disputes involving matters going beyond the interpretation or enforcement of particular provisions of the contract," *JLM*

[16] Courts in the Second Circuit have found such contracts enforceable "when [the] user is encouraged by the design and content of the . . . website and the agreement's webpage to examine the terms clearly available through hyperlinkage." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 401 (E.D.N.Y. 2015); *see Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77-79 (2d Cir. 2017). To the extent Plaintiff argues that whether each putative class member assented to the CoC is a question of fact, analyzing each member's intent and understanding of the CoC would require numerous individualized inquiries predominating over any common questions of fact.

*Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004). Moreover, because Plaintiff asserts she "could not have suffered these damages if [she] had not entered into . . . contracts with" JetBlue, the class waiver applies to her antitrust claim. *Id.* at 175 (holding same even if the alleged conspiracy was "formed *independently* of the specific contractual relations between the parties").

The JetBlue class action waiver also bars Plaintiff's claim against American. Under New York law, a non-signatory to a class action waiver, such as American with respect to JetBlue's waiver, can invoke it under principles of equitable estoppel where (1) the signatory's claims are intertwined with the underlying agreement, and (2) there is a close relationship between the non-signatory defendant and a signatory to the contract. *See Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281, 286-88 (E.D.N.Y. 2014).[17] Both elements are satisfied here.[18] *First*, Plaintiff's claim arises directly from her JetBlue ticket purchases, which are governed by the CoCs. *See JLM Indus.*, 387 F.3d at 178 (holding that the first prong of equitable estoppel was met where it was "the fact of [the plaintiff's] entry into the [agreements] containing allegedly inflated price terms that [gave] rise to the claimed [antitrust] injury"). *Second*, Plaintiff alleges the NEA was a

[17] The question whether equitable estoppel binds a non-signatory to a contract is governed by the laws of the state designated by that contract—i.e., New York, which governs the JetBlue CoC. *See Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 396 (S.D.N.Y. 2019).

[18] In previously expressing skepticism at the motion to dismiss stage that equitable estoppel would apply, the Court stated that "equitable estoppel is an 'extraordinary remedy' to be 'invoked sparingly and only under exceptional circumstances.'" ECF No. 76 at 9 n.8 (quoting *Pulver v. Dougherty*, 58 A.D.3d 978, 979 (3d Dep't 2009) and *Gross v. N.Y.C. Health & Hosps. Corp.*, 122 A.D.2d 793, 794 (2d Dep't 1986)). The *Pulver* and *Gross* courts used this language to describe the doctrine of equitable estoppel in a different context—*i.e.*, an attempt by one party to preclude a counterparty "from asserting [a] statute of limitations defense," which required the party to show that it was "prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the other." *Pulver*, 58 A.D.3d at 979-80; *Gross*, 122 A.D.2d at 794. Courts apply this doctrine "narrow[ly]" because it could "undermine the purpose of statutes of limitations of allowing potential defendants predictability and ultimate repose." *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 172 (S.D.N.Y. 2019). Those concerns are not present here.

conspiracy between Defendants, an announced purported "quasi-merger" and subject of a federal enforcement action, media coverage, and DOT regulatory proceedings. TCAC ¶¶ 49, 51. Plaintiff cannot both allege Defendants function as one airline for purposes of her antitrust claim but deny that relationship for waiver purposes. *Glover v. Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 450 (S.D.N.Y. 2022) (finding "a sufficiently close relationship" where "the facts forming the basis of the claims are in large part pleaded against [the signatory and nonsignatory] as a single unit").[19]

Plaintiff purchased tickets governed by JetBlue's CoC, which contains a class action waiver; her claim arises from those purchases; and American, JetBlue's alleged co-venturer, may invoke it under equitable estoppel. Otherwise, the waiver would bar a class action against JetBlue while permitting one against American when the suit rests on the JetBlue purchases governed by the waiver. Equitable estoppel prevents this result. Because Plaintiff agreed to a class action waiver when she purchased the tickets that she claims injured her, and American may enforce that waiver, class certification is inappropriate against either Defendant.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion and dismiss Plaintiff's claim.

---

[19] The Court previously cited *Ross v. American Express Co*., 547 F.3d 137, 148 (2d Cir. 2008), for the proposition that "a plaintiff who bought a JetBlue flight on JetBlue's website did not seem to have any 'reason . . . to believe that he (or she) was entering into any kind of relationship with [American],' another airline 'ostensibly competing' with JetBlue." ECF No. 76 at 9 n.8. But unlike here, where Plaintiff alleges the NEA was a publicly announced purported "quasi-merger" garnering national media coverage, there were no allegations in *Ross* concerning the plaintiffs' or the public's perception of any non-competitive relationship between the defendant issuers. Equitable estoppel here is "not a high bar." *Desarrolladora La Ribera v. Anderson*, 2024 WL 5186600, at *23 (S.D.N.Y. Dec. 20, 2024). Plaintiff's claim as a customer for air travel is necessarily "intertwined" with the CoC, and Plaintiff treats Defendants as a "single unit" in her pleadings; she "cannot now escape the consequences of those allegations" to avoid class waiver. *Breier v. Cong. Casa Grande*, 2026 WL 2837782, at *8 (S.D.N.Y. Sep. 22, 2026).

Dated: October 9, 2026


**LATHAM & WATKINS LLP**

Marguerite M. Sullivan (*pro hac vice*)
Jason R. Burt
Seung Wan Paik (*pro hac vice*)
Alexandra Clark (*pro hac vice*)
Kimon Triantafyllou (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Email: marguerite.sullivan@lw.com
jason.burt@lw.com
andrew.paik@lw.com
alexandra.clark@lw.com
kimon.triantafyllou@lw.com

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Ste 2800
Chicago, IL 60611
Telephone: 312-876-7700
Email: sean.berkowitz@lw.com


*Attorneys for Defendant*
*American Airlines Group Inc.*


**ALLEN OVERY SHEARMAN STERLING US LLP**

Richard Schwed
Matthew L. Craner
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Email: rschwed@aoshearman.com
matthew.craner@aoshearman.com

Brian Hauser (*pro hac vice*)
Grace Song
1101 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 508-8005
Email: brian.hauser@aoshearman.com
grace.song@aoshearman.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

**CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT**

I hereby certify that the foregoing document complies with Judge Donnelly's Court Order dated June 24, 2024, limit of 50 pages.

Marguerite M. Sullivan